## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

**CIVIL ACTION NO. 08-11955-DJC**

**STACEY HIGHTOWER,**
    **Plaintiff**

**v.**

**CITY OF BOSTON and BOSTON POLICE COMMISSIONER EDWARD DAVIS**
    **Defendants**

---

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS, CITY OF BOSTON AND BOSTON POLICE COMMISSIONER EDWARD DAVIS'S CROSS-MOTION FOR SUMMARY JUDGMENT *AND* OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

William F. Sinnott
Corporation Counsel

Lisa Skehill Maki, BBO No. 675344
Ian D. Prior, BBO No. 655704
Assistant Corporation Counsel
City of Boston Law Department
Room 615, City Hall
Boston, MA 02201
(617) 635-4022 (Maki)
(617) 635-4017 (Prior)
Lisa.Maki@cityofboston.gov
Ian.Prior@cityofboston.gov

## <u>TABLE OF CONTENTS</u>

Table of Contents……………………………………………………………………………ii-iii

Table of Authorities………………………………………………………………..……iv-vii

Summary of the Case………………………………………………………………....…1-2

Summary of the Argument……………………….…………………………………….2-3

Factual Background…………………………………………………………..………3-7

Summary Judgment Standard………………………………………………………..7

Argument……………………………………………………………………………8-33

   I. THE PLAINTIFF LACKS STANDING TO PURSUE HER CLAIMS AGAINST THE
     DEFENDANTS……………………………………………………………………8-15

        1.  The Plaintiff Has Not Suffered A Constitutional Injury In Fact……….…10

        2.  The Supreme Court's Decision In *McDonald* Announced A New And
           Unexpected Rule Of Law.........................................................................12

        3.  The History Of Second Amendment Jurisprudence And Its Purpose
           Counsel Against Applying *McDonald* Retroactively…………………...13

        4.  Retroactive Application Will Give Rise To A Substantial Inequity…......13

        5.  If *McDonald* Is Applied Prospectively, The Plaintiff Cannot Show Injury
           In Fact As A Result Of A Policy, Practice, Or Custom…………..……...14

        6.  The Plaintiff Is Not Suffering From An Ongoing Constitutional
           Injury…………..……………………………………………………………14

     II.     THE PLAINTIFF'S CLAIMS AGAINST THE DEFENDANTS ARE NOT
           YET RIPE FOR REVIEW……………………………………...…...…15-16

     III.    EVEN IF PLAINTIFF HAD STANDING TO CHALLENGE THE
           REVOCATION, THE REVOCATION DID NOT AMOUNT TO A
           SECOND AMENDMENT VIOLATION UNDER THE SUPREME
           COURT'S   HOLDINGS   IN   *HELLER*   AND   *MCDONALD*
           …..……………………………………………………..……...……16-22

1. The Revocation Of Plaintiff's Right To Carry A Weapon In Public Did Not Infringe Upon Her Second Amendment Right To Bear Arms………..………………………………………………………………17

2. The Revocation Of Plaintiff's Unrestricted Class A License Did Not Violate Her Second Amendment *Right* To Bear Arms Because She Has Alternative Means Of Possessing A Firearm Within Her Home………………………………….…………...………...21-22

IV. THE REVOCATION OF PLAINTIFF'S UNRESTRICTED CLASS A LICENSE PASSES CONSTITUTIONAL SCRUTINY……………....23-28

V. THE REVOCATION OF PLAINTIFF'S UNRESTRICTED CLASS LICENSE A SATISFIED DUE PROCESS…………..…….…………29-33

1. Procedural Due Process..………………………………………...…29

2. Substantive Due process…………………………...……………..…..32

VI. THE REVOCATION OF PLAINTIFF'S UNRESTRICTED CLASS A LICENSE DID NOT VIOLATE THE EQUAL PROTECTION CLAUSE…..…………………………………………………..…...33

Conclusion…………………………………...…………………………………34-35

## TABLE OF AUTHORITIES

**CASES**

*Adams v. Watson*, 10 F.3d 915 (1st Cir. 1993) ................................................................ 9

*Bach v. Pataki*, 289 F.Supp.2d 217 (N.D.N.Y. 2003). ................................................. 34

*Board of Regents v. Roth*, 408 U.S. 564 (1972)............................................................. 29

*Bryan County v. Brown*, 520 U.S. 397 (1997). ............................................................. 10

*Buchanan v. Maine*, 469 F.3d 158 (1st Cir. 2006)......................................................... 7

*Carroll v. Xerox Corp.*, 294 F.3d 231 (1st Cir. 2002) ................................................... 7

*Catucci v. Benedetti*, 27 Mass.L.Rptr. 385 (Mass.Super.Ct. 2010)............................... 25

*Charbonier v. Chief of Police of Melrose*, 66 Mass.App.Ct. 1105 (2006) ................... 30

*Chevron Oil Co. v. Huson*, 404 U.S. 97 (1971). ........................................................... 11

*Chongris v. Board of Appeals of Andover*, 811 F.2d 36 (1st Cir. 1987)................... 29, 30

*City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989).................................................... 10

*City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 440 (1985) ...................... 34

*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) ............................................... 8, 9, 14

*Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985); ...................................... 29

*Commonwealth v. Iglesia*, 403 Mass. 132 (1988) ......................................................... 20

*Commonwealth v. Lindsey*, 396 Mass. 840 (1986) ....................................................... 20

*Crowe v. Bolduc*, 365 F.3d 86 (1st Cir. 2004) .............................................................. 11

*DePoutot v. Raffaelly*, 424 F.3d 112 (1st Cir. 2005). ................................................... 33

*District of Columbia v. Heller*, 554 U.S. 570 (2008).................. 1, 2, 12, 13, 16-20, 23, 26, 27, 28

*Ernst & Young v. Depositors Economic Protection Corp.*, 45 F.3d 530 (1st Cir.1995) .............. 15

*Federal Deposit Ins. Corp. v. Mallen*, 486 U.S. 230 (1988) ........................................ 31

*Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.*, 528 U.S. 167 (2000) ............ 9

*FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215 (1990) .................................................................... 8

*Gastronomical Workers Union Local 610 & Metropolitan Hotel Ass'n Pension Fund v. Dorado Beach Hotel Corp.*, 617 F.3d 54 (1st Cir. 2010) ........................................................................ 15

*Golden v. Zwickler*, 394 U.S. 103 (1969). .................................................................................... 16

*Gonzalez v. Village of West Milwaukee*, 2010 WL1904977 (E.D. Wis. May 11, 2010) ............. 17

*Grendel's Den, Inc. v. Goodwin,* 662 F.2d 88 (1st Cir. 1981) ....................................................... 30

*Hain v. DeLeo*, 2010 WL 4514315 (M.D. Pa. Nov. 2, 2010) ....................................................... 31

*Harper v. Va. Dep't of Tax*, 509 U.S. 86 (1993)…………………………………………………11

*Herwins v. City of Revere*, 163 F.3d 15 (1st Cir. 1998) ............................................................... 31

*Huddleston v. United States*, 415 U.S. 814 (1974) ...................................................................... 25

*Hudson v. Palmer*, 468 U.S. 517, 532 (1984)……………………………………….............29

*Kaplan v. Board of Public Accountancy*, 452 Mass. 1026 (2008) ......................................... 27, 33

*Kentucky v. Graham*, 473 U.S. 159 (1985)…………………………………………………10

*Los Angeles County v. Humphries*, --- U.S. ---, 131 S.Ct. 447 (2010)…………………………..10

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992). .................................................................... 9

*MacNutt v. Police Commissioner of Boston*, 30 Mass.App.Ct. 632 (1991). ................................. 7

*Maymi v. P.R. Ports Auth.*, 515 F.3d 20 (1st Cir. 2008). .............................................................. 33

*McDonald v. City of Chicago*, --- U.S. ---, 130 S.Ct. 3020 (2010).. 1, 2, 7, 9-14, 16, 17, 19, 22, 23

*Medina v. Rudman*, 545 F.2d 244 (1st Cir.1976) ................................................................... 29, 30

*Miller v. Texas*, 153 U.S. 535 (1894) .......................................................................................... 12

*Monell v. Dep't of Social Services*, 436 U.S. 658 (1978) ............................................................ 10

*Northeastern Fla. Chapter of the Assoc. Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656 (1993) ........................................................................................................................ 8

*Number Three Lounge, Inc. v. Alcoholic Beverages Control Comm'n*, 7 Mass.App.Ct. 301 (1979) .................................................................................................................................. 27, 33

*Oklahoma City v. Tuttle*, 471 U.S. 808 (1985) .......................................................... 10

*O'Neill v. Town of Nantucket*, 545 F.Supp. 449 (D.Mass.1982).................................. 30

*Pagan v. Calderon*, 448 F.3d 16 (1st Cir. 2006).......................................................... 32

*Parratt v. Taylor,* 451 U.S. 527 (1981)……….…………………………………...………….29

*Patel v. Midland Memorial Hospital and Medical Center*, 298 F.3d 333 (5th Cir. 2002)…...…32

*Pease v. Burns*,  719 F.Supp.2d 143 (D.Mass. 2010) .................................................... 31

*Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986).................................................... 10

*Peruta v. County of San Diego*, 2010 WL 5137137 (S.D. Cal. Dec. 10, 2010) ......... 17, 23, 24, 28

*Presser v. Illinois*, 116 U.S. 252 (1886) ...................................................................... 12

*Rochin v. California*, 342 U.S. 165 (1952). .................................................................. 32

*Romer v. Evans*, 517 U.S. 620 (1996)........................................................................... 34

*Ruggiero v. Police Commissioner of Boston*, 18 Mass.App.Ct. 256 (1984).................... 25, 30, 31

*Ruston v. Town Bd. for Town of Skaneateles*, 610 F.3d 55 (2d Cir. 2010).................... 33

*Santiago v. Fenton*, 891 F.2d 373 (1989) .................................................................... 10

*Schiller v. Strangis*, 540 F. Supp. 605 (D. Mass. 1982).................................................. 32

*Seaboard Sur. Co. v. Town of Greenfield*, 370 F.3d 215 (1st Cir. 2004) ....................... 7

*Sims v. United States*, 963 A.2d 147 (D.C. 2008).......................................................... 19

*Summers v. Earth Island Institute*, --- U.S. ---, 129 S.Ct. 1142 (2009) ........................ 8

*Texas v. United States*, 523 U.S. 296 (1998) ................................................................ 15

*United States v. Chester*, 628 F.3d 673 (4th Cir. 2010).................................................. 26

*United States v. Cruikshank*, 92 U.S. 542 (1875) ........................................................ 12

*United States v. Hart*, 726 F.Supp.2d 56, 60 (D. Mass. 2010) .................................... 17

*United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010);.......................................... 16, 17, 23, 24

*United States v. Masciandaro*, --- F.3d ----, 2011 WL 1053618 (4th Cir. 2011) . 19, 20, 23, 24, 28

*United States v. Miller*, 604 F.Supp.2d. 1162, 1169-72 (W.D. Tenn. 2009)......................23,24

*United States v. Reese*, 627 F.3d 792 (10th Cir. 2010);.................................................... 16, 22, 23

*United States v. Salerno*, 481 U.S. 739 (1987) .......................................................................... 28

*United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010).................................................................. 16

*United States v. Williams*, 616 F.3d 685 (7th Cir. 2010);...................................................... 23, 24

*Warth v. Seldin*, 422 U.S. 490 (1975). ........................................................................................ 8

*Wetherbee v. Costerus*, 13 Mass.L.Rptr. 159 (Mass.Super.Ct. 2001) .......................................... 25

*Whitmore v. Arkansas*, 495 U.S. 149 (1990) ................................................................................ 9

*Williams v. State*, 417 Md. 479, 10 A.3d 1167 (Md. 2011)........................................................ 19

*Zinermon v. Burch*, 494 U.S. 113 (1990)..................................................................................... 31

## STATUTES

42 United States Code, Section 1983............................................................ 1, 2, 10, 12, 13, 14, 33

Massachusetts General Laws, Chapter 140, Section 129 ...................................................... 24, 25

Massachusetts General Laws, Chapter 140, Section 129B................................................. 4, 22, 26

Massachusetts General Laws, Chapter 140, Section 129D............................................................ 6

Massachusetts General Laws, Chapter 140, Section 131 ........ 1-4, 6, 17, 20, 22, 25, 26, 29, 30, 31

## RULES

Federal Rules of Civil Procedure, 56(a). ....................................................................................... 7

## OTHER AUTHORITIES

Tina Mehr & Adam Winkler, *The Standardless Second Amendment*, The American
Constitutional Society for Law and Policy (October, 2010).……………………………………..28

**SUMMARY OF THE CASE**

The Plaintiff, Stacey Hightower ("Plaintiff") commenced this action against the City of Boston ("City") and the Boston Police Commissioner Edward Davis ("Commissioner Davis") (collectively, the "City Defendants") pursuant to 42 U.S.C. § 1983 seeking declaratory and injunctive relief on the grounds that the City Defendants enforced an unconstitutional regulatory scheme that violated her Second Amendment right to carry a firearm in public.  The Second Amendment, as announced by the Supreme Court's landmark decision in *District of Columbia v. Heller*, 554 U.S. 570, 628 (2008), held that the Second Amendment protects the right of individuals to possess a firearm within their home for self defense.  Two years later, in *McDonald v. City of Chicago*, --- U.S. ---, 130 S.Ct. 3020, 3050 (2010), the Supreme Court held that the Second Amendment applies to the states through the Fourteenth Amendment.

Plaintiff challenges the constitutionality of M.G.L. c. 140, § 131 as it allows for the licensing authority to revoke an applicant's firearms license based on a determination of "suitability."  Plaintiff also challenges M.G.L. c. 140, § 131 as unconstitutional inasmuch as it amounts to an unconstitutional prior restraint on the possession of firearms.  Plaintiff further avers that M.G.L. c. 140, § 131 does not provide adequate due process and violates the Equal Protection Clause.  In doing so, Plaintiff seeks for this Court to considerably expand the parameters of the Second Amendment as announced in both *Heller* and *McDonald* from the right to possess a handgun in one's home to the right to carry a handgun in public.

Plaintiff avers that the City Defendants deprived her of her Second Amendment right to carry a firearm in public when they revoked her license based on their determination that she had provided false information on an internal Boston Police Department firearm license renewal form.  Plaintiff further contends that the revocation of her license was in violation of her

substantive and procedural due process rights as well as her rights under the Equal Protection Clause.

## <u>SUMMARY OF THE ARGUMENT</u>

Plaintiff lacks standing to bring this cause of action because, at the time her firearm license was revoked, the Supreme Court had yet to hold in *McDonald* that the Second Amendment applied to the states through the due process clause of the Fourteenth Amendment. Thus, the revocation of her license did not run afoul of her Second Amendment right. Plaintiff is therefore unable to make the requisite showing of an unconstitutional custom, policy, or practice as required to bring a claim under 42 U.S.C. § 1983 against the City. To date, Plaintiff has failed to reapply for any form of license to possess a firearm. As a result, Plaintiff's claims are not ripe for review.

Furthermore, Plaintiff did not suffer the deprivation of her Second Amendment right because neither the Supreme Court, nor any court since the Supreme Court's seminal decisions in *Heller* and *McDonald*, has recognized that the Second Amendment guarantees the right to carry a firearm in public. Even if this Court were to hold that the Second Amendment guarantees the Plaintiff the right to carry a firearm in public, the revocation of her unrestricted Class A firearm license did not severely limit that right and passes constitutional scrutiny.

Additionally, Plaintiff was afforded adequate post-deprivation due process after her license was revoked because M.G.L. c. 140, § 131(f) allows an individual aggrieved by a firearm revocation the right to appeal to a district court for review. Plaintiff's substantive due process rights were not violated because the revocation of her license did not rise to the level of "conscience shocking" action because Massachusetts courts have consistently affirmed revocations of various other types of licenses when an individual provides false information on

licensing forms.  Finally, Plaintiff's equal protection claim fails because she has not shown that similarly situated individuals, who were found to have provided inaccurate information on firearm licensing forms, did not have their license revoked.

## FACTUAL BACKGROUND[1]

Plaintiff, Stacey Hightower, is a Boston resident and former Boston police officer.  *See Statement of Facts* at ¶¶ 39, 59 ("*SOF* at ¶ __").  From approximately 2000–2008, she possessed an unrestricted Class A firearm license.  *SOF* at ¶ 60.  Under M.G.L. c. 140, ¶ 131(a), a Class A license permits individuals to possess a firearm in his or her home as well as carry a firearm, openly or concealed, in public.[2]  M.G.L. c. 140, § 131.  A Class A firearm license, "entitle[s] a holder thereof to purchase, rent, lease, borrow, possess and carry: (i) firearms, including large capacity firearms, and feeding devices and ammunition therefor, for all lawful purposes, subject to such restrictions relative to the possession, use or carrying of firearms as the licensing authority deems proper; and (ii) rifles and shotguns, including large capacity weapons, and feeding devices and ammunition therefor, for all lawful purposes; provided, however, that the licensing authority may impose such restrictions relative to the possession, use or carrying of large capacity rifles and shotguns as it deems proper . . .."  *Id*.  Plaintiff's Class A license was not restricted in any way; meaning, she was licensed to both possess a firearm in her home and carry it concealed in public.  *SOF* at ¶ 72.

An unrestricted Class A license is the least restrictive firearm license a Boston resident can obtain.  *SOF* ¶ 82, 83.  A Class B license allows licensed individuals to "purchase, rent,

---

[1]     The City Defendants incorporate by reference the facts set forth in the *City Defendant's Local Rule 56.1 Statement of Facts.*

[2]     Boston police officers are required to be licensed to possess a personal firearm.  *SOF* at ¶ 40.  They do not have to be licensed to possess a department-issued firearm.  *Id*.

lease, borrow, possess and carry: (i) non-large capacity firearms and feeding devices and ammunition therefor, for all lawful purposes, subject to such restrictions relative to the possession, use or carrying of such firearm as the licensing authority deems proper; provided, however, that *a Class B license shall not entitle the holder thereof to carry or possess a loaded firearm in a concealed manner in any public way or place*; and provided further, that a Class B license shall not entitle the holder thereof to possess a large capacity firearm. . . ; M.G.L. c. 140, § 131(b) (emphasis added).

Both Class A and Class B licenses may be issued if the licensing authority determines that the applicant is not statutorily disqualified, (*see* firearm identification card disqualifications, *infra*), is a "suitable person . . . and has good reason to fear injury to his person or property." M.G.L. c. 140, § 131(d).  In addition to Class A or Class B firearm license, an individual may possess a firearm[3] through a firearm identification card which *shall* issue unless the applicant is (1) a convicted felon; (2) mentally ill; (3) under treatment for drug or alcohol addiction; (4) less than fifteen years of age; (6) between fifteen years of age and eighteen years of age and without parental consent; (7) an alien; (8) the subject of an outstanding restraining order; or (9) an outstanding arrest warrant.  *See* M.G.L. c. 140, §§, 129B, 131.

In August 2008, Plaintiff resigned from the Boston Police Department ("BPD").  *SOF* at ¶ 73.  In July 2008, shortly before her resignation, Plaintiff applied to renew her Class A license which had expired four months earlier.  *SOF* at ¶ 46.  Boston police officers are required to fill out a BPD "sworn only" Form GS-13 ("Form GS-13") to apply for or renew their license.  *SOF*

---

[3]    A firearm identification card does not allow for the possession of large capacity firearms, a non-large capacity firearm, or large capacity rifle.  M.G.L. c. 140, § 129B(6).  Essentially, a firearm identification card allows for the possession of a non-large capacity rifle or shotgun. M.G.L. c. 140, § 129B(2).

at ¶ 47.  The Form GS-13 requires police officers to answer "yes" or "no" as to whether he or she has internal affairs "pending charges" against them.  *Id.*  The question of "pending charges" asks whether a police officer is subject to an unresolved internal affairs investigation.  *SOF* at ¶ 48. Plaintiff answered "no" to that question.  *SOF* at ¶ 50.

At the time Plaintiff applied to renew her license, however, internal affairs charges had been pending against her since 2004.  *SOF* at ¶¶ 61-71.  In 2004, an arrestee complained to internal affairs that he had been assaulted at a police station after he was arrested.  *SOF* at ¶¶ 61-62.  Plaintiff had transported the complainant from the location of his arrest to the police station for booking.  *SOF* at ¶ 64.  Therefore, as part of the internal affairs investigation, Plaintiff was interviewed.  *SOF* at ¶¶ 62-64.  Plaintiff was found by internal affairs to have withheld information during her interview and to have neglected her duty during the incident.  *SOF* at ¶ 64.  Plaintiff was informed that she had been found to be in violation of BPD rules on or about November 4, 2005.  *SOF* at ¶ 68.  Plaintiff enlisted an attorney to negotiate the rules violations with the BPD.  *SOF* at ¶ 70.

When Plaintiff filled out the Form GS-13 in 2008, negotiations between the BPD and her attorney had been ongoing since 2005.  *SOF* at ¶¶ 61-71.  Because Plaintiff's discipline had yet to be resolved, the 2005 sustained rules violations against her were still pending in 2008.  *SOF* at ¶ 71.  Consequently, Plaintiff's answer of "no" to the Form GS-13 "charges pending" question was false.  *SOF* at ¶¶ 72-76.

Although the Form GS-13 is reviewed and approved by internal affairs, the inaccuracy in Plaintiff's application appears to have been initially overlooked.  *SOF* at ¶ 72.  When Plaintiff submitted her resignation in July 2008, however, internal affairs alerted the Police Commissioner's office that she had resigned without resolving the charges stemming from the

2004 incident.  *SOF* at ¶ 73.  In response, the Commissioner's office issued a department-wide "Personnel Order" stating that Plaintiff had resigned with charges pending.  *Id*.  Upon viewing the Commissioner's Personnel Order, the Licensing Commander reviewed Plaintiff's Form GS-13 again and discovered that she had failed to disclose the pending charges on her form.  *SOF* at ¶ 75.  The Licensing Commander then confirmed with internal affairs that Plaintiff indeed had charges pending when she submitted the Form GS-13 in July 2008.  *SOF* at ¶ 74.

The Licensing Commander then revoked Plaintiff's license pursuant to M.G.L. c. 140 § 131(f) by mailing her a revocation letter instructing her to surrender her firearm and firearm license without delay.  *SOF* at ¶ 77.  A firearm license may be revoked or suspended "upon the occurrence of any event that would have disqualified the holder from being issued such license or from having such license renewed. . .  or if it appears that the holder is no longer a suitable person to possess such license."  M.G.L. c.  140 § 131(f).  The Licensing Commander revoked Plaintiff's license because she had provided false information by answering "no" to the pending charges question on her Form GS-13.  *SOF* at ¶76.  Plaintiff surrendered her firearm license and firearm approximately one week of receiving the revocation letter.[4]  *SOF* at ¶ 77.

---

[4]      Upon revocation of a firearm license, a licensee must surrender his or her license and firearm to his or her local police department.  M.G.L. c. 140, § 129D.

After the revocation of her license, Plaintiff had a ninety day right of appeal pursuant to M.G.L. c. 140, § 131(f).[5]   The District Court reviews license revocations to ensure that the revocation was not arbitrary, capricious, or an abuse of discretion.   *MacNutt v. Police Commissioner of Boston,* 30 Mass.App.Ct. 632, 635-36 (1991).   Plaintiff did not exercise her right of appeal.   *SOF* at ¶ 54.   Additionally, Plaintiff has declined, for nearly three years now, to reapply for a different firearm license or firearm identification card, all of which would allow her to possess a firearm in her home for the purpose of self defense.   *SOF* at ¶¶ 55-58, 78.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a).   For summary judgment purposes, "'genuine' means that the evidence is such that a reasonable jury could return a verdict for the nonmoving party, and a 'material fact' is one which might affect the outcome of the suit under the governing law."   *Buchanan v. Maine,* 469 F.3d 158, 166 (1st Cir. 2006) (*quoting Seaboard Sur. Co. v. Town of Greenfield,* 370 F.3d 215, 218-19 (1st Cir. 2004)) (internal quotation marks omitted).   "Neither conclusory allegations [nor] improbable inferences are sufficient to defeat summary judgment."   *Carroll v. Xerox Corp.,* 294 F.3d 231, 236-37 (1st Cir. 2002) (citation and internal quotation marks omitted).   Within this

---

[5]      Any applicant or holder aggrieved by a denial, revocation or suspension of a license. . . may, within either 90 days after receiving notice of such denial, revocation or suspension or within 90 days after the expiration of the time limit during which the licensing authority is required to respond to the applicant, file a petition to obtain judicial review in the district court having jurisdiction in the city or town wherein the applicant filed for, or was issued, such license. A justice of such court, after a hearing, may direct that a license be issued or reinstated to the petitioner if such justice finds that there was no reasonable ground for denying, suspending or revoking such license and that the petitioner is not prohibited by law from possessing same. M.G.L. c. 140, § 131(f).

analytical framework, the Plaintiff's Motion for Summary Judgment must be denied and the City

Defendants are entitled to summary judgment on all counts in Plaintiff's Complaint.

## ARGUMENT[6]

## POINT I

### PLAINTIFF LACKS STANDING TO PURSUE HER
### CLAIMS AGAINST THE CITY DEFENDANTS.

The Court should deny Plaintiff's request for declaratory and injunctive relief because the

Plaintiff has failed to demonstrate an ongoing constitutional injury in fact and thus does not have

standing to challenge the City Defendants' pre-*McDonald* revocation of her license.

Standing is a component of Article III's "case and controversy" requirement and has been

described as perhaps the most important of the jurisdictional requirements of the federal courts.

*See FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990); *Summers v. Earth Island Institute*,

--- U.S. ---, 129 S.Ct. 1142, 1151 (2009).   To have standing, a plaintiff must demonstrate a

personal stake in the outcome of the case to "assure that concrete adverseness which sharpens the

presentation of issues" necessary for the proper resolution of constitutional questions.   *City of*

*Los Angeles v. Lyons*, 461 U.S. 95, 101, (1983) (quotations omitted).   "In essence the question of

standing is whether the litigant is entitled to have the court decide the merits of the dispute or of

particular issues." *See Warth v. Seldin*, 422 U.S. 490, 498 (1975).[7]

---

[6]     The City Defendants hereby adopt and incorporate in its entirety, the Commonwealth's
Opposition to Plaintiff's Motion for Summary Judgment and Cross-Motion for Summary
Judgment.

[7]     The requirement of standing is important to our democratic system as without such
limitations, "courts would be called upon to decide abstract questions of wide public significance
even though other governmental institutions may be more competent to address the questions
and even though judicial intervention may be unnecessary to protect individual rights." *See*
*Warth*, 422 U.S. at 500.

Standing must be resolved as a threshold matter and the Court has an independent obligation to ensure that standing exists. *Northeastern Fla. Chapter of the Assoc. Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 663-64 (1993). "In its constitutional formulation, the doctrine of standing is a gatekeeper of justiciability, and 'serves to identify those disputes which are appropriately resolved through the judicial process.'" *Adams v. Watson*, 10 F.3d 915, 918 (1st Cir. 1993) (*quoting Whitmore v. Arkansas,* 495 U.S. 149, 155 (1990)). Thus, the Plaintiff must show the following to meet the threshold for standing:

> (1) Injury:  Injury in fact, an invasion of a legally protected interest which is concrete and particularized, and actual or imminent, not conjectural or hypothetical.
> (2) Causation:   A causal connection between the injury and the challenged conduct.
> (3) Redressability:  It must be likely, as opposed to merely speculative, that the injury complained of will be redressed by a favorable decision.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

In the case of complaints for injunctive and declaratory relief, the "injury in fact" element of standing requires a showing that the plaintiff faces a threat of ongoing or future harm. *See Lyons,* 461 U.S. at 101-05.   "It is the plaintiff's burden to establish standing by demonstrating that, if unchecked by the litigation, the defendant's allegedly wrongful behavior will likely occur or continue, and that the threatened injury is certainly impending." *Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.,* 528 U.S. 167, 190 (2000) (internal citations and quotations omitted).

Plaintiff makes two assumptions: (1) that the decision to revoke her license to carry was an unconstitutional injury in fact; and (2) that her ongoing status of being unlicensed is the equivalent of suffering an ongoing constitutional deprivation.   As demonstrated below, both assumptions are incorrect.

**1.  The Plaintiff Has Not Suffered A Constitutional Injury In Fact.**

Plaintiff has not suffered a constitutional injury in fact because the pre-*McDonald* decision to revoke her license was not caused by an unconstitutional policy, practice, or custom as required by *Monell v. Dep't of Social Services*, 436 U.S. 658, 690-95 (1978).[8]   More specifically, the decision to revoke Plaintiff's license could not possibly violate rights which had not yet been established and are not retroactive.

Under 42 U.S.C. § 1983, the City Defendants[9] can only be liable "where the municipality itself causes the constitutional violation at issue. *Respondeat superior* or vicarious liability will not attach under § 1983." *Santiago v. Fenton*, 891 F.2d 373, 381 (1989) (*quoting City of Canton, Ohio v. Harris,* 489 U.S. 378, 385 (1989)). "Thus, a plaintiff must show that a policy or custom of the city led to the constitutional deprivation alleged." *Id*. (citing *Monell*, 436 U.S. at 690-95 (1978)).  "This requires that plaintiff demonstrate both the existence of a policy or custom and a causal link between that policy and the constitutional harm." *Id*. (citing *City of Canton*, 489 U.S. at 385; *Oklahoma City v. Tuttle,* 471 U.S. 808, 823 (1985)).

When the policy is based on a "single decision," the decision must itself be unconstitutional.  *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986).  When the basis for municipal liability is a policy not based on a single decision, or a municipal practice or

---

[8]      "*Monell's* 'policy or custom' requirement applies in § 1983 cases irrespective of whether the relief sought is monetary or prospective."  *Los Angeles County v. Humphries*, --- U.S. ---, 131 S.Ct. 447, 453-54 (2010).

[9]      Plaintiff has brought claims against both the City and Commissioner Davis in his official capacity.  Official capacity suits are to be treated as a suit against the entity itself and thus require the same showing that the alleged constitutional deprivation was caused by a policy, practice, or custom of the municipality.  *See Kentucky v. Graham*, 473 U.S. 159, 166-67 (1985).  Therefore, the claims against Commissioner Davis in his official capacity are no different than the claims against the City.  Accordingly, the City Defendants analyze both claims under the same legal standard.

custom, plaintiffs must show that the practice or custom was done with "deliberate indifference" such that there is a substantial risk that a violation of a constitutional right will occur. *See Bryan County v. Brown*, 520 U.S. 397, 411 (1997).

Clearly, the issue in this case is whether the Supreme Court's decision in *McDonald* is applied retroactively to the City Defendants' decision to revoke the Plaintiff's license. While the general rule is that judicial decisions are retroactive, in civil cases there is a narrow equitable exception. *Crowe v. Bolduc*, 365 F.3d 86, 93 (1st Cir. 2004) (*citing Chevron Oil Co. v. Huson*, 404 U.S. 97, 106-07 (1971). The exceptions work as follows:

> A court in a civil case may apply a decision purely prospectively, binding neither the parties before it nor similarly situated parties in other pending cases, depending on the answers to three questions. First: does the court's decision announce a new and unexpected rule of law, by, say, overruling settled precedent on which the parties may have relied? Second: does the history of the jurisprudence in the affected area of the law, together with the new rule's purpose and effect, counsel for or against retroactive application? Third: would retroactive application give rise to a substantial inequity?

*Id.* (*citing Chevron Oil Co.*, 404 U.S. at 106-07).[10]

Even before determining whether to retroactively apply the *McDonald* decision in this case, it is necessary to determine to which policy, practice, or custom the Plaintiff is asserting that decision should be applied. It would appear from Plaintiff's *Memorandum in Support of her Motion for Summary Judgment* that she claims that (1) the single decision to revoke her license was an unconstitutional "policy," and/or (2) that the City Defendants' practice of revoking or denying gun licenses when an individual provides false information on firearm application or

---

[10]     While the use of selective prospectivity was prohibited by the Supreme Court in *Harper v. Va. Dep't of Tax*, 509 U.S. 86 (1993), pure prospectivity remains available. *Crowe*, 365 F.3d at 93-94.

renewal forms is an unconstitutional practice that was deliberately indifferent to Plaintiff's constitutional rights. Without conceding that Plaintiff has adequately demonstrated a policy or a practice/custom for § 1983 liability to attach,[11] the City Defendants submit that the Supreme Court's ruling in *McDonald* should be applied in a purely prospective manner.

**2. The Supreme Court's Decision In *McDonald* Announced A New And Unexpected Rule Of Law.**

Prior to the Supreme Court's decision in *McDonald*, the law regarding the Second Amendment's application to the states was clear. In *United States v. Cruikshank*, 92 U.S. 542, 553 (1875), the Supreme Court explicitly stated that "[t]he Second Amendment declares that it shall not be infringed; but this * * * means no more than it shall not be infringed by Congress." The Supreme Court's later decisions in *Presser v. Illinois*, 116 U.S. 252, 265 (1886) and *Miller v. Texas*, 153 U.S. 535, 538 (1894) "reaffirmed that the Second Amendment applies only to the Federal Government." *District of Columbia v. Heller*, 554 U.S. at 659, n. 23.

In *McDonald*, the Court explained that it was not precluded from revisiting the issue of whether the Second Amendment should be applied to the states because the doctrine of "selective incorporation" under the Fourteenth Amendment's Due Process Clause post-dated the *Cruikshank*, *Presser*, and *Miller* decisions. *McDonald*, --- U.S. ---, 130 S.Ct. 3020, 3031 (2010). The Supreme Court proceeded to draw on its more recent practice of "selective incorporation" to hold, for the first time, that the Second Amendment applies to the states through the Fourteenth Amendment's Due Process Clause. *Id.* at 3042, 3050.

Obviously, the Supreme Court's decision in *McDonald* was not a clarification or a new interpretation of an existing constitutional right that historically applied to the states. Rather, it

---

[11]   The City Defendants also maintain, and set forth in Point IV, that its decision to revoke the Plaintiff's license to carry and its suitability standard are constitutional even in light of *Heller* and *McDonald*.

was a total shift in the Supreme Court's historical position that the Second Amendment, the substance of which clarified for the first time in over a hundred years in the 2008 *Heller* decision, now applies to the states.  Thus, the City Defendants have clearly shown that "the court's decision announce[s] a new and unexpected rule of law [] by [] overruling settled precedent on which the parties may have relied."  *Crowe*, 365 F.3d at 93.

### 3. The History of Second Amendment Jurisprudence And Its Purpose Counsel Against Applying *McDonald* Retroactively.

As discussed, *supra*, prior to the *McDonald* decision, the Supreme Court explicitly held that the Second Amendment did not apply to the states.  Therefore, the history of Second Amendment jurisprudence weighs against applying it retroactively. Further, common sense demonstrates that the purpose of the Second Amendment does not suggest retroactive application.  As the Supreme Court noted in *McDonald*, "defense of self, family, and property," especially in the home, is "the central component" of the Second Amendment right.  *McDonald*, 130 S.Ct. at 3036 (*quoting Heller*, 554 U.S. at 598).  Retroactive application would no more help citizens achieve that goal than would prospective application.  Thus, the purpose of the Second Amendment, while not counseling against retroactive application, certainly does not counsel for it.

### 4. Retroactive Application Will Give Rise To A Substantial Inequity.

Applying *McDonald* retroactively would result in a substantial inequity to the City Defendants.  It would allow any person to bring a § 1983 suit against the City Defendants, seeking either injunctive or monetary damages plus attorneys' fees, for a past denial or revocation of a firearm license.  This could result in severe financial burden on the City's taxpayers.  On the other hand, no inequity would exist from applying *McDonald* purely prospectively.  Citizens will not receive any additional protections from a retrospective

application of *McDonald* than they will from only a prospective application.  Therefore, the equities weigh heavily in favor of purely prospective application.

### 5.   If *McDonald* Is Applied Prospectively, The Plaintiff Cannot Show Injury In Fact As A Result Of A Policy, Practice, Or Custom.

Applying *McDonald* prospectively defeats the Plaintiff's § 1983 claim.  The City Defendants' decision to revoke Plaintiff's license cannot be a single decision policy that is unconstitutional because, at the time, the Second Amendment did not apply to the states and as such, it did not offend the Constitution.  Further, the City Defendants' 2008 decision to revoke Plaintiff's license after determining she had provided false information in her renewal application could not be considered an unconstitutional policy or practice that was deliberately indifferent to constitutional rights that were not yet available to prospective and current gun owners.  Consequently, Plaintiff has failed to show an injury in fact under § 1983 and thus does not have standing to seek redress from this Court.

### 6.   The Plaintiff Is Not Suffering From An Ongoing Constitutional Injury.

Plaintiff also fails to show that she is suffering from the type of ongoing constitutional injury that is required to confer standing in a suit for injunctive and/or declaratory relief. *See Lyons,* 461 U.S. at 101-05.  Admittedly, Plaintiff is still without a firearm license even after *McDonald*.  However, Plaintiff clearly confuses not having a license with not having the right to acquire a license.  Plaintiff is not now, nor ever has been, precluded from reapplying for her firearm license or firearm identification card and has had every opportunity to do so in the wake of *McDonald*. *SOF* ¶¶ 54-57.  Because Plaintiff has not reapplied, she has not met her burden of showing that the City Defendants' policy, practice, and/or custom is continuing to deprive her of

14

the alleged constitutional right to carry a firearm in public.[12]   Consequently, Plaintiff has no

standing to petition the Court for declaratory or injunctive relief.

## POINT II

### PLAINTIFF'S CLAIMS AGAINST THE CITY DEFENDANTS ARE NOT YET RIPE FOR REVIEW

As demonstrated above, Plaintiff does not have standing to petition the Court for relief

from the City Defendants' August 20, 2008 decision to revoke her license.  As to any claim that

the City Defendants' current or future application of its unsuitability standard will affect the

Plaintiff's Second Amendment rights, any such claim is hypothetical, speculative, and thus not

yet ripe for review.

In addition to the requirement of standing, courts utilize the ripeness doctrine to "ensure

the integrity" of the justiciability principle that "federal courts may adjudicate only actual cases

and controversies."  *Gastronomical Workers Union Local 610 & Metropolitan Hotel Ass'n*

*Pension Fund v. Dorado Beach Hotel Corp.*, 617 F.3d 54, 61 (1st Cir. 2010) (internal citations

omitted).  "A claim is not ripe for adjudication if it rests on contingent future events that may not

occur as anticipated, or indeed may not occur at all."  *Texas v. U.S.*, 523 U.S. 296, 300 (1998)

(internal citations and quotations omitted); *see also Ernst & Young v. Depositors Economic*

*Protection Corp.*, 45 F.3d 530, 538 (1st Cir.1995) (a case is not ripe when it depends on a

"lengthy chain of speculation" and "serendipitous events that may not occur as anticipated or

---

[12]      As a practical matter, the Court would create problematic precedent by requiring the
Defendants to reinstate the Plaintiff's license and return her gun without her having to reapply
for a license in light of *McDonald*.   Arguably, such a ruling would put the burden on the
Defendants to reevaluate every license to carry which was denied or revoked pre-*McDonald* and
proactively find that individual, grant or reinstate his/her license if the circumstances merit, and
return all guns to anyone whose license was revoked.  This burden on the City Defendants would
severely outweigh any comparative burden on citizens to fill out a new application in light of the
altered state of the law.

may not occur at all"). Further, the ripeness doctrine is applicable to actions which seek declaratory and injunctive relief. *See Golden v. Zwickler*, 394 U.S. 103, 108 (1969).

Plaintiff has not re-applied for a license post-*McDonald*. There is no evidence that she will be denied a license if she reapplies for one. *SOF* ¶ 78. Thus, any contention that the City Defendants will deny her a license to carry upon reapplication is based upon speculation of an uncertain future event that may not occur at all. *SOF* ¶¶ 54-58, 78. This is a textbook example of a claim that is not ripe for review and, for that reason, the Court should grant the City Defendants' Cross-Motion for Summary Judgment.

## POINT III

1. **EVEN IF PLAINTIFF HAD STANDING TO CHALLENGE THE REVOCATION, THE REVOCATION DID NOT AMOUNT TO A SECOND AMENDMENT VIOLATION UNDER THE SUPREME COURT'S HOLDINGS IN *HELLER* AND *MCDONALD*.**

The Second Amendment states, "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *Heller v. District of Columbia*, 554 U.S. 570, 635 (2008), the United States Supreme Court held for the first time that the Second Amendment guarantees an individual's right to possess a handgun in the home for the purpose of self-defense. *Id.* at 622. Under the Due Process Clause of the Fourteenth Amendment, this right is equally protected against infringement by the States. *See McDonald v. City of Chicago,* --- U.S. ----, 130 S.Ct. 3020, 3026 (2010).

Since the *Heller* decision, Courts have analyzed Second Amendment challenges through a two-pronged approach. *See United States v. Reese*, 627 F.3d 792, 800 -801 (10th Cir. 2010); *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010); *see United States v. Skoien,* 614 F.3d 638, 641-42 (7th Cir. 2010) (en banc). The two-pronged approach requires a reviewing

court to first "ask whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee." *Marzzarella*, 614 F.3d at 89. "If it does not, [the court's] inquiry is complete." *Id*.  "If it does, [the court] must evaluate the law under some form of means-end scrutiny." *Id*.  "If the law passes muster under that standard, it is constitutional." *Id*. "If it fails, it is invalid." *Id*.

As applied to the City Defendants, the challenged government action is the revocation of Plaintiff's unrestricted Class A firearm license.   The burdened conduct was the carrying of a firearm in public, conduct which, as discussed *infra*, falls outside the scope of the Second Amendment.  Consequently, further inquiry is unnecessary.

### 1. The Revocation Of Plaintiff's License Did Not Infringe Upon Her Second Amendment Right To Bear Arms.

Plaintiff's contention, that the Supreme Court's decisions in both *Heller* and *McDonald* encompassed an unencumbered right to carry firearms in public, stretches the scope of the Supreme Court's decisions in both *Heller* and *McDonald* beyond their logical extreme.[13]   The Second Amendment does not guarantee the right to carry a concealed firearm in public.  *See Heller 554* at 626 (holding ban on concealed firearms constitutional); *Peruta v. County of San Diego*, 2010 WL 5137137 at * 4 (S.D. Cal. Dec. 10, 2010) (finding requirement that persons have "proper purpose" in order to carry firearm concealed passes constitutional scrutiny); *United States v. Hart*, 726 F.Supp.2d 56, 60 (D. Mass. 2010) ("Heller does not hold, or even suggest, that concealed weapons laws are unconstitutional"); *Gonzalez v. Village of West Milwaukee*, 2010 WL 1904977,  * 4 (E.D. Wis. May 11, 2010) (finding Supreme Court did not hold that the Second Amendment guarantees a right to carry handguns outside the home).

---

[13]     Massachusetts law does not prohibit the open carrying of firearms in public.  *Compare* M.G.L. c. 140, § 131(a) *with* § 131(b).

Rather, the Second Amendment protects an individual's right to keep a handgun in one's home "where the need for defense of self, family, and property is most acute" and "the right of law-abiding responsible citizens to use arms in defense of hearth and home." *Heller*, at 628, 635. While the *Heller* Court acknowledged that the "full scope" of the Second Amendment remained open for "future evaluation," it did not extend the Second Amendment right to keep and carry a firearm beyond the home. *Id*. In so holding, the Supreme Court made clear that the Second Amendment right is not "unlimited." *Id*. at 626.

In fact, the *Heller* Court held that the Second Amendment is not a right to "carry any weapon whatsoever in any manner whatsoever for whatever purpose." *Heller*, 554 U.S. at 626. Additionally, the *Heller* Court held that "long standing prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings" were presumptively constitutional. *Id*. at 626-27. *Heller's* list of "presumptively lawful regulations," however, was not exhaustive. *Id.* at 627. Notably, the *Heller* Court stated, "we do not read the Second Amendment to protect the right of citizens to carry arms for *any sort* of confrontation, just as we do not read the First Amendment to protect the right of citizens to speak for *any purpose*." *Heller,* at 595 (emphasis in original).

Under *Heller*, prohibitions on carrying concealed weapons in public are constitutional. *Id*. "From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose. For example, the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues." *Id*. at 626. The *Heller* Court did not qualify

prohibitions on carrying concealed weapons in public as being constitutional so long as open carrying was an alternative option of carrying.

Furthermore, in the wake of *Heller*, courts have refrained from expanding the Second Amendment to protecting the carrying of a handgun outside the home. *See e.g.*, *Masciandaro*, --- F.3d ----, 2011 WL 1053618 (4th Cir. 2011); *Williams v. State*, 479, 10 A.3d 1167, 1177 (Md. 2011) ("If the Supreme Court, in dicta, meant its holding to extend beyond home possession, it will need to say so more plainly."); *see also Sims v. United States*, 963 A.2d 147, 150 (D.C. 2008) ("what assuredly is not clear and obvious from [*Heller*] is that it dictates an understanding of the Second Amendment which would compel the District to license a resident to carry and possess a handgun outside the confines of his home.") (internal quotations omitted).

In this case, Plaintiff avers that she has a nearly unfettered Second Amendment right to carry a handgun in public *in case* she needs it for self defense. *SOF* at ¶ 58. This is exactly the type of "*any sort* of confrontation" the *Heller* Court held to fall outside the protections of the Second Amendment. *Id*. at 595. Plaintiff justifies her need to carry a concealed weapon in public because, as a former police officer she has arrested and testified against dangerous individuals who may recognize her on the street and want to exact revenge, she lives in a bad neighborhood, and has suffered a previous home invasion, all of which leave her vulnerable to attack. *SOF* at ¶ 58. This list of circumstances which, may or may not lead to Plaintiff needing to defend herself at some point in the near or distant future, falls outside the scope of activity the *Heller* and *McDonald* Courts found to be protected by the Second Amendment.

Quite obviously, one's need for self defense is a rarely scheduled event, but it would breach the outer limits of the Supreme Court's holdings in both *Heller* and *McDonald* to find that the Second Amendment is a twenty-four hour, seven-day-a-week right to be armed in public

because arguably, there is *always a possibility* that one may be faced with a situation which calls for self defense. The Second Amendment does not guarantee an individual the right to arm and defend oneself with handguns *anywhere,* in case of *any* danger, at *any* time. *See Heller*, 554 U.S. at 595. Although *Heller* has been construed to provide broader self defense rights under the Second Amendment than simply possession of a firearm within the home, *see United States v. Masciandaro*, --- F.3d ----, 2011 WL 1053618, *7-8 (4th Cir. 2011) (opining that language in *Heller* infers broader Second Amendment right than self defense within the home), Plaintiff's averred right to carry a weapon anywhere she pleases *in case* of an unforeseen need for self defense, is well beyond the parameters of that inferred broader right.

Notwithstanding the perceivable interpretation that, in its broadest reading, *Heller may* have inferred that the Second Amendment extends beyond the home, the revocation of Plaintiff's unrestricted Class A license did not bar her from carrying a firearm in public. *See* M.G.L. c. 140, § 131(a), (b) (both Class A and B license permit the carrying of firearms in public subject to restrictions by the licensing authority). The City of Boston regularly issues its residents licenses to carry firearms.[14] Further, individuals who do *not* have a license to carry a firearm may lawfully carry a handgun outside their home if there is an *actual* need for self defense. *See Commonwealth v. Lindsey*, 396 Mass. 840, 845 (1986) (holding that unlicensed possession of a firearm outside of the home is lawful if self defense is necessitated); *see also Commonwealth v. Iglesia*, 403 Mass. 132, 134-35 (1988) (affirming application of necessity defense where individual possessed a firearm in public without a license for the purpose of imminent self

---

[14]    As of March 1, 2011, 2,239 City of Boston residents possessed unrestricted Class A licenses, allowing them to possess firearms within their homes and carry firearms in public. *See SOF* ¶ 80. That number makes up more than half of the total number of firearm licenses currently issued in the City of Boston which is 3,798. *See id.*

defense).   Thus, Plaintiff has alternate means of carrying a weapon outside her home for self defense aside from an unrestricted Class A license.

Finally, Plaintiff's contention that she will be denied a different type of firearm license or firearm identification card if she were to reapply is based solely on speculation.[15]   *SOF* at ¶ 57. Plaintiff admits that she only wants a firearm license if she is allowed to carry it concealed in public.   *Id.*   Indeed, Plaintiff has refused to reapply for a different firearm license because she fears she will be granted a firearm license but will not be allowed to carry her handgun concealed in public.   *Id.*   Thus, even if this Court were to find that the Second Amendment extends beyond the home, the revocation of Plaintiff's unrestricted Class A license did not prohibit her from making use of the other lawful ways she could carry a firearm in public.   She has simply chosen not to avail herself of the alternatives available to her.   *SOF* at ¶¶ 54-57.   A Second Amendment violation does not occur if it is caused by the plaintiff's own refusal to exercise his or her constitutional right.

### 2.   The Revocation Of Plaintiff's License Did Not Violate Her Second Amendment *Right* To Bear Arms Because She Has Alternative Means Of Possessing A Firearm Within Her Home.

The "core" Second Amendment right announced in *Heller* was the right of individuals to possess a firearm within one's home for self defense.   *Heller*, 554 U.S. at 635.   The revocation of Plaintiff's license did not infringe upon her "core" Second Amendment *right* to possess a firearm within her home for the purpose of self defense.   Rather, Plaintiff was deprived of a *specific means* of exercising her Second Amendment right, which prior to the revocation, was her unrestricted Class A license.   Just as Plaintiff could carry a firearm in public through means other

---

[15]     Based on the undisputed facts, the City is prohibited from denying Plaintiff a firearm identification card because she is not statutorily disqualified under M.G.L. c. 140, § 129B. Plaintiff can, at the very least, possess a non-large capacity rifle or shotgun within her home.   *Id.*

than an unrestricted Class A license, Plaintiff could possess a firearm in her home through alternative measures.  Plaintiff's *right* to possess a firearm in her home was not burdened by the revocation of her unrestricted Class A license because she had ample alternative means of obtaining a different firearm license which would allow her to possess a firearm within her home.

Plaintiff could have (1) reapplied for an unrestricted Class A license;[16] (2) appealed to the district court for a review of her firearms license pursuant to M.G.L. c. 140, § 131(f); (3) applied for a restricted Class A license; (3) applied for a Class B license pursuant to M.G.L. c. 140, § 131(b);[17] or (4) obtained a firearms identification card pursuant to M.G.L. c. 140, § 129B. All of these options provided Plaintiff with a reasonable means of exercising the "core" Second Amendment right to possess a firearm inside her home as recognized by *Heller* and *McDonald*. To date, Plaintiff has opted not to avail herself of these options.  Thus, Plaintiff's "core" Second Amendment right to possess a firearm in her home has not been infringed.  Further constitutional inquiry, therefore, is not required.  *See Reese,* 627 F.3d at 792.

---

[16]    At the time her license was revoked, Plaintiff was no longer a Boston police officer and would not have had to fill out the Form GS-13 again.  Thus, she would not have had to answer as to whether she had pending internal affairs charges against her since she still maintains that she did not.  Even if Plaintiff was still a police officer at the time of her revocation, she could have simply reapplied and provided the correct information on the form.

[17]    Plaintiff could have applied for a Class B license in order to possess her personal five-round revolver because it does not qualify as a large capacity firearm under the Massachusetts firearm statute.  *See* M.G.L. c. 140, § 121.

## POINT IV

### THE REVOCATION OF PLAINTIFF'S UNRESTRICTED CLASS LICENSE PASSES CONSTITUTIONAL SCRUTINY

Even if the revocation of Plaintiff's unrestricted Class A license burdened her Second Amendment right to bear arms, the revocation of Plaintiff's license passes constitutional scrutiny. Although the Supreme Court declined to adopt a level of constitutional review for Second Amendment rights, it did eliminate rational basis review and Justice Stevens's proffered "interest-balancing approach" as possibilities. *Heller*, 554 U.S. at 634. Since *Heller* and *McDonald*, federal courts have applied intermediate scrutiny to prohibitions that do not implicate an individual's "core" Second Amendment right to possess a firearm in one's home for the purpose of self defense. *See e.g.*, *U.S. v. Masciandaro*, --- F.3d ----, 2011 WL 1053618 (4th Cir. 2011) ("a lesser showing [than strict scrutiny] is necessary with respect to laws that burden the right to keep and bear arms *outside of the home*); *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010); *United States v. Reese*, 627 F.3d 792 (9th Cir. 2010); *United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010); *United States v. Williams*, 616 F.3d 685, 692-93 (7th Cir. 2010); *Peruta v. County of San Diego*, 678F.Supp.2d --- WL 5137137, *12, n.9 (S.D. Cal. 2011) (recognizing no post-*Heller* court has applied strict scrutiny when "core" Second Amendment right is not at stake); *United States v. Miller*, 604 F.Supp.2d. 1162, 1169-72 (W.D. Tenn. 2009).

In *Marzzarella*, the Third Circuit reviewed a Second Amendment challenge to a statute that prohibited the possession of firearms with obliterated serial numbers. *Marzzarella*, 614 F.3d at 88. There, the Third Circuit held that, analogous to the First Amendment, the Second Amendment can trigger multiple levels of scrutiny depending on the type of restriction. *Id*. at 96-97. The Court determined that intermediate scrutiny was the appropriate level of review because the restriction—the prohibition on possessing firearms with obliterated serial numbers—

did not "severely limit the possession of firearms." *Id*. at 97.  Similarly, in *Peruta v. County of San Diego*, the Court found that intermediate scrutiny applied to a County licensing scheme that severely restricted the number of people who could carry a concealed firearm in public.  WL 5137137, at * 8.

Like both *Marzzarella* and *Peruta*, the revocation of Plaintiff's license did not severely limit Plaintiff's Second Amendment right to bear arms.  Rather, the revocation merely prevented her from exercising her Second Amendment right through an unrestricted Class A license which allowed her to carry her firearm in public concealed.  As discussed *supra*, Plaintiff had ample alternative measures she could have taken to lawfully possess and carry a firearm inside and/or outside her home through alternative licensing schemes.  Plaintiff is also permitted to carry a firearm outside her home without a license in the event she *actually* needs to defend herself. Because the revocation of Plaintiff's unrestricted Class A license did not severely limit her "core" Second Amendment right to bear arms, intermediate scrutiny, rather than strict scrutiny is the appropriate standard of review.  *Masciandaro*, 2011 WL 1053618 at 12.

Intermediate scrutiny requires the asserted governmental end to be more than just legitimate; it must be either "significant," "substantial," or "important," and it requires the "fit between the challenged regulation and the asserted objective be reasonable, not perfect." *Marzzarella,* 614 F.3d at 89 (citations omitted).  In contrast with strict scrutiny, intermediate scrutiny, "by definition, allows [the government] to paint with a broader brush." *Miller,* 604 F.Supp.2d at 1172.  "To pass constitutional muster under intermediate scrutiny, the government has the burden of demonstrating that its objective is an important one and that its objective is advanced by means substantially related to that objective.  *Williams*, 616 F.3d at 692-93.

In this case, the City Defendants have an important and substantial interest in ensuring that all firearms applicants, especially those who seek to carry a concealed firearm in public, answer the requisite forms accurately and completely. *See Huddleston v. United States,* 415 U.S. 814, 825 (1974) (upholding constitutionality of federal statute that criminalized untruthful response on firearm redemption form); *see* M.G.L. c 140, § 129 (criminalizing use of false information in obtaining firearm or applications for firearms); *see also Catucci v. Benedetti*, 27 Mass.L.Rptr. 385, *1 (Mass.Super.Ct. 2010) (finding licensing authority could consider applicant's untruthful denial of prior convictions on firearm application form in finding applicant "unsuitable"); *Wetherbee v. Costerus*, 13 Mass.L.Rptr. 159, *8 (Mass.Super.Ct. 2001) (reinstating police chief's revocation of licensee's firearm license based on untruthful, misleading, and unforthcoming responses on firearm application form).

The requirement that applicants provide truthful information on firearm licensing forms is consistent with the "goal of firearms control legislation in Massachusetts [which] is to limit access to deadly weapons by irresponsible persons." *Ruggiero v. Police Commissioner of Boston,* 18 Mass.App.Ct. 256, 258 (1984). "Consistent with these aims, persons who [are] immature[e] [or of] antisocial behavior . . . are deemed improper persons to obtain licenses." *Id.* The firearms licensing statute provides local police chiefs with the authority to prevent firearms from landing into the hands of improper persons. *Id.*

In order to ensure that only responsible individuals possess firearms, the City Defendants must require that applicants truthfully and accurately complete firearm license forms. *See* M.G.L. c. 140, § 129. The veracity of an applicant's responses on a firearm licensing form is of *critical importance* to the City Defendants' goal in preventing firearms from being placed into the hands of dangerous or mentally unstable individuals. *Ruggiero*, 18 Mass.App.Ct at 259. Of

particular importance is that the City licensing authority is entirely dependent on the applicant to provide accurate information on certain questions without adequate means to verify its truthfulness; namely, whether an applicant has a mental illness or has a chemical dependency. Both the mentally ill and drug dependent are statutorily disqualified from possessing a firearm in Massachusetts. *See* M.G.L. c. 140, §§ 129B, 131.[18] It is not always discernable by an individual's appearance or available public, criminal, or department of mental health records whether an individual has a mental illness or chemical dependency.

With respect to the BPD's Form GS-13, it is imperative that the City's own police officers provide truthful and complete answers as to whether they have pending internal affairs complaints against them. Certain internal affairs complaints require officers to immediately surrender their department-issued firearms. If the City has divested one of its officers of his or her department-issued firearm it logically follows that the City may also take away that officer's personal firearm. Police officers are highly skilled in the use of firearms and knowledgeable of law enforcement tactics, making them dangerous and evasive should they become engaged in criminal activity. Therefore, it is crucial that a police officer, who is being internally investigated for improper or criminal behavior, is disarmed immediately.

Forcing the City Defendants to simply accept false or misleading information without consequence would render the regulation process meaningless. Regulation of firearms was expressly sanctioned by the *Heller* Court as a constitutionally permissible tool to aid states in reducing the serious problem of gun violence. *Heller* 554 U.S. at 636; *United States v. Chester*, 628 F.3d 673, 676 (4th Cir. 2010) ("Significantly, *Heller* recognized that the right to keep and bear arms, like other Constitutional rights, is limited in scope and subject to some regulation").

---

[18] The Supreme Court has explicitly sanctioned the long-standing prohibition of possession of firearms by the mentally ill. *Heller*, 554 U.S. at 626.

The firearm regulation process is completely undermined when an individual, either intentionally or unintentionally, provides false information on licensing forms.

Denial, suspension, or revocation is the most direct and logical means of enforcing the requirement that accurate information be provided in licensing forms.[19]  Massachusetts courts have consistently upheld license denials and revocations in other areas of licensing when an individual provides false information on an application.  *See e.g.*, *Kaplan v. Board of Public Accountancy*, 452 Mass. 1026, 1027 (2008) (upholding revocation of licensee's accounting license based on his false denial of a criminal conviction); *Number Three Lounge, Inc. v. Alcoholic Beverages Control Commission*, 7 Mass.App.Ct. 301, 313 (1979) (upholding revocation of liquor license to licensee after it was determined that licensee had provided false information on license application form).

Indeed, allowing falsified information to stand without penalty would lead to the eventual evisceration of the regulation of handguns in its entirety.  Thus, the City Defendants' revocation of Plaintiff's license was substantially related to its efforts in ensuring that applicants provide truthful information and firearms do not get into the hands of the irresponsible.  To treat Plaintiff any differently, as she suggests she should be because she is a former police officer, would be an injustice.  *All applicants*, regardless of their profession or stature in life, must provide accurate and complete information on firearm licensing forms for the regulation process to be effective.

Finally, ensuring that all applicants provide truthful information on firearm licensing forms also serves to reduce the number of handguns in public.  If denial, suspension, or revocation were not available options in deterring individuals from providing false information

---

[19]     To the extent that Plaintiff maintains that she did not have pending charges against her and that the information on her renewal form was accurate, proper protections are in place to guard against erroneous revocations.  *See* M.G.L. c, 140, 131(f) (right of appeal for revocation of firearm).  This post-deprivation remedy is discussed in depth in Point V, *infra*.

on firearm licensing forms, there is no doubt that the number of handguns in public would rise significantly.  Reducing the number of handguns in public is a substantial government interest because firearms have a disproportionate involvement in life-threatening crimes of violence, particularly in a large city such as Boston.[20]  *See Heller,* 554 U.S. at 636 (noting the importance of the "variety of tools for combating th[e] problem [of handgun violence], including some measures regulating handguns."); *see also Peruta*, WL 5137137, at * 8 (finding reduction of handguns in public places important government interest).  Without a doubt, reducing the level of gun violence in Boston is both a substantial and compelling government interest.  *See Masciandaro*, 648 F.Supp.2d at 789 (observing government interest in public safety has been found by federal courts to be compelling); *United States v. Salerno*, 481 U.S. 739, 748-50 (1987) (crime prevention is compelling government interest and in some instances outweighs an individual's liberty interest).

Accordingly, the City Defendants' are entitled to judgment as a matter of law because the revocation of Plaintiff's license passes constitutional scrutiny.

---

[20]     Arguably, densely populated cities such as Boston, with areas that have disproportionately high rates of gun violence, comport with what the *Heller* Court deemed to be "sensitive places" where prohibitions on handguns are presumptively lawful.  *See* Tina Mehr & Adam Winkler*, The Standardless Second Amendment*, The American Constitutional Society for Law and Policy, p. 3 (October, 2010).  From 2005 - 2011 1,876 shootings occurred within the City of Boston.  *See SOF* ¶ 79.  Of those 1,876 shootings, 1,402 occurred within three neighborhoods of the City of Boston.  *Id.*

## POINT V

### THE REVOCATION OF PLAINTIFF'S LICENSE SATISFIED DUE PROCESS

#### 1.  Procedural Due Process

Plaintiff avers that her due process rights under the Fourteenth Amendment were violated when the City Defendants revoked her license without pre-deprivation due process.[21]   The threshold requirement for a due process claim is the existence of a property or liberty interest. *Board of Regents v. Roth*, 408 U.S. 564, 569 (1972).

The "requirements of due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property." *Id.*  "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it." *Id* at 577.  "He [or she] must have more than a unilateral expectation of it."  "He [or she] must, instead, have a legitimate claim of entitlement to it." *Id.*  Property interests are not defined by the Constitution, "[r]ather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law. . .." *Id. See also Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 538 (1985); *Chongris v. Board of Appeals of Andover,* 811 F.2d 36, 43 (1st Cir. 1987).

Plaintiff did not have a cognizable property interest in her unrestricted Class A license. The First Circuit has held that individuals do not have a cognizable property interest in a license where the licensing authority has broad discretion, and as such, the general populace is not entitled to such a license.  *Medina v. Rudman,* 545 F.2d 244, 251 (1st Cir.1976); *See, e.g.,*

---

[21]     To the extent Plaintiff argues that the City Defendants did not follow existing revocation procedures, i.e., she did not have pending charges against her and therefore, the revocation of her license was "random" and "unauthorized," post-deprivation process was constitutionally sufficient. *Hudson v. Palmer,* 468 U.S. 517, 532 (1984); *Parratt v. Taylor,* 451 U.S. 527, 537 (1981).

*Chongris,* 811 F.2d at 43-44; *Grendel's Den, Inc. v. Goodwin,* 662 F.2d 88, 90 n. 4 (1st Cir.

1981), *rev'd on other grounds,* 662 F.2d 102 (1st Cir.1981) (en banc), *aff'd,* 459 U.S. 116, 103

S.Ct. 505, 74 L.Ed.2d 297 (1982); *O'Neill v. Town of Nantucket,* 545 F.Supp. 449, 452

(D.Mass.1982), *aff'd,* 711 F.2d 469 (1st Cir.1983).

 In the present case, it is the very core of the Plaintiff's argument that the licensing

authority has too much "unbridled" discretion in the issuing and revoking of firearms.  Indeed,

the licensing authority may deny, suspend, or revoke an individual's Class A or Class B license

if it is determined that the licensee is no longer "suitable" to possess such license.  M.G.L. c.

140, § 131(a), (b), (f); *Ruggiero*, 18 Mass.App.Ct. at 258 ("In [issuing firearm licenses], the

licensing authority is given considerable latitude; *see also Superintendent v. Grover*, 76

Mass.App.Ct. 1117,   (2010); (licensing authority has same amount of latitude in revoking a

firearm license as he does in issuing one); *Charbonier v. Chief of Police of Melrose,* 66

Mass.App.Ct. 1105, *2 (2006) (same). Thus, Plaintiff had no legitimate property interest in her

unrestricted Class A license because of the broad discretion afforded and *retained* by the

licensing authority once her license was issued.

 A Class A firearm license is distinguishable from an occupation or retail license which

becomes a property interest once it is issued.  That is because the licensing authority maintains

the same broad authority to revoke a firearm license as he had before he issued it.  *Cf. Medina*,

545 F.2d at 250 ("Doubtless once a license, or the equivalent, is granted, a [property] right or

status recognized under state law would come into being").  The general populace of the City of

Boston is not entitled to an unrestricted Class A firearm license.  Nor are City of Boston

residents who are granted an unrestricted Class A license entitled to keep it because the licensing

authority retains the same broad discretion to revoke a license as he does to issue a license based

on "suitability" and whether a licensee has "good reason to fear injury to person or property." M.G.L. c. 140, § 131; *Ruggiero*, 18 Mass.App.Ct. at 259.

In a similar case from the Middle District of Pennsylvania, the court there held that the plaintiff did not have a continuing property interest in her license to carry a firearm under the Fourteenth Amendment based on the broad discretion retained by the licensing authority in revoking licenses to carry firearms. *Hain v. DeLeo*, 2010 WL 4514315, *6-7 (M.D. Pa. Nov. 2, 2010) (finding no property interest in license to carry firearm even after it was obtained based on broad discretion to revoke license maintained by licensing authority).

Even if Plaintiff had a property interest in her Class A license and/or a liberty interest in her "natural right of self defense," due process was satisfied.  Due process is ordinarily construed to require "some kind of hearing" *before* a state may deprive an individual of a protected property interest. *Zinermon v. Burch,* 494 U.S. 113, 127 (1990). The pre-deprivation due process requirement is, however, far from absolute. *Herwins v. City of Revere,* 163 F.3d 15, 18 (1st Cir. 1998) (requirement of pre-deprivation hearing "very loose.").  In situations where the government's interest in swift action is substantial, a pre-deprivation hearing is not constitutionally necessary if there is adequate post-deprivation process available. *Pease v. Burns*, 719 F.Supp.2d 143, 151-52 (D.Mass. 2010) (*citing Federal Deposit Ins. Corp. v. Mallen,* 486 U.S. 230, 240 (1988)).

As discussed in the Commonwealth's *Memorandum in Support of its Cross-Motion for Summary Judgment* and fully incorporated herein, the Commonwealth and the City of Boston have a particularly strong public safety interest in the swift removal of guns from potentially dangerous individuals.  The risk that a firearm license is erroneously revoked is far outweighed by the risk posed to the public if an irresponsible individual is permitted to retain possession of a

firearm while the adequacy of the revocation itself is resolved.  *See Patel v. Midland Memorial Hospital and Medical Center*, 298 F.3d 333, 339-40 (5th Cir. 2002) (holding where public safety is at risk post-deprivation due process is sufficient).  If an individual's firearm license is revoked, post-deprivation process is available through a ninety day right of appeal to a district court pursuant to M.G.L. c. 140, § 131(f).  Plaintiff's decision not to exercise her right to a post-deprivation hearing did not make the due process afforded her any less meaningful.  Because both the Commonwealth and the City's interests in preventing gun violence is so compelling and Plaintiff was afforded adequate post-deprivation due process, the City Defendants are entitled to judgment as a matter of law on Plaintiff's procedural due process claim.

### 2.  Substantive Due Process

Any contention that the City Defendants violated Plaintiff's substantive due process rights is equally unavailing.  For Plaintiff to succeed on her claim that the City Defendants violated her substantive due process rights, she must show "both that the acts were so egregious as to shock the conscience and that they deprived him [or her] of a protected interest in life, liberty or property." *Pagan v. Calderon,* 448 F.3d 16, 32 (1st Cir.2006).  A substantive due process claim is "fundamentally, not a claim of procedural deficiency, but rather, a claim that the state's conduct is inherently impermissible." *Schiller v. Strangis*, 540 F. Supp. 605, 614 (D. Mass. 1982).  "Due process of law is a summarized constitutional guarantee of respect for those personal immunities which . . . are so rooted in the traditions of conscience of our people as to be ranked as fundamental, or are implicit in the concept of ordered liberty." *Rochin v. California,* 342 U.S. 165, 169 (1952).

Though not precisely defined, conscience-shocking conduct "must at the very least be 'extreme and egregious' . . . [and] 'mere violations of state law, even violations resulting from

bad faith,' do not invariably amount to conscience-shocking behavior." *DePoutot v. Raffaelly,* 424 F.3d 112, 119 (1st Cir.2005). The revocation of Plaintiff's firearm license is objectively reasonable given that it was determined that she had provided false information on her license renewal form. Massachusetts licensing authorities have consistently revoked or denied licenses to licensees as a means of ensuring the integrity of the application process. *See supra*, *Kaplan and Number Three Lounge, Inc.* at Point IV. The revocation of Plaintiff's license was, therefore, not "so brutal, demeaning, and harmful that it is shocking to the conscience." *Maymi v. P.R. Ports Auth.,* 515 F.3d 20, 30 (1st Cir. 2008). Consequently, the City Defendants are entitled to judgment as a matter of law on Plaintiff's substantive due process claim.

## POINT VI

### THE REVOCATION OF PLAINTIFF'S LICENSE DID NOT VIOLATE THE EQUAL PROTECTION CLAUSE

Plaintiff contends that the revocation of her license violated her right to equal protection because the decision was "arbitrary and irrational" based on the City Defendants' failure to justify the revocation on the grounds that Plaintiff posed a public safety risk. To succeed on her § 1983 equal protection claim, Plaintiff must demonstrate a similarity between herself and other persons to whom she compares such that no reasonable person could discern a difference between the Plaintiff and her comparators that would justify differential treatment. *Ruston v. Town Bd. for Town of Skaneateles*, 610 F.3d 55, 59-60 (2d Cir. 2010). Here Plaintiff has demonstrated no evidence whatsoever to show that she was treated differently than other individuals that provided false information on their application or renewal form.

"The Fourteenth Amendment's promise that no person shall be denied the equal protection of the laws must coexist with the practical necessity that most legislation classifies for one purpose or another, with resulting disadvantages to various groups." *Romer v. Evans*, 517

U.S. 620, 631 (1996). Thus, "if a law neither burdens a fundamental right, nor targets a suspect class, [the court] will uphold the legislative classification so long as it bears a rational relation to some legitimate end." *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 440 (1985); *Bach v. Pataki*, 289 F.Supp.2d 217, 228 (N.D.N.Y. 2003). "[L]egislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *Cleburne, supra*, 473 U.S. at 439; *Bach, supra*, 289 F.Supp.2d at 228. Plaintiff "bears the burden of demonstrating that there is no reasonable basis for the challenged distinction." *Bach,* at 229.

Plaintiff has failed to put forth any evidence of any similarly situated individuals, applicants who provided, either intentionally or unintentionally, false information on their firearms applications, and did not have their license revoked. The City Defendants' justification for their need to protect the integrity of the firearm licensing process is set forth *supra* in Point IV. Such interests are furthered by the revocation of firearms licenses by those who do not provide truthful information on licensing forms. Revoking the firearm license of an individual who has provided false information on a licensing form bears a rational relationship to legitimate state public safety interests. Accordingly, the City Defendants are entitled to judgment as a matter of law on Plaintiff's Equal Protection claim.

## CONCLUSION

Plaintiff lacks standing under the Second Amendment to challenge the revocation of her license and her claims are not ripe for review. The City of Boston and Commissioner Davis are entitled to judgment as a matter of law on all Plaintiff's claims because she does not have a Second Amendment right to carry a firearm in public and, even if she did have that right, the

revocation of her license to carry a concealed firearm did not severely limit that right.   Any

burden on Plaintiff's Second Amendment right passes constitutional scrutiny

Finally, the revocation of Plaintiff's license satisfied both substantive and procedural due

process and did not offend the Equal Protection Clause.   Accordingly, the City Defendants are

entitled to summary judgment on all counts within Plaintiff's Complaint.

| | |
|---|---|
| **<u>CERTIFICATE OF SERVICE</u>** | DEFENDANTS, CITY OF BOSTON and BOSTON POLICE COMMISSIONER EDWARD DAVIS<br>By their attorneys: |
| I, Lisa Skehill Maki, hereby certify that on this date I served a copy of the foregoing documents upon plaintiff's counsel, Alan Gura and Chester Darling, and counsel for the Commonwealth of Massachusetts, Ken Salinger, by electronic filing. | William F. Sinnott<br>CORPORATION COUNSEL |

April 22, 2011     /s/ Lisa Skehill Maki     /s/ Lisa Skehill Maki_____
Date            Lisa Skehill Maki       Lisa Skehill Maki, BBO No. 675344
Ian D. Prior, BBO No. 655704
Assistant Corporation Counsel
City of Boston Law Department
Room 615, City Hall
Boston, MA 02201
(617) 635-4022 (Maki)
(617) 635-4017 (Prior)
Lisa.Maki@cityofboston.gov
Ian.Prior@cityofboston.gov