```
Volume I                                    Pages 1 - 114

                                            Exhibits 1 - 8

           UNITED STATES DISTRICT COURT

      FOR THE COMMONWEALTH OF MASSACHUSETTS

                   Civil Action No. 08-11955-PBS

*******************************

STACEY HIGHTOWER,                    *

     Plaintiff,                      *

vs.                                  *

CITY OF BOSTON and BOSTON POLICE     *

COMMISSIONER EDWARD DAVIS,           *

     Defendants.                     *

*******************************



           DEPOSITION of STACEY HIGHTOWER

      Thursday, December 30, 2010 at 12:00 p.m.

           City of Boston Law Department

                    City Hall

               Boston, Massachusetts

 ------ Jacqueline P. Shields, RPR, CSR ------

                 REPORTERS, INC.

         CAPTURING THE OFFICIAL RECORD

          617.786.7783/FAX 617.639.0396

                www.reportersinc.com
```

```
 1        Q.  Did you know why the department was
 2   investigating more than just the officer who
 3   allegedly punched him in the face?
 4            MR. GURA:  Calls for speculation.
 5   BY MS. MAKI:
 6        Q.  If you know.
 7        A.  No.
 8        Q.  Had you ever heard that there was a coverup
 9   amongst the other officers?
10        A.  No.
11        Q.  No.  Did you know that there was a civil
12   lawsuit brought in connection with this?
13        A.  Not sure.  I'm not sure about a civil case
14   with it.
15        Q.  Were you ever called to testify as part of
16   the civil case?
17        A.  I don't think so.  I don't recall, no.
18        Q.  Other than your IA interview, had you ever
19   been questioned about it before or after?
20        A.  No, I don't think so.  To the best of my
21   recollection, it was that one time.
22        Q.  At Internal Affairs?
23        A.  Yes.
24        Q.  What did you receive as a discipline with
```

```
 1  regard to those sustained charges?
 2       A.   Discipline?
 3       Q.   Were you disciplined?
 4       A.   For what?
 5       Q.   For the charges that were sustained.
 6            MR. GURA:  Are you referring to Exhibit 3?
 7       A.   What charges?
 8  BY MS. MAKI:
 9       Q.   Exhibit 3.
10       A.   That's not a charge.  That's a violation.
11       Q.   Okay.
12       A.   That's not a charge.  It's a violation.
13       Q.   Okay.
14       A.   It says "violation."
15       Q.   I'm sorry.
16       A.   Not a charge.  So a violation is like
17  running a red light.  That's a violation.
18       Q.   Did you receive a discipline for violating
19  those three rules?
20       A.   No.
21       Q.   You never received a discipline?
22       A.   No.
23       Q.   Did you ever appeal those rules violations?
24       A.   Yes.  I believe my union rep may have.  I'm
```

```
 1   not sure.
 2        Q.   Did you contact your union rep once you
 3   received that?
 4        A.   Yes.
 5        Q.   Why did you do that?
 6        A.   Well, I did that because my understanding
 7   was that I was a witness and that I wasn't being --
 8   there were no charges filed against me whatsoever.
 9   And that I was coming in as a witness to give
10   testimony as if someone would in a shooting.
11   Subsequently, after giving my testimony I received
12   this.  So, you know, you can imagine the shock, how
13   was it I turn from witness to all of a sudden the
14   defendant?  How did that happen without any hey,
15   you're being charged with this or -- no one said
16   anything like that.  So I was a witness.  And then I
17   get this, that I'm in violation.  So I'm -- it's
18   very confusing.  How is it that I'm in violation of
19   something when I came in and gave you honest
20   testimony of what I recalled?  Then I found out a
21   lot of people had one of these.
22             So the next thing to do is to contact your
23   union rep, so they can handle this type of
24   situation.  That's what they are there for.  That's
```

```
 1   who I contacted.
 2        Q.   Were you disputing the violations?
 3        A.   Yes.
 4        Q.   Okay.  And why were you disputing them?
 5        A.   I was disputing them because, first of all,
 6   I'm not a liar.  That was a big one, and the second
 7   one, given the chaos at the scene, and the fact that
 8   superior officers were there at the scene, and they
 9   were the ones was telling us hurry up.  Get out of
10   there.  Get out of there.  There was a bunch of
11   frenzy all over the place.  They had already
12   searched the prisoner, I wasn't going to get out of
13   the vehicle.  It was just not appropriate.  These
14   violations weren't appropriate based on the scene.
15        Q.   Okay.
16        A.   Based on the scenario.
17        Q.   Okay.  But at that point you realized that
18   you had become more than just a witness, and when I
19   say at this point, I mean November 4th, 2005 as
20   displayed in Exhibit 3?
21             MR. GURA:  Objection.  Vague and ambiguous.
22   What do you mean by "more than just a witness"?
23   BY MS. MAKI:
24        Q.   You had gone from a witness to a police
```

```
 1   speculation, calls for a legal conclusion.
 2   BY MS. MAKI:
 3        Q.   You can answer.
 4        A.   That was over two years later, from that
 5   incident to this incident.  So I'm not really sure
 6   what was going on in his head.
 7        Q.   What do you know, what is your
 8   understanding of what happened with these rules
 9   violations?
10        A.   My understanding is nothing happened with
11   them.  That's my understanding.
12        Q.   Okay.  So you're found to be in violation
13   of these rules, right?
14        A.   Uh-huh.
15        Q.   You called your union representative
16   because you disputed them, right?
17        A.   That's correct.
18        Q.   And at some point you're in discussions
19   with Richard Bardi, I don't want to hear anything
20   that you guys discussed, but you contacted him?
21        A.   Yes.
22        Q.   He represented your interests with regard
23   to the rules violations noted in Exhibit 3?
24        A.   Yes.
```

```
 1        Q.   And in 2007 he was still representing you
 2   with regard to the rules violations in Exhibit 3?
 3        A.   Yes.
 4        Q.   Okay.  And as you sit here today you have
 5   no idea of what happened with those rules
 6   violations?
 7        A.   No.
 8        Q.   Are you aware that those rules violations
 9   listed in Exhibit 3 were still pending in 2008 when
10   you resigned from the Boston Police Department?
11        A.   No, I'm not aware of what was going on with
12   that.
13             MS. MAKI:  Mark that as the next exhibit,
14   please.
15             (Exhibit No. 5, marked; Document entitled
16   Police Commissioner's Personnel Order, dated August
17   18, 2008.)
18   BY MS. MAKI:
19        Q.   Ms. Hightower, I'm going to show you
20   Exhibit 5.  Do you recognize that document?
21        A.   Yes.
22        Q.   Okay.  When did you first see that
23   document?
24        A.   "Resignation of Police Officer Stacey
```

```
 1  being presented with charges pending is hereby
 2  effective Friday, August 15th, 2008," when you
 3  received that language, what did you think "charges
 4  pending" meant?
 5       A.  I had no idea.
 6       Q.  Did you think it meant the Holbrook appeal?
 7       A.  I didn't know what it was talking about,
 8  charges pending.
 9       Q.  Did you ever --
10       A.  I was never charged with anything.  I had
11  never been charged with anything, so I didn't know
12  what this charges pending was.
13       Q.  What is your understanding of the word
14  "charge" within Boston Police Department?
15       A.  So charge is when, let's say you have a
16  complaint filed against you and you go in and you
17  testify to the complaint that's filed against you,
18  all right?  And subsequently the department says
19  that, all right, I found you -- we're going to
20  charge you with stolen property.  All right?  So now
21  you're charged with stolen property, whatever it is,
22  whatever crime it is, and that charge is pending
23  against you, or let's say administrative, not
24  criminally.  So administrative, you go in and say
```

```
 1  you're charged with, I don't know, violation of,
 2  let's say a violation of these rules, say that they
 3  say you're charged with violation of 102, Section 4,
 4  102, Section 27, 103A, Section 28, and they want you
 5  to come in and testify to those charges, you go in
 6  and you testify to those charges and then they say,
 7  we now find you guilty of this and we're going to
 8  give you 28 days' suspension.  Those charges are
 9  pending.
10       Q.  So your understanding of "charges" means it
11  is the equivalent of somebody investigating you and
12  disciplining you for a Boston Police Department
13  rules violations?
14       A.  With due process.
15       Q.  Of course, with due process.  But is that
16  the same thing in your mind?
17       A.  So in my mind, I told you charges pending
18  means charges pending, it means you've been accused
19  of something.  You've been called in to give
20  testimony on whatever it is you're being accused of,
21  right?  So you have your opportunity to testify to
22  it or whatever, get an attorney, whatever, and then
23  they inflict charges.  They inflict punishment.  And
24  you get the date to serve.  And it's done.
```

```
 1        Q.  Okay.  So Exhibit 3, how is that different
 2   from what you just described?
 3        A.  Well, because I didn't -- first of all, I
 4   didn't have any due process on this.  I told you, I
 5   was called in as a witness and gave testimony as a
 6   witness.
 7        Q.  That's not due process?
 8        A.  No, that is not.  Okay?  Is this due
 9   process?  If I call you in and give witness
10   testimony on a motor vehicle accident that you
11   witnessed --
12        Q.  Let me just stop you right there.  I'm
13   going to ask you the question.
14        A.  I'm just saying that due process is if I
15   called you and ask you to give testimony on a car
16   accident that you witnessed, and then I say thank
17   you, have a nice day, and subsequently I send you a
18   letter in the mail saying that I found you in
19   violation of jaywalking --
20        Q.  I appreciate this.  My question is, you
21   just described what you feel is charges pending, and
22   the difference, what you're telling me between what
23   Exhibit 3 is and charges pending is due process?
24             MR. GURA:  Misstates the testimony.  I
```

1  believe she was getting to answer you.
2  BY MS. MAKI:
3      Q.  Why don't you finish.  You described it,
4  you feel that you weren't given due process in
5  Exhibit 3.  What else is the difference?
6      A.  It's the difference, just like I told you,
7  now I'm saying that you're jaywalking, and then I
8  send you a letter back and say I found you in
9  violation of jaywalking, right, however, what
10 happened here, I never allowed you to -- I never
11 called you in and said that I was finding you in
12 violation of jaywalking.  I never allowed you the
13 opportunity to talk about whether you were
14 jaywalking or not.  I could have said that you were
15 doing anything in anything and wrote it down on the
16 piece of paper and trying to say that you were in
17 violation of that.  That's what happened here.  This
18 was not -- this was just something that came out of
19 nowhere.  I don't know where this came from.  I was
20 a witness, so to me this isn't any type of sustained
21 violation in connection with any type of charges
22 pending.  It just can't be.  It doesn't make any
23 sense.  It's not sensible.
24      Q.  Okay.  Other than it doesn't make any sense

```
 1  to you, what is the difference?
 2       A.  It doesn't make any sense if you were given
 3  a violation of jaywalking, what you would have done
 4  was you would have taken your violation of
 5  jaywalking, you would have contacted yourself an
 6  attorney, or would you have filed an appeal in court
 7  against this, and people would have had to come and
 8  give testimony, right?  And you come and give
 9  testimony on this jaywalking, and your attorney
10  would represent you on that, and the City of Boston
11  would come in and give the, bring evidence as to why
12  they say that you're jaywalking.  That's what would
13  happen.  And then someone who was not related would
14  then make a determination that they find you guilty
15  and therefore guilty as charged, at which time you
16  would have to either pay or, you know, community
17  service.
18       Q.  Okay.
19       A.  That's charges pending.
20       Q.  You're still not answering my question.
21       A.  I don't know how to answer your question.
22           MR. GURA:  She's -- okay --
23       A.  I'm trying to answer your question.  I
24  can't really put this into --
```

```
1            MR. GURA:  Okay, is there -- go ahead and
2    ask.
3    BY MS. MAKI:
4       Q.  My question is the difference between what
5    you just described as rules violations and you come
6    in and you're being investigated, and you're
7    notified that you're being investigated for X, Y and
8    Z, right?  That's charges pending to you?
9       A.  Yes, being investigated for something,
10   you're called in to give testimony on what it is,
11   like, for instance, the original complaint, so the
12   officers who were allegedly in violation of the
13   original Reddick complaint, the two officers
14   mentioned, two, three, four, whoever they were, I
15   believe it was two, they were charged with --
16      Q.  They were investigated?
17      A.  It was my understanding that they were
18   charged.
19      Q.  Okay.  But for purposes of this deposition,
20   and I don't want to talk about speculation over what
21   happens when you jaywalk, the difference between
22   what this paper says here and what you believe to be
23   charges pending is that you were not notified that
24   you were being investigated; is that correct?
```

```
 1         A.   Not necessarily.
 2         Q.   Please explain how it's different.
 3         A.   I just tried to explain to you how it was
 4    different.
 5         Q.   But the due process, to be notified that
 6    you were investigated and to have a hearing and
 7    defend yourself, right?  And you're saying the
 8    difference here is that you didn't have that; is
 9    that correct?
10         A.   Well, I did not have that.  I just all of a
11    sudden just got this piece of paper saying that I
12    was in violation.
13         Q.   I understand that, but you're saying that
14    you don't believe these to be charges pending
15    because you were not notified and you were not given
16    an opportunity to --
17         A.   Is this what you're talking about, this
18    charges pending?  Is this what you're talking about?
19         Q.   Let's stay on my question.  What's charges
20    pending in your mind?
21         A.   I just told you, charges pending is when
22    you've been found to broke some rule, whatever it
23    is, and the next thing you do is you go and you
24    testify to that, and a decision is made, discipline
```

```
 1  is issued, and you're about to serve it out.  You're
 2  going to serve it out.  That's charges pending.
 3      Q.  Okay.  When you're --
 4      A.  That's closure.  It's done.
 5      Q.  Sure.  When you're being investigated, is
 6  there a specific document that you receive that's
 7  saying you're being investigated?
 8          MR. GURA:  Objection.  Calls for
 9  speculation.  Are you asking about the procedure
10  used by the Boston Police Department?
11  BY MS. MAKI:
12      Q.  Ms. Hightower, you've been investigated on
13  the Holbrook case; is that right?
14      A.  Have I been investigated before the
15  Holbrook case?
16      Q.  There was an investigation into the
17  Holbrook case, correct?  Specifically of you.
18      A.  Yes.
19      Q.  What notice did you receive that you were
20  being investigated?
21      A.  I don't recall necessarily if I had
22  documentation on it, versus my captain just talking
23  to me, that that's what he was doing.
24      Q.  That what?  What was he doing?
```

```
 1  understand that to mean only Boston Police officers
 2  are required to fill out this form?
 3      A.  Yes.
 4          MR. GURA:  I thought the first question was
 5  whether they are required to do it.
 6          THE WITNESS:  It was.
 7          MS. MAKI:  As a Boston Police officer.
 8  Sorry if the question was bad.
 9  BY MS. MAKI:
10      Q.  If you don't understand my question, let me
11  know and I will ask it in a better way.
12      A.  I understood what you just said.
13      Q.  We'll work like that.  Moving down the
14  page, I guess three quarters of the way down where
15  it says, under restrictions it says, "Are there any
16  complaints or charges pending against you?"  You
17  wrote no.
18      A.  That's right.
19      Q.  And what did you understand the language
20  "Are there any complaints or charges pending against
21  you" to mean when you filled this out?
22      A.  Are there any charges or complaints against
23  you.
24      Q.  Okay.  What do you understand "complaints"
```

```
 1  to mean?
 2       A.  Someone's filed a complaint against you.
 3       Q.  Like a civilian?
 4       A.  Like any type of misdemeanor or felony,
 5  complaint or charge.
 6       Q.  Okay.  So you understand that to mean
 7  criminal complaint?
 8       A.  Yes.
 9       Q.  Okay.  Do you understand it to possibly
10  mean an internal complaint as a Boston Police
11  officer?
12       A.  No.
13       Q.  So you understand the word "complaint" to
14  mean only criminal complaints?
15       A.  To me, yes.
16       Q.  Okay.  And what's "or charges" mean to you?
17       A.  Criminal.
18       Q.  Okay.  So this question here, you only
19  understood to mean did you have any criminal charges
20  pending against you?
21       A.  Yes.
22       Q.  Okay.  Did you ever find out that it meant
23  Internal Affairs charges pending against you?
24       A.  Absolutely not.
```

```
 1       Q.  You never heard that?
 2       A.  No.
 3       Q.  Is today the first day that you heard that?
 4           MR. GURA:  Can you be more specific about --
 5   it's a vague question.  Can you rephrase it?  Have
 6   you ever found out, I mean, that...
 7   BY MS. MAKI:
 8       Q.  Have you ever learned that question to mean
 9   something other than do you have criminal complaints
10   or charges pending against you?
11       A.  No.
12       Q.  Okay.  Okay.
13           MS. MAKI:  Let's mark this as Exhibit 7.
14           (Exhibit No. 7, marked; Letter dated August
15   20, 2008.)
16   BY MS. MAKI:
17       Q.  Ms. Hightower, I'm passing to you what's
18   marked as Exhibit 7.  Do you recognize that?
19       A.  Yes.
20       Q.  What do you recognize that to be?
21       A.  This was a letter sent to me telling me
22   they revoked my license to carry a firearm, sent
23   after I had left the Boston Police Department.
24       Q.  Do you know why they were revoking your
```

```
 1        Q.   Do you know you have a right to reapply?
 2        A.   Yeah, sure.
 3        Q.   You're aware that you can reapply?
 4        A.   Sure, I can reapply.
 5        Q.   So you know that, why haven't you done
 6   that?
 7        A.   Why would I?  They revoked my license.
 8        Q.   But you understand that you can go reapply
 9   for another one, right?
10        A.   Sure.
11        Q.   Okay.  Why haven't you done that?
12        A.   Because they revoked my license.
13        Q.   Okay.
14        A.   It's a waste of time.  Why would I go apply
15   when they revoked my license?
16        Q.   So you believe that because they revoked
17   your license you'll be denied if you reapply?
18        A.   It's not my belief that I would be
19   necessarily denied to care a firearm.  It's my
20   belief I would be denied a Class A.
21        Q.   A Class A, unrestricted license to carry a
22   concealed --
23        A.   That's right.
24        Q.   You don't want your gun license if you
```

```
 1  can't carry it concealed?
 2       A.   That's not necessarily true.
 3       Q.   Okay.
 4       A.   I would like to have my gun license and be
 5  able to carry it concealed.  I was a police officer
 6  for ten years with the Boston Police.  I've been a
 7  police officer for over 20 years.  I've arrested a
 8  lot of people, a lot of criminals with very
 9  dangerous pasts, drugs, and what have you.  You run
10  into people that I've arrested in the past, in malls
11  shopping, what have you.  I need to be protected
12  from these individuals who perhaps may remember me
13  or maybe I don't remember them or whatever, but I've
14  lived a very dangerous life and I've arrested some
15  dangerous people, and I would feel a lot more
16  comfortable if I could have a Class A unrestricted
17  license.
18       Q.   Okay.
19       A.   Specially since Boston Police were the ones
20  who wanted me to live in the City of Boston when I
21  wanted to live elsewhere.  So I ended up living for
22  ten years in the City of Boston where I policed, you
23  know the old saying, you know, don't shit where you
24  lay.  Well, I shit where I laid.  It's not good.
```