**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

---

|  |  |
|---|---|
| STACEY HIGHTOWER, | )<br>) C.A. No. 08-CV-11955-DJC<br>) |
| Plaintiff, | ) LEAVE TO FILE GRANTED ON<br>) MAY 10, 2011 |
| v. | )<br>) |
| CITY OF BOSTON, et al., | )<br>) |
| Defendants. | )<br>) |

---

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS
CITY OF BOSTON AND EDWARD DAVIS'S MOTION FOR SUMMARY JUDGMENT
AND IN REPLY TO OPPOSITION TO PLAINTIFF'S SUMMARY JUDGMENT MOTION

Comes now the Plaintiff, Stacey Hightower, by and through undersigned counsel, and

submit her memorandum of points in authorities in opposition to Defendants City of Boston and

Edward Davis's Motion for Summary Judgment, and in Reply to Opposition to Plaintiff's

Motion for Summary Judgment.

Dated: May 6, 2011

Chester Darling (BBO # 114320)
9 Mayflower Drive
Andover, MA 01810
978.475.2520
Fax 978.475.1741

Respectfully submitted,

Alan Gura
Gura & Possessky, PLLC
101 N. Columbus Street, Suite 405
Alexandria, VA 22314
703.835.9085/Fax 703.997.7665


By:  /s/ Chester Darling
     Chester Darling

By:  /s/ Alan Gura
     Alan Gura

     Attorneys for Plaintiff

## TABLE OF CONTENTS

TABLE OF AUTHORITIES. ..................................................................................... ii

PRELIMINARY STATEMENT. ............................................................................... 1

STATEMENT OF FACTS. ....................................................................................... 4

SUMMARY OF ARGUMENT. ................................................................................ 6

ARGUMENT. ............................................................................................................ 6

    I.     HIGHTOWER PLAINLY HAS STANDING, AS THE ADMINISTRATIVE
           REVOCATION OR DENIAL OF A PERMIT IS, WITHOUT QUESTION,
           AN ARTICLE III INJURY-IN-FACT. .................................................... 6

    II.    *McDONALD* GOVERNS DEFENDANTS' CONDUCT. .................................... 11

    III.   HIGHTOWER HAS THE RIGHT TO CARRY A HANDGUN
           FOR SELF-DEFENSE. ............................................................................... 16

    IV.   DEFENDANTS' REVOCATION OF HIGHTOWER'S GUN CARRY
           LICENSE FAILS ANY LEVEL OF SCRUTINY. ............................................... 21

CONCLUSION. ....................................................................................................... 24

## TABLE OF AUTHORITIES

Cases

*Bach* v. *Pataki*,
408 F.3d 75 (2nd Cir. 2005) ...................................................................... 9, 11

*Charette* v. *Town of Oyster Bay*,
159 F.3d 749 (2d Cir. 1998)........................................................................ 10

*Chicago B. & Q. R. Co.* v. *Chicago*,
166 U.S. 226 (1897).................................................................................... 15

*City of Lakewood* v. *Plain Dealer Publishing Co.*,
486 U.S. 750 (1988) ................................................................................... 10

*Cohens* v. *Virginia*,
19 U.S. (6 Wheat.) 264 (1821)..................................................................... 19

*Commonwealth* v. *Seay*,
376 Mass. 735, 383 N.E.2d 828 (1978). ...................................................... 1, 2

*Crowe* v. *Bolduc*,
365 F.3d 86 (1st Cir. 2004).......................................................................... 11, 12

*Dearth* v. *Holder*,
2011 U.S. App. LEXIS 7737 (D.C. Cir. Apr. 15, 2011)..................................... 8

*District of Columbia* v. *Heller*,
554 U.S. 570 (2008).................................................................... passim

*Harper* v. *Va. Dep't of Taxation*,
509 U.S. 86 (1993)...................................................................................... 12

*Houghton* v. *Shafer*,
392 U.S. 639 (1968) (per curiam) ................................................................. 9

*Int'l Brotherhood of Teamsters* v. *United States*,
431 U.S. 324 (1977) .................................................................................... 9

*Jones* v. *Opelika*,
316 U.S. 584 (1942) .................................................................................... 10

*Kaplan* v. *Bd. of Registration in Pub. Accountancy*,
452 Mass. 1026, 897 N.E.2d 67 (2008). ....................................................... 22

ii

*Lovell* v. *Griffin*,
    303 U.S. 444 (1938)................................................................................................ 10

*Lujan* v. *Defenders of Wildlife*,
    504 U.S. 555 (1992)................................................................................................ 7

*McDonald* v. *City of Chicago*,
    130 S. Ct. 3020 (2010).................................................................................... passim

*Muscarello* v. *United States*,
    524 U.S. 125 (1998)................................................................................................ 18

*New Hampshire Hemp Council, Inc.* v. *Marshall*,
    203 F.3d 1 (1st Cir. 2000)...................................................................................... 7

*Nordyke* v. *King*,
    563 F.3d 439 (9th Cir. 2009). ............................................................................... 14

*Number Three Lounge, Inc.* v. *Alcoholic Beverages Control Commission*,
    7 Mass. App. Ct. 301, 387 N.E.2d 181 (1979). ................................................... 23

*Ord* v. *District of Columbia*,
    587 F.3d 1136 (D.C. Cir. 2009) ........................................................................... 7

*Parker* v. *District of Columbia*,
    478 F.3d 370 (D.C. Cir. 2007). ................................................................. 7, 8, 13

*Peruta* v. *County of San Diego*,
    2010 U.S. Dist. LEXIS 130878 (S.D. Cal. Dec. 10, 2010) ............................... 20

*Peruta* v. *County of San Diego*,
    678 F. Supp. 2d 1046 (S.D. Cal. 2010).............................................................. 17

*Plummer* v. *United States*,
    983 A.2d 323 (D.C. 2009). .................................................................................. 13

*Seegars* v. *Gonzales*,
    413 F.3d 1 (D.C. Cir. 2005) ................................................................................ 7

*Shuttlesworth* v. *City of Birmingham*,
    394 U.S. 147 (1969)............................................................................................. 10

*The Slaughter-House Cases*,
    83 U.S. (16 Wall.) 36 (1873). ............................................................................. 14

*United States* v. *Baugh*,
  187 F.3d 1037 (9th Cir. 1999). .................................................... 10

*United States* v. *Masciandaro*,
  2011 U.S. App. LEXIS 5964 (4th Cir. March 24, 2011) . .................................. 17, 19, 20

*United States* v. *Miller*,
  307 U.S. 174 ( 1939). .................................................... 17

*United States* v. *Skoien*,
  614 F.3d 638 (7th Cir. 2010) (en banc)........................................... 17

*Williams* v. *State*,
  417 Md. 479, 10 A.3d 1167 (2011) . .............................................. 18

*Woollard* v. *Sheridan*,
  2010 U.S. Dist. LEXIS 137031 (D. Md. Dec. 30, 2010). ........................................... 8, 11


Statutes

28 U.S.C. § 1331................................................................. 19

28 U.S.C. § 1343................................................................. 19

42 U.S.C. § 1983................................................................. 3, 11, 19

42 U.S.C. § 1988................................................................. 15

Cal. Penal Code § 12031(a) . ........................................................ 20

M.G.L. c. 140, § 131................................................................. 3

iv

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS
CITY OF BOSTON AND EDWARD DAVIS'S MOTION FOR SUMMARY JUDGMENT
AND IN REPLY TO OPPOSITION TO PLAINTIFF'S SUMMARY JUDGMENT MOTION

PRELIMINARY STATEMENT

The parties are in agreement with respect to at least one issue: regardless of how Stacey

Hightower completed her Class A firearms license renewal form, her action should not today

disqualify her from obtaining a Class A license. That is not to say the paperwork dispute is

irrelevant—Hightower would still maintain in another forum, as she does here, that the notation

on her service record indicating she resigned with charges pending is false. Notably, not one of

Defendants' Exhibits A through U reflects *any* communication to Hightower that "charges" are

"pending" against her.

But the dispute is irrelevant to any issue in *this* case, which essentially concerns whether

there exists any valid public safety reason to deny this honorably discharged military veteran,

with a long record of service as a police officer, her constitutional right to bear arms for self-

defense. There is not. *See, e.g.*, Def. Exh. R (plaintiff Hightower qualified to own firearms).

To this end, Plaintiff welcomes the Declaration of Boston Police Lieutenant Detective

Mark Harrington, Def. Exh. C, which clarifies exactly what she could and could not expect upon

application for a "Permit to Carry." Notwithstanding the statutory appellation for this type of

permit, Plaintiff, like most law-abiding Massachusetts residents, could expect to receive only a

permit to *possess* a handgun. Def. Exh. C, ¶¶ 7, 8, 19; *Commonwealth* v. *Seay*, 376 Mass. 735,

737, 383 N.E.2d 828, 830 (1978). Hightower's ability to obtain a permit that actually permits

carrying would depend upon Harrington's subjective balancing of "her needs and the interests of

the Boston police department," *id.*, ¶ 19, rather than on any objective standards. Whether this

sort of licensing scheme is constitutional is the relevant question.

Indeed, much of Defendants' brief labors to establish principles that are not disputed by Hightower, and which have no bearing on the outcome. For example, there is no dispute that Defendants might revoke the licenses of untruthful applicants—but there is a difference between falsehood and error, and while it is not even clear that Hightower erred, what is clear is that due process should be afforded to resolve these kinds of disputes.

It is also not contested that the concealed carrying of handguns may be banned. But it bears emphasizing that Hightower is *not* claiming a right to carry a concealed handgun per se, nor does Hightower dispute that the right to bear arms may be regulated. The right is, simply, the right to carry a handgun, and pursuant to the authority to regulate the manner of carrying handguns, states may restrict carrying to one mode or another, open and/or concealed.

Massachusetts, for whatever reason, opts to issue "Class B" licenses to "carry" smaller handguns, and "Class A" licenses to carry larger handguns, "concealed." But "carrying" in Massachusetts does not necessarily mean the open carrying of functional handguns for self-defense. Under Massachusetts law, "carrying" means mere transportation: "'[C]arrying' a firearm occurs when the defendant knowingly has more than momentary possession of a working firearm and moves it from one place to another." *Seay*, 376 Mass. at 737 (citations omitted). A license to "carry" a gun does not necessarily imply a license to "bear arms" as defined in *District of Columbia* v. *Heller*, 554 U.S. 570, 584 (2008). Indeed, issuing authorities may impose restrictions on handgun "carry" licenses, and as Lieutenant Detective Harrington testifies, Defendants generally forbid the carrying of handguns in public by restricting the "carry" permit.[1]  True "carry" permits are left to Defendants' unbridled discretion.

---

[1]It is therefore somewhat misleading for Defendants to claim that "Massachusetts law does not prohibit the open carrying of firearms in public." Def. Br. at 17 n.13 (citing M.G.L. c.

Thus, the issue is *not* that Hightower wants to conceal her handgun. Hightower just happened to have suffered revocation of a permit that allowed concealed carrying.[2] The real issue is that Hightower seeks a license to carry her handgun for self-defense, and regardless of whether she obtains a Class A or B license, Defendants have made clear that there will be a carrying restriction on that permit subject to their total discretion. If Defendants prefer that Hightower carry her gun concealed, or openly, they may make that determination, as may the legislature. And if Defendants wish to condition the carrying of a handgun upon a permit, then they may do so, subject to *objective* licensing standards and due process.

These most basic features of our legal tradition—objective standards, and due process— are missing from the current regulatory scheme, and notwithstanding Defendants' professed concern with being repeatedly sued by prospective licensees, nothing has changed since the Supreme Court advised that the bearing of arms is a fundamental right secured against infringement by local officials. Plaintiff is therefore entitled to seek relief in the manner normally available to individuals whose constitutional rights are violated: by applying to a federal court for declaratory and injunctive relief under 42 U.S.C. § 1983.

---

140, § 131(a) and (b)). As Harrington testifies, Defendants limit carrying to "sport and target practice and for employment purposes," typically with the gun being unloaded and inaccessible. Def. Exh. C, ¶¶ 7, 8. Whatever Massachusetts law might authorize, nowhere do Defendants claim that *they* freely license the open carrying of handguns for self-defense, or that Hightower could obtain a license to walk around Boston with a loaded gun on her hip.

[2]Likewise, the Commonwealth seeks to create an issue of the apparent distinction between Class A and Class B handguns, arguing that Class A handguns are somehow not constitutionally-protected. That sort of categorical dispute is simply not an issue in this case, because Hightower's complaint seeks only the return of and right to carry her Class B revolver. This litigation is unrelated to any Class A handguns.

3

## STATEMENT OF FACTS

The basic relevant facts are not disputed. Hightower is a law-abiding, responsible adult, and there is no particular reason to suspect she would pose any public danger by doing what she has done for many years: carrying a handgun for self-defense. As a former police officer, Hightower does not dispute that Defendants may and should disarm dangerous individuals, but this case does not concern any such objective, cause-based firearms disqualification.

There is also no dispute as to Defendants' custom, practice, and policy with respect to the licensing of handgun carrying. Defendants' Exhibits C and M are conclusive, and reflect Hightower's allegations: Defendants enforce Massachusetts law on the subject, and pursuant to such law, have adopted a policy wherein even Class A handgun carry permits are restricted to bar the public carrying of handguns unless a determination is made that it is in "the interests of the Boston police department," Def. Exh. C, ¶ 19, whatever those are.

Accordingly, Plaintiff is constrained to address only briefly the claim that she was somehow untruthful in completing her application. As noted *supra*, there is nothing in the record demonstrating that Hightower was ever informed of "charges" "pending" against her. Three years prior to completing the application—notably, three years during which Hightower's handgun permit was never questioned—Hightower was informed that an investigation had found she broke department rules, but Hightower never understood that "charges" were "pending" against her, apparently for an indeterminate amount of time. And while the Defendants disagree with Hightower's interpretation of the term "charges pending," they point to nothing that defined that term, much less in a manner excluding Hightower's understanding.

Indeed, it is still not obvious that charges were pending against Hightower at the time of her resignation. There remains a great deal of contemporaneous evidence that Hightower's

4

superiors shared her understanding of the term. Defendants' brief is incomplete in claiming that "the inaccuracy in Plaintiff's application appears to have been initially overlooked." Def. Br. at 5. Their separate statement of facts is more precise: Defendants do not dispute facts 24, 25, and 26—relating to the fact that Hightower's superiors also reviewed, and approved, her resignation form without charges pending. *See* Pl. Exh. B.

Hightower understood a notice that she was found to have committed violations to be different than an allegation that "charges" are "pending." Pl. Exh. F, p. 37, l. 24 - p. 38, l. 17. She testified at some length that in her mind, charges are pending when notice is provided that an individual is accused of some wrongdoing, which initiates an adjudicative process. Pl. Exh. F, p. 54, l. 13 - p. 61, l. 4. She offered that "charges pending," in her mind—the mind of a ten year veteran of the Boston Police Department—related to criminal charges. Pl. Exh. F, p. 71,13 - 73, 11. And contrary to Defendant's suggestion, Hightower *was* a member of the police union. Pl. Exh. F, p. 38, l. 23 - p. 40, l. 1; p. 46, l. 15-17. As such, she had the right to expect negative information would be inserted into her personnel file in strict accordance with her rights under the collective bargaining agreement—something Defendants do not claim ever occurred.

Not only are Hightower's propositions self-evidently logical—Defendants have failed to evince *any* reason for supposing that Hightower disbelieved these positions such that she committed a knowing falsehood in stating that no charges were pending against her. Nor do Defendants suggest what Hightower had to gain from misrepresenting the pendency of charges, since according to Defendants, the charges had been pending for several years with no adverse action taken against Hightower's handgun carry license.

Indeed, Defendants do not claim, much less explain, that this bureaucratic disagreement has any bearing on Hightower's fitness to bear arms. Defendants still admit that Hightower

5

would be granted some form of handgun permit today. And Defendants admit that Hightower spent many years disrupting violent criminals, has been victimized by serious crime, and lives in a rough neighborhood.

## SUMMARY OF ARGUMENT

The one argument that Defendants do *not* offer is that Hightower is somehow dangerous or cannot be trusted to carry a handgun. Plainly, she is a model citizen with a long record of public service in the military and police, during which time she has never had any negative incidents with firearms. The hurdles placed on her path to exercising Second Amendment rights are impermissible. There is no question that a handgun permit revocation confers standing, and creates a live case or controversy. Neither futile acts, nor submission to a licensing scheme are required to test the constitutionality of the subject licensing scheme. Nor may this Court decline to implement Supreme Court precedent as a matter of equity.

The Second Amendment does, in fact, secure a right to keep and bear arms outside the home. And the current scheme governing handgun licensing simply lacks the sort of due process protections which typically govern the licensing of fundamental rights.

## ARGUMENT

I.      HIGHTOWER PLAINLY HAS STANDING, AS THE ADMINISTRATIVE
        REVOCATION OR DENIAL OF A PERMIT IS, WITHOUT QUESTION, AN
        ARTICLE III INJURY-IN-FACT.

Defendants argue that Hightower lacks standing based on the revocation of her Class A permit, claiming that the rule of *McDonald* v. *City of Chicago*, 130 S. Ct. 3020 (2010), applying the Second Amendment to state and local officials, must only be applied prospectively. The argument is a non-sequitor. Whether Hightower has suffered a constitutional injury is a separate matter from the question of whether *McDonald*'s rule is to be applied on a purely prospective

6

basis. Plaintiff addresses each argument in turn.

Standing's three elements are injury-in-fact, causation by the defendants, and redressability. *Lujan* v. *Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Defendants do not suggest that their enforcement of gun laws does not influence Hightower's conduct, or that the courts are powerless to address the situation. The dispute centers on the injury-in-fact element.

"[I]njury in fact" means that "the plaintiff must have suffered . . . . an invasion of a legally-protected interest which is (a) concrete and particularized, and (b) 'actual or imminent, not 'conjectural' or 'hypothetical.'" *Lujan*, 504 U.S. at 560 (citations omitted).  Hightower obviously suffered an actual injury when Defendants revoked her license and compelled her to surrender her firearm. It is a well-established tenet of Article III standing that an individual suffers justiciable injury when the government administratively denies his or her permission to engage in some desired conduct.

The proposition's two most obvious examples are *Heller* and *McDonald*.  *Heller* was brought by six plaintiffs, one of whom— Heller—had been denied an application to register his handgun. The D.C. Circuit found five of the six plaintiffs lacked standing because it utilizes a unique pre-enforcement standing doctrine requiring an imminent prosecutorial threat, a requirement that it acknowledged contradicts Supreme Court precedent. *Parker* v. *District of Columbia*, 478 F.3d 370, 374-75 (D.C. Cir. 2007), *aff'd sub nom Heller.aff'd sub nom Heller*.[3]

---

[3]This unique imminent threat requirement remains controversial within the D.C. Circuit, as judges continue to point out that it contradicts Supreme Court precedent. *See, e.g. Ord* v. *District of Columbia*, 587 F.3d 1136, 1146-53 (D.C. Cir. 2009) (Brown, J., dissenting in part); *Seegars* v. *Gonzales*, 413 F.3d 1, 2 (D.C. Cir. 2005) (Williams, J.); *id.* (Sentelle, J., dissenting). The First Circuit, like all other federal courts, employs a more "practical jurisprudence" of pre-enforcement standing, *New Hampshire Hemp Council, Inc.* v. *Marshall*, 203 F.3d 1, 4 (1st Cir. 2000) (citations omitted), wherein "courts are content with any realistic inferences that show a likelihood of prosecution." *Id.* at 5.

Nonetheless,

> appellant Heller has applied for and been denied a registration certificate to own a handgun . . . The denial of the gun license is significant; it constitutes an injury . . . This is not a new proposition. We have consistently treated a license or permit denial pursuant to a state or federal administrative scheme as an Article III injury . . . . Heller has invoked his rights under the Second Amendment to challenge the statutory classifications used to bar his ownership of a handgun under D.C. law, and the formal process of application and denial, however routine, makes the injury to Heller's alleged constitutional interest concrete and particular. He is not asserting that his injury is only a threatened prosecution, nor is he claiming only a general right to handgun ownership; he is asserting a right to a registration certificate, the denial of which is his distinct injury.

*Parker*, 478 F.3d at 376 (citation omitted). Judge Henderson dissented from the panel's interpretation of the Second Amendment, but acknowledged Heller had standing to challenge the handgun ban based on the permit denial. *Parker*, 478 F.3d at 402 n.2 (Henderson, J., dissenting). Subsequently, in *McDonald*, the four individual Plaintiffs each applied for, and were denied, handgun registration permits as a basis of challenging that city's handgun ban. The Supreme Court never questioned standing in either case.

More recently, the D.C. Circuit turned away the government's standing defense in a case challenging the federal prohibition against expatriated Americans acquiring firearms while visiting the United States. *Dearth* v. *Holder*, 2011 U.S. App. LEXIS 7737 (D.C. Cir. Apr. 15, 2011). In *Dearth*, the Plaintiff could not complete a firearms transaction because the required federal form mandated declaring a state residence, which he lacked. The administrative denial was taken as an on-going constitutional injury. And directly on-point, the District of Maryland recently observed that it was "undisputed" that an individual denied renewal of his permit to carry a handgun "has standing to bring a facial challenge" to Maryland's similar licensing law. *Woollard* v. *Sheridan*, 2010 U.S. Dist. LEXIS 137031 at *2 n.1 (D. Md. Dec. 30, 2010).

8

In fact, it is doubtful that even a permit denial or revocation should be required of Hightower to establish standing. A well-established corollary to the basic rule that Article III standing arises upon some negative governmental action is the futile act doctrine: if circumstances make clear that an administrative application is hopeless, a plaintiff need not go through the futile ritualistic act of submitting paperwork. *See, e.g. Int'l Brotherhood of Teamsters* v. *United States*, 431 U.S. 324, 365-66 (1977) (minority job applicants need not test a "whites only" sign before filing a Title VII claim); *Houghton* v. *Shafer*, 392 U.S. 639, 640 (1968) (per curiam) (hopeless administrative appeal not required to sustain facial challenge).

The Second Circuit's holding in *Bach* v. *Pataki*, 408 F.3d 75 (2nd Cir. 2005) is instructive. In *Bach*, the plaintiff, a Virginia resident, frequently visited his parents in New York, and challenged that state's prohibition on the issuance of firearms carry permits to those who neither permanently reside nor work in the state. Because the prohibition clearly applied to the plaintiff, he did not bother applying for a firearms permit. Both the District Court and the Second Circuit rejected a standing challenge:

> The State Police informed Bach that he was statutorily ineligible for a carry license. Bach had nothing to gain thereafter by completing and filing an application . . . . Imposing a filing requirement would force Bach to complete an application for which he is statutorily ineligible and to file it with an officer without authority to review it. We will not require such a futile gesture as a prerequisite for adjudication in federal court.

*Id.* at 82-83 (footnotes, citations and internal quotation marks omitted).

Defendants might respond with their claim that Hightower, unlike Dearth or Bach, could at least theoretically obtain a permit were she to re-apply. Indeed, a version of this argument is asserted as an entire section claiming the case is not ripe. But Harrington's declaration unravels this argument by clarifying that Hightower could only expect a *restricted* license to possess a handgun. Whether Hightower obtains a true carry permit is left to the discretion of the same

9

licensing officer who summarily revoked her permit for a reason that, even if true, does not implicate any public safety interest, and subject to arbitrary revocation at any time.

Considering that the entire object of Hightower's complaint is that the licensing standards themselves are unconstitutional, she cannot be expected to (re)apply. "[O]ne need not apply for a benefit conditioned by a facially unconstitutional law." *United States* v. *Baugh*, 187 F.3d 1037, 1041 (9th Cir. 1999) (citations omitted). "The Constitution can hardly be thought to deny to one subjected to the restraints of [a licensing law] the right to attack its constitutionality, because he has not yielded to its demands." *City of Lakewood* v. *Plain Dealer Publishing Co.*, 486 U.S. 750, 756 (1988) (*quoting Jones* v. *Opelika*, 316 U.S. 584, 602 (1942) (Stone, C. J., dissenting), adopted *per curiam* on rehearing, 319 U.S. 103, 104 (1943)). "As the ordinance [providing for unbridled licensing discretion] is void on its face, it was not necessary for appellant to seek a permit under it." *Id.* (quoting *Lovell* v. *Griffin*, 303 U.S. 444, 452-53 (1938)); *see also Shuttlesworth* v. *City of Birmingham*, 394 U.S. 147, 151 (1969); *Charette* v. *Town of Oyster Bay*, 159 F.3d 749, 757 (2d Cir. 1998).

It simply will not do for Defendants to avoid constitutional review of their standards by claiming that they will act only in good faith. The Supreme Court flatly rejected this approach:

> The city asks us to presume that the mayor will deny a permit application only for reasons related to the health, safety, or welfare of Lakewood citizens, and that additional terms and conditions will be imposed only for similar reasons. This presumes the mayor will act in good faith and adhere to standards absent from the ordinance's face. But this is the very presumption that the doctrine forbidding unbridled discretion disallows.

*Lakewood*, 486 U.S. at 770 (citation omitted). Thus, it does not matter that Hightower has not bothered re-applying, or that Defendants promise to be fair, or that on occasion, they might look favorably upon some people's applications. The issue here is the licensing standard itself, and neither standing nor ripeness can be issues at this point.

10

Finally, on the issue of standing, Defendants' argument that Hightower's permit revocation was not an injury, because it was not done pursuant to any custom, policy or practice of the Defendants, is specious. Initially, the claim is based on a factual error. Defendants claim that Commissioner Davis is sued only in his official capacity, but that is incorrect. *See* First Am. Compl., ¶ 6 ("Commissioner Davis . . . is sued in both his official and individual capacities."). There is no question Davis revoked Hightower's permit. *See* Def. Exh. M.

In any event, the Complaint specifically alleges the Defendants have adopted the challenged provisions as their customs, practices, and policies, First Am. Compl. ¶ 45, and Defendants' voluminous filings confirm this to be the case. *See, e.g.* Defendants' Exhibit M (letter by Defendant Davis revoking Hightower's handgun permit pursuant to M.G.L. c. 140, § 131). Indeed, Harrington's declaration spells out the challenged policies quite clearly—the police issue true carry licenses only when deeming it in their "interests." Def. Exh. C, ¶ 19.

The revocation of Hightower's permit was, to be sure, arbitrary and capricious, but state actors cannot defend arbitrary and capricious behavior by claiming they lack a policy. Hightower challenges a policy of employing unbridled discretion, and there is no serious question that Defendants maintain such a practice. Regarding the existence of a "custom, practice, or policy," Hightower's case is indistinguishable from *Heller*, *McDonald*, *Woollard*, and *Bach*—all brought under 42 U.S.C. § 1983, and as in this case, claiming a constitutional injury stemming from an ordinance or statute that prevented the plaintiffs from obtaining or maintaining a gun permit.

II.    *McDONALD* GOVERNS DEFENDANTS' CONDUCT.

Defendants' claim that they cannot be subject to Second Amendment rights because *McDonald* must have only prospective relief is untenable. It is true that "[a] court in a civil case may apply a decision purely prospectively," *Crowe* v. *Bolduc*, 365 F.3d 86, 93 (1st Cir. 2004),

11

but the reference here is to a court applying *its own decision* creating a new rule. This most

emphatically does not mean a lower court can decline to follow a higher court's precedent. The

Supreme Court flatly forbids lower courts from limiting the application of *its* decisions:

> When this Court applies a rule of federal law to the parties before it, that rule is the
> controlling interpretation of federal law and must be given full retroactive effect in all
> cases still open on direct review and as to all events, regardless of whether such events
> predate or postdate our announcement of the rule.

*Harper* v. *Va. Dep't of Taxation*, 509 U.S. 86, 97 (1993). The analysis could end here.

The prospective relief limitation was available *to the Supreme Court* in deciding

*McDonald*. It is not available here. Because *McDonald* bound the litigants in that case, its rule

binds all others. "As a general rule, judicial decisions are retroactive in the sense that they apply

both to the parties in the case before the court and to all other parties in pending cases." *Crowe*,

365 F.3d at 93. "Selective prospectivity . . . is not permissible; if a new rule is applied to the

parties in the rule-creating case, then it must be applied retroactively to similarly situated parties

in all pending cases." *Id.* (citing *Harper*).

In *McDonald*—"the rule creating case" at issue— the Supreme Court made clear that

further proceedings applying its decision were required. *McDonald*, 130 S. Ct. at 3050.  Missing

from the Court's opinion is any language indicating that its rule would *not* bind the litigants in

the case, and that Chicago could continue its unconstitutional policies. Indeed, in litigating

before the Supreme Court, Chicago *conceded* that an adverse decision in the case would not be

merely prospective. In briefing its case, Chicago acknowledged that the Supreme Court would be

passing upon its handgun ban's constitutionality. Chicago claimed that McDonald plaintiffs

"limit their argument in this Court to handgun bans," but then noted that they also "raised other

issues." Exh. G, at 80 n.27. Describing these "other issues," Chicago concluded, "[i]f the

judgment is reversed, the lower courts should be directed to address those claims in the first

instance." Exh. G, at 81 n. 27. Accordingly, Chicago differentiated between the handgun ban,

and the "other issues," and acknowledged that there would be no need for the lower courts to

address the handgun ban "in the first instance" if the Court, in fact, were to fully apply the

Second Amendment to it—as it would do.

Ten days before the Supreme Court issued its opinion in *McDonald*, Chicago

Corporation Counsel Mara Georges testified that "if the Supreme Court were to find

incorporation of the Second Amendment, the city's handgun ban would be invalidated. As the

Court's decision in Heller has already found a right to possess a handgun in the home for self-

defense purposes." Exh. H. The day after the Court's decision, Ms. Georges testified, "[T]he

section of our ordinance that prohibits the registration of handguns is unenforceable." Exh. I.

Chicago repealed its handgun ban and otherwise modified its laws to moot further proceedings.

[There is also no question that *Heller* applied retroactively. The D.C. Circuit granted

Heller's motion for summary judgment, *Parker*, 478 F.3d at 401, and the Supreme Court

affirmed, commanding: "the District must permit [Heller] to register his handgun and must issue

him a license to carry it in the home." *Heller*, 554 U.S. at 635.[4] *Heller* is given retroactive effect

in the District of Columbia. *See Plummer* v. *United States*, 983 A.2d 323, 340-41 (D.C. 2009).]

Beyond misstating the availability of an exception, Defendants misstate some basic facts

about the *McDonald* case. First, neither the City of Chicago nor any court in *McDonald* ever

questioned the plaintiffs' standing to challenge various Chicago gun ordinances, including that

city's late handgun ban, under which each of the plaintiffs had suffered a registration denial.

---

[4]Heller did not apply for a permit to carry his gun in public, only for a permit, then required, to carry his gun *inside his home*. That requirement was quickly repealed.

13

Chicago questioned whether the complaint stated a valid claim for relief, and indeed, at the

District Court, prevailed on an oral Rule 12(c) motion.[5]

Nor did applying Second Amendment rights to the States necessarily require any

precedent to be overruled. Plaintiffs advanced two theories for applying the Second Amendment

to the states, under the Fourteenth Amendment's Privileges or Immunities and Due Process

Clauses, respectively. While the first argument required the Supreme Court reverse *The

Slaughter-House Cases*, 83 U.S. (16 Wall.) 36 (1873), the second issue was—as the City of

Chicago conceded— a matter of first impression:

> We acknowledge, however, that the Court has not decided whether, under its modern
> selective incorporation cases, the Second Amendment right to keep and bear arms in
> common use, including handguns, is incorporated into the Due Process Clause so that it
> binds the States.

Exh. J. Indeed, prior to *McDonald*, the Ninth Circuit invoked the Due Process Clause to

incorporate the Second Amendment. *Nordyke* v. *King*, 563 F.3d 439 (9th Cir. 2009), *vacated and

remanded*, 611 F.3d 1015 (9th Cir. 2010) (en banc). Although both of *McDonald*'s arguments

proved necessary to form a majority, no official could have relied on a contrary legal regime

considering the absence of a decision under the modern incorporation doctrine.

Indeed, nearly two months before Defendants revoked Hightower's handgun permit, the

Supreme Court cautioned that the incorporation issue remained open under its modern

jurisprudence, noting that precedent barring the Second Amendment's application to the States

"did not engage in the sort of Fourteenth Amendment inquiry *required* by our later cases."

---

[5]The District Court had instructed that it wished to reach the central legal issue in the
case via a Rule 16 motion to clarify the issues. Having denied Plaintiffs' motion, there was
nothing left to do other than issue a judgment for defendant on the pleadings.

14

*Heller*, 554 U.S. at 620 n.23 (emphasis added).[6] Thus, even if *McDonald* announced a new rule, Defendants had no right to rely on an absence of the Second Amendment's application to them.

The arguments for applying the unavailable prospective relief exception are likewise untenable. The repeated claims along the lines that "[r]etroactive application would no more help citizens achieve [self-defense] than would prospective application," Def. Br. 13, is inapposite. Plaintiff seeks injunctive and declaratory relief. Restoring her right to bear arms would immediately help her defend herself, and the declaratory relief would immediately be of help to others. Since Defendants are not volunteering to change anything about their practices, it is not as though they are agreeing to any form of prospective relief, either.

Finally, money damages are not being requested. The statute of limitations, and *Harper*'s inherent limits on retroactivity being inapplicable to closed matters, bar the prospect of much additional litigation. And Defendants' complaints about the prospect of fee shifting pursuant to 42 U.S.C. § 1988 should be addressed to the Congress. This is the system we have for enforcing constitutional rights, and for whatever it may be worth at this stage of the proceedings, it is not generally viewed as very lucrative by the Bar. If the Defendants are nonetheless concerned about their liability under Section 1988, they should reconsider their licensing standards and adopt a more accommodating litigating position.

In any event, the rule of *Harper* is clear. *McDonald* contained no limitations on retroactivity, and was understood by all to bind the litigants in that case. It must be applied here.

---

[6] Due process incorporation began with *Chicago B. & Q. R. Co.* v. *Chicago*, 166 U.S. 226 (1897), after the Court's last *pre-McDonald* word on applying the Second Amendment to states.

15

III.    HIGHTOWER HAS THE RIGHT TO CARRY A HANDGUN FOR SELF-DEFENSE.

Hightower welcomes Defendants' concession that "[q]uite obviously, one's need for self defense is a rarely scheduled event." Def. Br. at 19. That is precisely why the Second Amendment leaves it to individuals, not the government, to determine as a preliminary matter whether and when they should "bear arms." Contrary to Defendants' claims, Hightower does *not* seek to carry a handgun for "*any sort* of confrontation." Def. Br. at 19. Hightower seeks a license that is limited to "all *lawul* purposes." First Am. Complaint, ¶¶ 15, 16 (emphasis added). Her interest: "self-defense." First Am. Complaint, ¶¶ 37, 53, 54, 59, 60, 64, 65, 70.

Of course, Defendants are also correct in claiming that this right is not absolute, and can be subject to time, place, and manner limitations. Hightower never claims otherwise. But the laws at issue here are not in the nature of time, place, or manner restrictions. Rather, Defendants are preventing Hightower from carrying a handgun for self-defense, period, at all times and places. If Hightower has the right to bear arms—and assuredly, she does—the fact that this right may be regulated does not mean it can be completely foreclosed at the whim of a licensing official. Hightower's authorities in support of that proposition in her moving summary judgment papers amply demonstrate as much and there is no need to recount them here.

But Defendants err in suggesting that the Second Amendment is limited to the home. *Heller* and *McDonald* defined the right to "bear" arms as the right to "carry" them, cited numerous precedents applying and securing the right to bear arms in public, and even noted that the Second Amendment protects some activities, such as target practice and hunting[7]—that

---

[7] "The Constitution secures the right of the people to keep and bear arms. No doubt, a citizen who keeps a gun or pistol under judicious precautions, *practises in safe places the use of it, and in due time teaches his sons to do the same*, exercises his individual right." *Heller*, 554 U.S. at 619 (emphasis added) (citation omitted). "Americans valued the ancient right [to keep

typically occur outside the home. Several lower courts have followed suit, indicating the right to bear arms is not necessarily limited to the home. *United States* v. *Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc); *Peruta* v. *County of San Diego*, 678 F. Supp. 2d 1046, 1051 (S.D. Cal. 2010) ("*Heller* does not preclude Second Amendment challenges to laws regulating firearm possession outside of home.").

Indeed, the Supreme Court's application of the Second Amendment outside the home dates back to *United States* v. *Miller*, 307 U.S. 174 (1939), which remanded for further proceedings the question of whether a sawed-off shotgun qualified as a constitutionally-protected arm. The shotgun came within federal purview because it had allegedly been transported from Claremore, Oklahoma to Siloam Springs, Arkansas, *id.* at 175—well outside Miller's home, yet potentially within the Second Amendment's protection. Were the Second Amendment limited to the home, *Miller* would have been a much shorter opinion.

Text and history determine the content of our fundamental constitutional rights. "In interpreting this text, we are guided by the principle that '[t]he Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning.'" *Heller*, 554 U.S. at 576 (citations omitted). "[H]istorical meaning enjoys a privileged interpretative role in the Second Amendment context." *United States* v. *Masciandaro*, 2011 U.S. App. LEXIS 5964 at *33-*34 (4th Cir. March 24, 2011) (citations omitted).

--------------------

and bear arms] . . . for self-defense *and hunting*." *Id.*, at 599 (emphasis added). "The settlers' dependence on game for food and economic livelihood, moreover, undoubtedly undergirded . . . state constitutional guarantees [of the right to arms]." *McDonald*, 130 S. Ct. at 3042 n.27.

In *Heller*, the Supreme Court engaged in a long discussion of what it meant, in 1791, to "bear arms," because that question lay at the heart of the District of Columbia's defense. Even were it not somehow a part of the holding, Plaintiffs hereby adopt and submit the Supreme Court's definition of "bear arms:" to "wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person." *Heller*, 554 U.S. at 584 (quoting *Muscarello* v. *United States*, 524 U.S. 125, 143 (1998) (Ginsburg, J., dissenting)). Defendants fail to address, let alone rebut, this definition. They offer no explanation as to how the people of 1791 believed the Second Amendment right was limited to the home, or what else "bear arms" might mean if it does not mean what the Supreme Court said it means.[8]

Defendants correctly point out that Maryland's Court of Appeals, perhaps uncomfortable with the Second Amendment's policy prescription, declared that "if the Supreme Court . . . meant its holding to extend beyond home possession, it will need to say so more plainly." *Williams* v. *State*, 417 Md. 479,  496, 10 A.3d 1167, 1177 (2011). This statement appears somewhat defiant of the Supreme Court's existing opinions, which are expected to provide guidance to the lower courts in resolving legal questions. The Supreme Court is not the court of first resort in resolving federal constitutional questions, and it probably does not expect that there would be a Second Amendment exception to this rule.[9]

---

[8]Contrary to Defendants' assertions, the Supreme Court's definition of "bear arms" is not satisfied by the existence of a traditional criminal law necessity defense to a charge of carrying arms. The fact is, if Hightower were to carry a handgun "for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person," *Heller*, 554 U.S. at 584, without a true license to carry, she would be jailed.

[9]*Williams* is somewhat inapposite in that the defendant in that case was charged with carrying a handgun without a license to do so. Plaintiffs here do not challenge Maryland's ability

But whatever rules govern Maryland's courts, the jurisdictional rules in federal courts are different. As stated memorably by the Supreme Court long ago,

> The judiciary cannot, as the legislature may, avoid a measure because it approaches the confines of the constitution. We cannot pass it by because it is doubtful. With whatever doubts, with whatever difficulties, a case may be attended, we must decide it, if it be brought before us. We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given . . . All we can do is, to exercise our best judgment, and conscientiously to perform our duty.

*Cohens* v. *Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821). There is simply no question that this Court has jurisdiction over the claim pursuant to 28 U.S.C. §§ 1331, 1343 and 42 U.S.C. § 1983. The Court cannot decline to hear this case simply because it involves the Second Amendment, any more than it could decline to hear other constitutional cases over which it has jurisdiction.

Pursuing the same theme, the Commonwealth invokes Judge Wilkinson's recent statement that "This is serious business. We do not wish to be even minutely responsible for some unspeakably tragic act of mayhem because in the peace of our judicial chambers we miscalculated as to Second Amendment rights." *Masciandaro*, 2011 U.S. App. LEXIS 5964 at *48. Indeed, no court should want to be in the position of thinking itself "minutely responsible" for the death of an innocent person because it "miscalculated as to Second Amendment rights," leaving the victim without arms for her defense.

But courts are not in a position to make basic policy choices, and determine whether the Second Amendment provides a net-benefit or net-burden to society. The Second Amendment does not "require judges to assess the costs and benefits of firearms restrictions and thus to make difficult empirical judgments in an area in which they lack expertise." *McDonald*, 130 S. Ct. at 3050. "The right to keep and bear arms . . . is not the only constitutional right that has

---

to require a permit, or to punish people for not having one.

controversial public safety implications." *McDonald*, 130 S. Ct. at 3045. And even the very

reluctant Judge Wilkinson conceded that there would sometimes be a "necessity" to adjudicate

Second Amendment rights outside the home, even if only "to a small degree." *Masciandaro*, at

\*46-\*47. Such necessity did not arise in a case concerning what the court believed to be an

obvious "sensitive place," but there is no way to adjudicate Hightower's claim without

determining whether she enjoys a right to bear arms.

  While most of the concealed carry cases cited by Defendants are inapposite, as Plaintiff's

claim relates only to carrying as a general matter, one such case warrants closer reading.

Defendants aver that the Southern District of California upheld that state's "proper cause"

requirement for a concealed carry license, Def. Br. at 17, but there is much more. As Plaintiff

noted, the *Peruta* court had rejected the claim that the Second Amendment right is limited to the

home. The court re-emphasized this point in its subsequent opinion, cited by Defendants:

> in its order denying Defendant's motion to dismiss, this Court emphasized that not *all*
> concealed weapons bans are presumptively lawful. *Heller* and the 19th-century cases it
> relied upon instruct that concealed weapons restrictions cannot be viewed in isolation;
> they must be viewed in the context of the government's overall scheme.

*Peruta* v. *County of San Diego*, 2010 U.S. Dist. LEXIS 130878 at \*18 (S.D. Cal. Dec. 10, 2010)

(emphasis in original). And "the government's overall scheme" in California differs from that of

Massachusetts' in at least one critical respect:

> Here, to the extent that Penal Code sections 12025 and 12050 and Defendant's policy
> burden conduct falling within the scope of the Second Amendment, if at all, the burden is
> mitigated by the provisions of [Cal. Penal Code] section 12031 *that expressly permit
> loaded open carry for immediate self-defense.*

*Peruta*, at \*19 (emphasis added). California Penal Code § 12031(a) does *not* prohibit individuals

from carrying handguns, without a license, provided they do so openly and provided that, in

incorporated areas or prohibited portions of unincorporated areas, the handgun is unloaded

(although ammunition may be separately carried).

While Hightower would strongly disagree that the open carrying of an unloaded handgun provides individuals with an effective means of self-defense in case of emergency satisfying Second Amendment standards (or is even a good idea, considering that the open display of *unloaded* firearms may make one a tempting robbery target), the fact is that in California, unlike in Massachusetts, anyone who can legally possess a handgun can openly carry it without a permit. In Massachusetts, the *only* way to legally carry a handgun is to first obtain a license of the type Defendants will not issue Hightower unless they determine it to be in their "interests." The *Peruta* court might well have enjoined Defendants' practice.

In sum, there is no way to avoid the Second Amendment question. The Supreme Court has defined "bear arms" to include carrying guns outside the home, and has stated the Second Amendment extends to various outdoor activities. It long ago addressed a Second Amendment case arising on the highways. If Defendants have a contrary definition of "bear arms," they have not supplied it. And the fact that the right to bear arms is not totally absolute and beyond all regulation means only that it is a normal constitutional right, not that it does not exist.

IV.   DEFENDANTS' REVOCATION OF HIGHTOWER'S GUN CARRY
       LICENSE FAILS ANY LEVEL OF SCRUTINY.

Defendants' initial justification for the revocation of Hightower's gun carry permit simply recounts their arguments that she has other alternative means of exercising her rights, primarily, by re-applying, a topic already addressed above. But even if Hightower could reapply with any expectation of having her application granted or at least governed by objective standards and due process, that would neither address the legality of the revocation that has already occurred, nor remove Hightower from the prospect of completely arbitrary revocation.

More to the point, Defendants claim that it is acceptable to bar Hightower from exercising a fundamental constitutional right because her answer to the "charges pending" question was incorrect. Defendants do not reveal whether Hightower's commander, Lieutenant Cruz, or Defendant Commissioner Davis, were disarmed because they approved Hightower's resignation submitted as being without charges pending, Pl. Exh. B. Nor does it appear that any Internal Affairs personnel were disarmed for initially reviewing her gun permit renewal form and approving it. Hightower had absolutely nothing to gain by concealing existing charges being pending against her, both because the renewal form makes plain that it would be reviewed by Internal Affairs, but more critically, because even now Defendants do not take the position that the existence of these so-called "charges" disqualify Hightower. Certainly, they did not disqualify Hightower for over three years.

Hightower does not question that Defendants have an interest in ensuring that individuals complete their handgun license applications truthfully. But there is no evidence suggesting that Hightower was untruthful. The evidence is, at best, debatable as to whether she misinterpreted the question at issue. All the same, Defendants would have a point if they only argued that the existence of these "charges," were they existing, was itself a material event disqualifying Hightower. But such a claim would be untenable in light of (1) the fact that no action was taken to disarm Hightower during the three year alleged pendency of these "charges," and (2) Defendants' submissions before this Court that they might still issue Hightower a license to carry a gun and in any event would not dispossess her of firearms.

The cases cited by Defendants actually make Hightower's point by providing illuminating contrast. In *Kaplan* v. *Bd. of Registration in Pub. Accountancy*, 452 Mass. 1026, 897 N.E.2d 67 (2008), an accountant knowingly failed to disclose a larceny conviction. In

22

*Number Three Lounge, Inc.* v. *Alcoholic Beverages Control Commission*, 7 Mass. App. Ct. 301, 387 N.E.2d 181 (1979), a liquor licensee knowingly concealed the true ownership interests in his licensed establishment. In both cases, (1) the applicant unquestionably engaged in knowing deceit; (2) the subject matter being concealed would have obviously led to adverse licensing action, and (3) the authorities were committed to maintaining the adverse action. None of those factors are present here.

And in any event, it is not for this Court to review, in the first instance, whether Hightower truly had "charges pending" against her, or whether, if so, misunderstanding that fact should result in depriving a ten-year veteran of the Boston Police Department of the means of self-defense. Ideally, because a fundamental right is involved, Defendants would provide some form of constitutionally-adequate due process to review the matter.

The precise standard of review is thus largely immaterial to the substantive due process issue. Nothing Hightower has done implicates any interest in preventing her from carrying a handgun, and Defendants do not contend otherwise.[10]

* * *

_____

[10]Defendants are wrong, however, in claiming that "[r]educing the number of handguns in public is a substantial government interest because firearms have a disproportionate involvement in life-threatening crimes of violence, particularly in a large city such as Boston." Def. Br. at 28. This was *exactly* the argument rejected in *Heller* and *McDonald*. The possession and carrying of handguns by individuals is protected by the Second Amendment. Whatever the regulatory interest in enhancing firearm safety, there is never a valid governmental interest in reducing the exercise of a fundamental constitutional right. Defendants would never claim that arbitrary restrictions tending to reduce abortions, or speech, or religious worship, are acceptable insofar as they necessarily reduce any negative externalities of these constitutionally-protected activities.

The City Defendants' other due process, standard of review, and equal protection arguments overlap with those developed at further length by the intervenor-Defendant Commonwealth of Massachusetts. Plaintiff's opposition to those arguments are fully set forth in her opposition to the Commonweath's motion for summary judgment, and in the interest of judicial economy, are not re-printed here but are fully incorporated by reference.

## CONCLUSION

Defendants revoked Hightower's handgun carry license for no meaningful reason. At most, Defendants insist that she could still own a gun, but leave the question of whether she would obtain a true license to carry it up to their complete discretion. Plaintiff's standing to challenge the licensing law, and the ripeness of her claim, are plainly established. Nor can there be any question that Defendants are bound by Second Amendment rights, which do extend beyond the threshold of one's home.

Of course the right to bear arms may be regulated in any number of ways, but the issue here is not some time, place, or manner limitation on the right to bear arms. It is the entire prior restraint of that right absent objective standards. Nor is there a dispute that knowingly withholding material information might properly trigger a license revocation.  But there is not even scant evidence that Hightower lied about anything on her application form, and Defendants do not claim now, nor have they ever claimed, for years, that Hightower should be disarmed for cause. That paperwork dispute is utterly irrelevant to Hightower's suitability, as a constitutional matter, to bear arms. A fundamental right rooted in the ultimate individual interest—self-defense—cannot be so casually dismissed. Defendants' motion for summary judgment must be denied, and Plaintiff's motion for summary judgment should be granted.

Dated: May 6, 2011                          Respectfully submitted,

Chester Darling (BBO # 114320)              Alan Gura
9 Mayflower Drive                           Gura & Possessky, PLLC
Andover, MA 01810                           101 N. Columbus Street, Suite 405
978.475.2520                                Alexandria, VA 22314
Fax 978.475.1741                            703.835.9085/Fax 703.997.7665

By:   /s/ Chester Darling            By:    /s/ Alan Gura
      Chester Darling                       Alan Gura
                                            Attorneys for Plaintiff

CERTIFICATE OF SERVICE

I, Alan Gura, hereby certify that this document filed through the ECF system was served on all counsel of record.

      Date: May 6, 2011              /s/ Alan Gura
                                     Alan Gura

25