```
 1                 UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS
 2

 3   _____

 4   STACEY HIGHTOWER,

 5                     Plaintiff,        Civil Action
                                         No. 08-11955-DJC
 6   V.

                                         June 21, 2011
 7   CITY OF BOSTON, et al.,             1:59 p.m.
                          Defendant.
 8   _____

 9

10

11              TRANSCRIPT OF MOTION HEARING

12           BEFORE THE HONORABLE DENISE J. CASPER

13              UNITED STATES DISTRICT COURT

14           JOHN J. MOAKLEY U.S. COURTHOUSE

15                  1 COURTHOUSE WAY

16                  BOSTON, MA  02210

17

18

19

20
                     DEBRA M. JOYCE, RMR, CRR
21                   Official Court Reporter
                 John J. Moakley U.S. Courthouse
22                1 Courthouse Way, Room 5204
                      Boston, MA  02210
23                     617-737-4410

24

25
```

```
 1   APPEARANCES:

 2   FOR THE PLAINTIFF:

 3   ALAN GURA, ESQ.
     Sidley & Austin
 4   1722 Eye Street, N.W.
     Washington, DC 20006
 5   202 736-8000

 6   CHESTER DARLING, ESQ.
     9 Mayflower Drive
 7   Andover, MA 01810
     978-475-2520
 8
     FOR THE DEFENDANTS:
 9
     LISA SKEHILL MAKI, ESQ.
10   IAN D. PRIOR, ESQ.
     City Of Boston Law Department
11   One City Hall Plaza
     Room 615
12   Boston, MA 02201
     617-635-4017
13
     KENNETH W. SALINGER, ESQ.
14   Massachusetts Attorney General's Office
     Government Bureau
15   One Ashburton Place
     Boston, MA 02108
16   617-963-2075

17

18

19

20

21

22

23

24

25
```

<u>P R O C E E D I N G S</u>

1

2          (The following proceedings were held in open

3    court before the Honorable Denise J. Casper, United States

4    District Judge, United States District Court, District of

5    Massachusetts, at the John J. Moakley United States Courthouse,

6    1 Courthouse Way, Boston, Massachusetts, on June 21, 2011.)

7          THE CLERK:  Civil action 08-1955, <u>Stacey Hightower v.</u>

8    <u>City of Boston, et al.</u>

9          Counsel, please state your name for the record.

10 01:59     MR. GURA:  Good afternoon, your Honor.  Alan Gura for

11   the plaintiff.

12          MR. DARLING:  Chester Darling with him.

13          MR. GURA:  And with us, of course, is our client,

14   Stacey Hightower, as well.

15          MS. HIGHTOWER:  Good afternoon, your Honor.

16          THE COURT:  Good afternoon.

17          MR. SALINGER:  Good afternoon.  Assistant Attorney

18   General Kenneth Salinger for the Commonwealth of Massachusetts.

19          MS. SKEHILL MAKI:  Good afternoon.  Lisa Skehill Maki

20 01:59  on behalf of the City of Boston and Commissioner Ed Davis.

21          MR. PRIOR:  Good afternoon.  Ian Prior on behalf of

22   the City of Boston and Edward Davis.

23          THE COURT:  Good afternoon.

24          Counsel, I've got your papers for planitiff's motion

25   for summary judgment and also the cross-motion for summary

1    judgment.  I've had an opportunity to read the briefs on both

2    sides, so I'm ready to hear argument.

3           Counsel, do you want to begin?

4           MR. GURA:  Thank you, your Honor.

5           Your Honor, this is a narrow case, and we believe it's

6    a fairly simple case.

7           If there are two principles that we would seek to

8    vindicate in this action, it is that we wish to see the Second

9    Amendment, right to keep and bear arms, subjected to licensing

02:00 10   regimes, only if those licensing regimes contain objective

11   standards and due process.  Objective standards and due process

12   are time-honored constitutional requirements when we're dealing

13   with fundamental rights, and there's no reason why the Second

14   Amendment should be any different than the First Amendment or

15   the Fourth Amendment, the Sixth Amendment, or any other part of

16   the Bill of Rights.

17          This is not a case about, as the defendants sometimes

18   have intimated in their papers, a right to have machine guns or

19   the right to have high-capacity, semiautomatic Glocks.  It's

02:01 20   not a case about concealment.  It's not a case that argues for

21   any aversion of some absolute right that is completely immune

22   from government regulations.  All we are saying is that if the

23   defendants wish to regulate the right to bear arms -- and we

24   concede fully that they are entitled to do so -- that they use

25   objective standards and provide some due process.

1          THE COURT:  So, counsel, is your argument that even

2     post Heller and post McDonald it's permissible for the statute

3     to bar the disqualifi -- the bases for disqualification from

4     having a license, but that the discretion that is allowed to

5     the Commissioner for determining whether or not someone is

6     suitable is what's problematic here?

7          MR. GURA:  That's correct, your Honor.  We're not

8     challenging any particular disqualifying feature.  In fact,

9     Stacey Hightower is not disqualified under any particular

02:01 10     aspect of the Massachusetts law.  The defendants have certainly

11     not suggested as much.  They have admitted in their papers that

12     she is entitled to some form of a handgun permit, and we're not

13     aware of any disqualifying feature.

14          What we are bothered by is the fact that her

15     entitlement to engage in what is for her a constitutional right

16     is subjected -- is subjected to the complete and utter whim of

17     a licensing official without any standards governing the

18     licensing official's discretion whatsoever.  That is something

19     the Supreme Court has condemned now for a very long time as

02:02 20     unconstitutional prior constraint.  It literally fits the

21     definition of Staub v. City of Baxley, which held that whenever

22     a freedom which the Constitution guarantees is subject to, as

23     an initial matter, a licensing regime, it's an unlawful prior

24     restraint if there is unbridled discretion in the issuance of

25     that license.

1    There can be no room for an assessment of facts, there

2    can be no room for opinion or feelings or any other kind of

3    subjective notions about whether the applicant is a good person

4    or a deserving person or whether the right is a good idea or a

5    bad idea.  There have to be objective licensing standards.  A

6    background check is an objective licensing standard, we have no

7    problem with that.  Something that requires, as many states do,

8    some demonstration, perhaps, of proficiency, knowledge of the

9    state's use of force laws, all those are common objective

02:03  10   qualifications that are imposed upon permits to carry firearms.

11    But what is not permissible anymore, in the post

12   McDonald world, is a statute that says we, the government, will

13   determine whether or not you have a good enough reason to

14   engage in this behavior.  If you have a right to do something,

15   then that's the beginning of the discussion.  The government

16   carries the burden of disproving entitlement to engage in a

17   constitutional right.

18    THE COURT:  And, counsel, I certainly understand the

19   argument, but what case or have there been any cases yet that

02:04  20   have imported this concept of prior restraint in the Second

21   Amendment context?

22    MR. GURA:  No, there have not.  However, what we have

23   had is a trend in the federal courts that look to the First

24   Amendment to interpret the Second Amendment.

25    We are really in a very new and emerging area of law.

1     It's been less than a year since McDonald came out.  That was

2     the green light for us to even file such cases.  There are not

3     many of them because the Massachusetts law is definitely rare.

4     There are a small handful of states that have unbridled

5     discretion in their licensing scheme.  I believe there's only

6     five or six states left that do this.  So there hasn't been a

7     lot of time for law to develop.

8          What we have seen the D.C. Circuit, the 3rd Circuit,

9     and the 4th Circuit all say that the First Amendment will

02:05 10     henceforth be a guide for the Second Amendment.  They do this

11     by drawing upon Heller, which refers repeatedly to First

12     Amendment analogies.  The D.C. Circuit case in Parker, which

13     became Heller, that drew heavily upon the First Amendment.

14     We've seen recent cases, the Nordyke case, 9th Circuit that

15     came out in May, although it has sort of an unusual way of

16     approaching the Second Amendment, it also draws upon first

17     amendment standards for the way that it goes after the Second

18     Amendment.  And it's not a mystery as to why the Supreme Court

19     and all the circuit courts have looked to the First Amendment

02:05 20     for a guide.

21          The first and Second Amendment are the two places in

22     the Bill of Rights where people are secured in engaging in some

23     sort of affirmative conduct, be it speaking, worshipping, or

24     keeping and bearing arms.  And so it makes sense that the kind

25     of regulations that you see in the First Amendment will happen

1   in the Second Amendment area.  For example, in the First

2   Amendment we have a very well-established regime of time,

3   place, and manner.  You can speak but you can't have a sound

4   truck blaring it through your morning.  There are tests about

5   which forums are appropriate and what kind of restrictions are

6   going to be allowed in different forums.

7        Likewise, the Second Amendment, if we look at the

8   Heller case and its various discussions of the right to carry a

9   gun as traditionally understood sounds a lot like time, place,

02:06 10   and manner.  There are sensitive places to which you cannot

11   carry a gun.  You can carry a gun for some types of reasons,

12   not for all reasons.  There is definitely an established

13   history of regulating the manner in which firearms are carried.

14   It's undisputed that the state can ban entirely, for example,

15   the concealed carrying of guns.  We're not challenging that.

16   However, all of those cases, if you read them carefully, what

17   pops out is an explanation that we can ban the concealed

18   carrying of weapons because we allow the open carrying of guns.

19   The lesson there is they can tell you how to do it.  I think

02:07 20   the society has changed its preference since the 19th century.

21   Today the preference has probably reversed itself.  There are

22   some people who like to openly carry their firearms, I think

23   it's a political statement in some regard.

24        Today we have states that generously license the

25   concealed carry of guns and some look at open carrying as kind

of horrifying to the public.  It's seen as a brandishment or

perhaps a hostile act in some places that are otherwise quite

friendly to gun rights.

In any event, it's for the legislature to decide.

They can regulate the manner in which the guns are carried, but

they can't ban it all completely.

THE COURT:  But isn't there an argument here that even

the discretion to the Commissioner for whether or not someone

was suitable for a class A license, that it's on the continuum

of time, place, and manner restrictions in the sense that the

legislature has decided that it should be within the discretion

of the leading law enforcement officer in that community to

decide whether or not there are folks who fall outside of the

categories of disqualification that still should not be in

possession of a large capacity or concealed weapon?

MR. GURA:  That is exactly, your Honor -- there's no

question that the legislature has done that, and that's why

we're challenging their decision to do that.  The fact is that

that kind of subjective determination is exactly what the prior

restraint doctrine seeks to disallow.

If a person meets certain objective standards or --

they should be able to exercise their constitutional rights.

If they're disqualified by objective standards, they should be

disqualified, of course, as long as they have due process and

can face their accusers and sort of have the normal

1    protections.

2         I suppose that in theory one can imagine a regime

3    where an officer asserts some reason as to why a person is to

4    be disqualified, but, again, that reason has to be objective,

5    it has to be within a defined set of objective standards.  And

6    here what's amazing is we don't actually have much of a reason.

7    There is no question whatsoever that Stacey Hightower is fit to

8    carry a gun.  She's not a public hazard, they never claimed

9    that she is.  We have this dispute about whether charges were

02:09 10   pending on this application, and we can dispute that all day

11   long, but the one thing that is completely missing from the

12   defense brief is any accusation or allegation that Stacey

13   Hightower is a dangerous person.  In fact, the alleged pendency

14   of these charges were known to the defendants for three years.

15   They took no action against her.  She was still on the force,

16   she still had her class A license.  It was only when she left

17   her employment that suddenly these things became problematic.

18         THE COURT:  And, counsel, do you think that the

19   imposing this prior restraint framework on Second Amendment

02:10 20   cases follows from Heller and McDonald, which I think in both

21   of those cases the Supreme Court was very careful to say that

22   they were not doing away with or not questioning the

23   government's right to regulate the issuance of licenses for

24   firearms?

25         MR. GURA:  Oh, yes, your Honor.  In fact, adopting our

1    prior restraint framework is probably the most limited kind of

2    action that the Court could take with respect to striking down

3    gun regulations, because we're not -- our primary argument does

4    not require any sort of judicial interest balancing or even the

5    selection of some kind of a means end level scrutiny.  Of

6    course we would need that if we were to get to our equal

7    protection argument.  However, all the Court would be saying is

8    you, City of Boston, Commonwealth of Massachusetts, you can

9    regulate guns, but you need to come up with objective

02:11 10   standards.  And what those standards are, they are free to come

11   up with them in the first instance, and if they adopt standards

12   that are problematic or difficult, then we can have a lawsuit

13   that examines those specific standards and evaluates whether or

14   not they are appropriate to regulate the Second Amendment

15   right.  But all the Court would be saying here is that however

16   they go about the business of regulating firearms, it simply

17   has to be done with some kind of objectively defined

18   limitations, and they have to provide some level of due process

19   to people so that those limitations can be effectively applied.

02:12 20   And that's a very minimal approach.

21           THE COURT:  Counsel, do you want to go on?

22           MR. GURA:  Well, the -- I think the application of

23   prior restraint doctrine flows both from Heller, McDonald but

24   also from Staub and Shuttlesworth and prior doctrine of prior

25   restraint.  Of course, in Staub v. City of Baxley, the court

1    defined prior restraint quite broadly.  It spoke about freedom

2    that Constitution guarantees.  Now we know this is a freedom

3    that the Constitution guarantees, so if it's going to be

4    regulated -- of course we don't contest that it need be

5    regulated -- it has to be regulated in accordance with

6    something other than the licensing official's mere whim.

7         Moving on, your Honor, to the due process questions

8    that we have raised, it's not really in dispute after McDonald

9    that there is a Fourteenth Amendment liberty interest at stake.

02:13 10   There is a liberty interest in keeping and bearing arms.  We

11   also have alleged that there's a property interest that

12   Ms. Hightower possessed in her license.  It's interesting that

13   the defendants contest that.  I suppose it goes both ways.

14        An alternative form of argument for us, their primary

15   dispute with the property interest is that we can't have a

16   property interest under Massachusetts law in having handgun

17   licenses because it is wholly discretionary and can be revoked

18   at any time, and the applicant always has the burden of

19   disproving the lack of entitlement to the license.  Taking them

02:13 20   at their word and accepting that, that's sort of works to prove

21   the other part of our case, which is that the discretion here

22   is excessive.  But at least the liberty interest is not really

23   at issue.  McDonald came out, it's a fundamental right, and we

24   know that it applies to the defendants.

25        So the question now is whether or not there's going to

1  be some kind of hearing afforded to someone who is going to be

2  losing this interest.  There has to be some pretermination

3  opportunity to respond and there has to be some kind of notice.

4  Notice and an opportunity to be heard are the fundamental

5  aspects of the procedure of due process.

6         Again, we concede that there might be exigent

7  circumstances.  There might be times that come up, as with

8  other contexts where there's an emergency, an applicant or a

9  license holder has done something bad or is under indictment

02:14  10  and the government has to act quickly.  That's not really the

11  case here, though.  The case here is remarkably similar to the

12  Supreme Court's landmark ruling in the <u>Lattimore</u> case.

13         THE COURT:  But, counsel, you're attacking the

14  statutory scheme here both facially and as applied.

15         MR. GURA:  Correct, correct.  And actually, the City

16  of Boston does have enough discretion to adopt procedures that

17  would be constitutionally sufficient, and there are licensing

18  officials in the Commonwealth of Massachusetts that take a more

19  constitutionally adequate approach to applying section 131.

02:15  20  But these defendants don't, and in fact, we have the quite

21  helpful declaration of, I believe it's Lieutenant Harrington,

22  Defense Exhibit C, which really we welcome.  It states quite

23  candidly that in the City of Boston, people are not going to

24  get an unrestricted license to carry a handgun unless the

25  police department determines that it is within its interests,

1   whatever those might be, undefined.

2          So if there's any question at all as to whether or not

3   there's an injury or a ripeness, I think that probably resolves

4   it.

5          The City could do a better job of applying the

6   statute.  Perhaps if they did so, then they would have an

7   argument about standing or ripeness, but they don't, because

8   they maximize the amount of discretion that the statute allows

9   them to take.  So we do have both a facial challenge and as

02:16  10   applied challenge.

11          THE COURT:  And, counsel, I know you're arguing

12   obviously that the notice and hearing should be before any

13   revocation or before any firearm has to be handed back, as it

14   was by Ms. Hightower in this case by her revocation.  As I

15   understand the statutory scheme, anyone aggrieved of a

16   revocation can go into state District Court, am I right in

17   that, once the revocation has occurred to contest the

18   revocation of a license?

19          MR. GURA:  That's correct, but the procedures in

02:16  20   District Court don't comport with due process also.

21          First of all, the Supreme Court has made it clear, as

22   has the 1st Circuit, sometimes we do need pretermination,

23   predeprivation hearings.  Sometimes you do need a

24   predeprivation process.  Sometimes it's not going to be

25   available because there are exigent reasons, because it's not

1    in the nature of the -- of what has occurred.  Here, however,

2    when there's no emergency, when there's no possible argument

3    that the wrong that was allegedly committed by Ms. Hightower

4    had anything to do with public safety, perhaps a pretermination

5    hearing would have avoided this entire lawsuit because we would

6    have had some kind of a meaningful notice and opportunity to be

7    heard as to whether or not, quote-unquote, charges were,

8    quote-unquote, pending.  And it's always better to have

9    appropriate due process at the administrative level before you

02:17 10   have a federal case under section 1983.  It's obviously the

11   more logical, appropriate way to approach things.

12        But the post-deprivation procedures we don't contend

13   are sufficient either.  There's hearsay evidence is admissible,

14   there's no right to conduct discovery, the police Commissioner

15   is not required to even file any kind of written response.  And

16   the standards applied by the Massachusetts court are such that

17   the applicant has the burden of disproving their lack of

18   entitlement.

19        THE COURT:  And is it abuse of discretion?  I mean,

02:18 20   what is the standard of review?

21        MR. GURA:  The standard of review is that the

22   applicant has to -- the applicant has to prove that the police

23   Commissioner has abused his or her discretion.  And of course,

24   that's kind of tough to do because the -- there's no

25   entitlement to having the license in the first place.  So it

1      puts people in the sort of Kafkaesque procedure where they have

2      the burden of disproving a negative that they're not entitled

3      to do.  So it's not really a very fair proceeding either in

4      terms of what's evidentially going to be allowed or even in

5      terms of how things are balanced.

6              THE COURT:  And where would you put the balance of

7      public safety -- if you're moving -- I'm assuming when you're

8      saying moving to a pretermination hearing, you're talking about

9      the owner of a firearm retaining their firearm while any

02:19 10   hearing is being conducted.  Where do you think the balance, if

11     you think the balance of public safety falls in that analysis?

12             MR. GURA:  Well, actually, that's -- if I may

13     correct -- if I gave that impression, that's not necessarily

14     true.  There are going to be circumstances where for public

15     safety reasons the police have to intervene and take the

16     firearm away, if a person has been seen on, you know, live TV,

17     you know, shooting people in the street.  Obviously we can

18     write regulations that capture that sort of incident and say,

19     you know, under certain circumstances there's going to be a

02:20 20   seizure prior to any hearing.  Again, we can write laws that

21     capture, that make an allowance for public safety.  And we

22     would have no objection at all to laws that properly account

23     for public safety, but we have to see what those are first

24     before we can evaluate their constitutionality.  It's not for

25     us to propose laws for the Commonwealth, and it's not for the

court to rewrite the Commonwealth's laws.  All we can do is
look at the legislature's handiwork, look and say this is not
enough, you have to do something different because there's a
fundamental right at stake.  And there's going to be a place
where public safety is adequately secured and people's rights
are adequately secured, and that balance is going to be
achieved.  But that balance is not achieved here.

        Anyway, finally, moving on to our last argument,
the -- or last due process argument, we have a substantive due
process violation as well.  The defendants make a very
interesting argument.  They correctly note that the 1st Circuit
in -- I'm not sure how to pronounce this case -- DePoutot v.
Raffaelly case, it's in both of our briefs, adopted a so-called
conscience-shocking test.  Where only behavior that shocks the
conscience, depriving someone of a substantive liberty interest
is going to be held as constitutional.  When we first look at
that kind of language, as people -- all of us who speak the
English language, conscience-shocking, that's a pretty high
standard, but if we read the case close, the 1st Circuit has a
much more dry definition of how that is to be applied.  It's a
totality of circumstances test, where conduct that was
reasonable under the circumstances and proportionate to the
governmental interests at stake is going to be okay.  And of
course, in many of these types of cases it's going to wind up
being something dramatic that violates that standard because

1  usually you're talking about the police interacting with

2  somebody under some kind of an emergency or some kind of

3  fast-evolving situation, but not in this type of case where

4  it's very much a paperwork dispute that's happening in an

5  office somewhere over what box somebody checked off three years

6  ago.

7           So it's -- here, if we apply the language of the test,

8  was it reasonable under the circumstances to order Stacey

9  Hightower to give up her -- essentially her means of

02:23 10  self-defense?  Was that proportionate to the government

11  interest in whatever this dispute is about the language on the

12  form?  It might be, we submit that it's not.  And so it's also

13  a substantive due process violation.

14           THE COURT:  And let me ask you now to respond to one

15  of the government's arguments in regard to the fact that this

16  challenge is not ripe at this time, that as I understand the

17  argument, that Ms. Hightower was -- her class A license was

18  revoked but she didn't appeal that revocation and that she

19  didn't -- or she hasn't since applied as a civilian for a class

02:23 20  A license or -- and she hasn't applied for a class B license,

21  which, although not allowing her to carry a concealed revolver,

22  would allow her to carry her revolver.  What, if any, response

23  do you have to that argument?

24           MR. GURA:  Several responses.  First of all, there was

25  no need for Stacey Hightower to exhaust her administrative or

1    judicial remedies under Patsy v. Board of Regents and all the

2    cases that flow through that.  The Supreme Court has

3    established that in a 1983 action, once there's been some

4    action taken by the government, people are entitled to federal

5    court review.  The federal courts have primary jurisdiction

6    over federal civil rights claims.  So there's no need to

7    involve any sort of state administrative procedure, especially

8    when the question here is not so much whether the standard was

9    properly applied, it's whether the standard itself is

02:24 10    constitutional or not.  So that's how we would answer that.

11           Beyond that, we have the simple fact of a revocation

12    and seizure of a firearm is plainly an Article III injuring

13    fact.  That was the basis, of course, for the injury in Heller.

14    It's the basis for the entire body of administrative law in the

15    United States courts.  If a license disapproval or revocation

16    does not constitute an Article III injury, then all of the

17    administrative laws are unconstitutional.

18           THE COURT:  I follow you there.  I think the argument,

19    at least how I took the argument, was to the extent that I

02:25 20    think you concede in your papers that there's no Second

21    Amendment right to carry a concealed firearm, and that to the

22    extent that's the portion of class A that appears to apply to

23    Ms. Hightower's privately held firearm, that the fact that you

24    haven't applied for the lesser license that would allow her to

25    carry the firearm but not as concealed means that this matter

1    isn't ripe for review at this time.

2         MR. GURA:  There are two parts to that, your Honor.

3    The first part is the license that Ms. Hightower happened to

4    have, she happened to have a class A license which did permit

5    her to carry a gun.  It permitted her to carry a gun in a

6    concealed fashion, it permitted her to carry a gun in an open

7    fashion.  However, either of those manners could have been

8    banned by the Commonwealth.  There are some states that do ban

9    the open carrying of guns but allow the concealed carrying of

02:26 10   guns, and we would not contend that those states are in

11   violation of the Second Amendment.  So you're right, there's no

12   right to carry a concealed gun, we would also say there's no

13   right to carry an open gun, there's a right to carry a gun

14   somehow.  So we don't think that distinction makes sense.

15        The fact was she had this particular permission and it

16   was taken away from her and now they're not going to give it

17   back, because we have this declaration from Lieutenant

18   Harrington who says there's not going to be an unrestricted

19   license to carry of any flavor unless it is deemed to be within

02:27 20   the interests of the Boston Police Department.  So going

21   forward, if she wanted to reapply, Ms. Hightower is subject to

22   an unconstitutional prior constraint, and the Supreme Court has

23   made clear in cases like City of Lakewood and others going back

24   further than that, that when a person is confronted with an

25   unconstitutional licensing regime, there's no need to make an

application in order to challenge its constitutionality.  And

in fact, beyond that, there's the futile act doctrine.  People

do not need to engage in futile acts in order to trigger the

jurisdiction of the federal courts where the government has

made it very clear what its policy is and has established

practice.  Here there's no dispute as to what the practice is.

We have Lieutenant Harrington's declaration, which we accept as

being accurate and representing the police department's views,

then we have an injury.  Because it would be completely

pointless for her to file paperwork, we know what's going to

happen.  She was going to get some kind of permit that's

restricted, that does not allow the carrying of guns, or at the

very least her application will be subjected to unbridled

discretion, the prior restraint that she's entitled to

challenge because she disagrees with the fact that her

application could even be subjected to that kind of scheme.

THE COURT:  Although -- and correct me if I'm wrong --

it wasn't my impression it was clear on the record that she

would be denied a class B license.

MR. GURA:  It is not clear that she would be denied a

class B license.  We believe that she might probably get one.

But what is clear on the record is that there would be a

restriction on that.  Lieutenant Harrington's declaration is

fairly clear.  The law in Massachusetts allows the issuers of

carry licenses A or B to impose restrictions, and typically the

City of Boston will restrict the carrying of license.  It's

called the license to carry, but that's not carry in the

constitutional sense.  Carrying under the Commonwealth's law,

the case is Seay, S-e-a-y, v. Commonwealth or Commonwealth v.

Seay, it's in both of our pleadings, I believe, states that

carrying for purposes of section 131 is having even momentary

possession of a gun and then moving it from place to place.

That's not the same definition of bear arms that Heller gives

for what the Second Amendment allows, which is to carry a gun

upon one's person for purposes of self-defense in cases of

confrontation with another person.  If Ms. Hightower were to do

that even with a restricted class B license, she would be in

jail.  There's no suggestion that she would get an unrestricted

class B license any more than she would get an unrestricted

class A license, unless, of course, they deemed it to be in

their interests.  It is not common in the City of Boston to see

people freely walking around with open small capacity handguns

on their hip, and it's because those licenses just aren't given

out.

        Thank you.

        THE COURT:  Thank you.

        Counsel.

        MR. SALINGER:  Good afternoon.  Ken Salinger for the

Commonwealth, your Honor.

        Your Honor, Ms. Hightower's Second Amendment and

substantive due process claims are not ripe.  The 1st Circuit

has stressed that ripeness doctrine is particularly important

in cases like this one, where a party comes to federal court

and asks a judge to strike down a state law on constitutional

grounds, same, of course, as a federal law.  We cite in our

papers, for example, Doe v. Bush, 2003 case where the 1st

Circuit affirmed dismissal of a challenge to that 2002

congressional authorization of use of military force in Iraq on

the ground that it wasn't clear there was going to be any use

of the force so the claim was not ripe.

          Your Honor, I think you've got our argument right, but

just to summarize it very quickly, the complaint specifically

seeks an order restoring Ms. Hightower's unrestricted class A

license.  An unrestricted class A license allows Ms. Hightower

to do things that clearly are not protected by the Second

Amendment, that would allow her to carry a concealed weapon.

She concedes today that's not a right she has under the Second

Amendment.  We've shown that, in addition, unrestricted class A

license allows somebody to carry a capacity firearm in a

concealed matter.  And under the Supreme Court's decision in

Heller, the Court makes clear than an M-16 assault riffle and

other kinds of weapons not in common use at the time the Second

Amendment was enacted are not protected by that amendment.  On

remand, the federal District Court in Heller II has held that

high capacity firearms are not protected by the Second

1    Amendment.

2         Today, Ms. Hightower gave three reasons why she said

3    our ripeness argument is just wrong, even though she

4    acknowledges she has never gone back to the City and applied

5    for either for a restricted class A license that would allow

6    her to carry the five-shot revolver she used to carry but not

7    large-capacity guns, and she's also not applied for a class B

8    license.

9         First she says, well, there's no need to exhaust

02:32 10    administrative remedies.  Your Honor, we haven't made an

11    exhaustion argument, so I am not sure why she makes that as a

12    defense to the ripeness question.

13         Second, she says, well, there's clearly injury in

14    fact.  Your Honor, injury in fact goes to standing, not

15    ripeness.  And in Ms. Hightower's response, not to the

16    Commonwealth's paper, but to the City's papers she asserted

17    basically, well, if I have standing, I must have ripeness.

18    We've demonstrated at page 3 of our reply memorandum that under

19    settled 1st Circuit precedent that's not correct.  Standing and

02:33 20    ripeness are discrete inquiries, both are required for the

21    Court to have subject matter jurisdiction.

22         Now, most substantively Ms. Hightower asserted today

23    well, it would be a futile act to go back and apply for, say, a

24    restricted class A license.  Your Honor, as we pointed out,

25    albeit in another constitutional context, the U.S. Supreme

1    Court has rejected this kind of argument when it comes to

2    ripeness in the regulatory takings area.  People used to go

3    into courts saying, you know, I presented one development plan

4    for my property to the local officials and they denied it, so

5    what can I do?  They've taken my property.  The Supreme Court

6    made clear in MacDonald -- not the same McDonald of Second

7    Amendment fame but the one cited in our papers at pages 8 to

8    9 -- that the denial of a grandiose development plan doesn't

9    demonstrate that a less ambitious one would be denied here as

02:34 10   well.

11          There can be no basis for presuming that if

12   Ms. Hightower, as a civilian, had gone back instead of deciding

13   to press her Second Amendment claim, applied for a restricted

14   class A license, for example, limited to the kind of weapon she

15   wants to carry, we can't know that the City of Boston would

16   have denied that.  Certainly the declaration doesn't say that.

17   It says the application would be reviewed individually as all

18   applications are.

19          And so for important prudential and constitutional

02:34 20   reasons, the Court should not reach the merits of these claims.

21          THE COURT:  And can I just ask a question, factually

22   speaking, the reason the license was not renewed in the first

23   place was the position, the Commissioner's position, that

24   Ms. Hightower had lied on the application in response to a

25   question about charges pending, as I recall.

1          MR. SALINGER:  Technically, that's the reason why the

2     license was revoked.  It was renewed for a week and a half and

3     then revoked.

4          THE COURT:  Is that still true?  Meaning, is that

5     disqualification still in place because now she's no longer a

6     police officer and can apply as a civilian, and, as I

7     understood it, would not have to fill out this additional form

8     that sworn officers needed to fill out to apply for a class A

9     license?

02:35 10          MR. SALINGER:  I believe I know the answer, although I

11     don't represent the City.  I understand from the City's

12     papers --

13          THE COURT:  I can wait to ask the City.

14          MR. SALINGER:  But I think the answer is yes.  First

15     of all, she wouldn't have to fill out that form; and secondly,

16     Commissioner Davis quite understandably should have concern if

17     a sworn Boston police officer, in applying for renewal of a

18     firearms license, lies to the Commissioner.

19          Now, there have been some arguments today by

02:36 20     Ms. Hightower and in her papers, that's silly, she's not

21     dangerous, there really weren't grounds for finding she's not a

22     civil person.  Your Honor, none of those issues is before the

23     Court.

24          The 1st Circuit made clear in Rosenfeld v. Egy, which

25     we cite in our memorandum, that the question of whether under

the Massachusetts firearms statute somebody is or is not a

suitable person is a question of state law, that Ms. Hightower,

if she wanted to press it, could have appealed to District

Court, as you suggested, she chose not to.  But in footnote

5 -- I'm sorry, not in footnote 5 -- in footnote 4 of the

Rosenfeld decision, the 1st Circuit made clear that's a

question that should be raised in state court as a matter of

state law, it's not a constitutional question.

So the Court with respect to the claims that are

asserted in this case has to assume that Commissioner Davis had

good grounds for finding that Ms. Hightower was no longer a

suitable person.

THE COURT:  Well, let me ask you this question.  Your

brother has argued that in light of McDonald, in light of

Heller, clearly the Second Amendment has been recognized as a

fundamental right and that the issue here is not whether or not

Ms. Hightower has a right to carry a concealed weapon or

high-capacity weapon under the class A license, but that her

right at this moment, her possession of her firearm, has been

taken away by the operation of the statutory scheme,

particularly in regard to the discretion that the Commissioner

has to determine whether or not someone is suitable.  What, if

any, standard is there that cabins the Commissioner's

discretion in determining whether or not someone is suitable?

I didn't see any language in my review of Chapter 140 section

131.  I wasn't sure if there are regulations that bear on that.

If you could address that.  Certainly if I need to address your

sister representing the City, I can do that.

MR. SALINGER:  That's very much a question about the

State of Massachusetts law, which I'm able to and happy to

answer.

A two-part answer, your Honor.  First, there's a

statutory part of the answer and then there's a case law part

of the answer.

We quote at the bottom of page 4 of our summary

judgment memorandum the relevant language from section 131(f)

of Chapter 140 of the Massachusetts General Laws.  It's a long

section, and so that's why I draw your attention to where we

quote.

The statute provides that if an appeal had been taken

to state District Court, if the District Court had found that

there was, quote, no reasonable ground for denying, suspending

or revoking such license and that the petitioner is not

prohibited by law from possessing the same, close quote, then

the District Court could have and of course would have ordered

the reinstatement of the weapon.

So there's got to be a reasonable ground for denying,

suspending or revoking a license.  And this goes directly to

the repeated incorrect, mistaken assertion by Ms. Hightower

that Massachusetts law allows a licensing authority, such as

1    Commissioner Davis of the City, to just on a whim revoke or

2    refuse to renew a license.

3         The case law is clear as well, your Honor.  There is

4    no opportunity -- I'm sorry, Massachusetts law simply does not

5    permit arbitrary denial or revocation of a license, that would

6    be unlawful.  The standard, making clear that arbitrary action

7    is unlawful, is discussed, for example, in the Howard case, 59

8    Mass. App. Ct. at page 902.  And, your Honor, we gave an

9    example in our papers.  We cite to a Superior Court case from

02:40 10   2006, the Lizotte case, where the District Court judge

11   undertook just this review, found that the denial was

12   arbitrary, and reversed, ordered the granting of a license.  So

13   the premise of Ms. Hightower's position that a licensing

14   authority can just on a whim say, well, I don't feel like

15   giving it to you, is wrong as a matter of law in Massachusetts.

16   Although it is not a categorical standard, the suitable person

17   standard does require that there be a reasonable ground for

18   granting or for revoking.

19        Your Honor, if the Court, despite the lack of ripeness

02:40 20   and the important reasons -- well, before I make the

21   transition -- you pointed out that Ms. Hightower's argument --

22   well, she's trying to protect the standard, she's as concerned

23   about her facial claim as she is about her as applied claim.

24   That was the point of us directing the Court's attention to Doe

25   v. Bush and the other case law we have cited at that spot in

our memorandum, your Honor.  Someone with great passion that a
statute is incorrect under ripeness doctrine is not allowed to
come into federal court and the court is not allowed to
exercise jurisdiction unless it's clear there's a violation or
a potential violation that needs to be addressed.  Here, where
Ms. Hightower now says, you know, that unrestricted class A
license that I previously had, that's not what I want, I'm not
trying to carry a concealed weapon, I'm not trying to carry a
high-capacity weapon, like a Glock with a .33 round magazine, I
just want to be able to carry in public my old five-round
revolver.  Again, she hasn't sought that kind of license.  If
she were to seek one and it were to be denied, she would have a
ripe claim.  But rather than either do that or exercise her due
process right of getting judicial review in state District
Court, she has opted to prematurely try to get this Court to
pass judgment on the constitutionality of a Massachusetts
statute that violates the requirements of ripeness.

Your Honor, if nonetheless you were to reach the
merits of the Second Amendment claim, I think it boils down to
there being two parts.  One, this prior restraint notion --
excuse me, just a little twinge in the back.  I need to sit for
a moment, I'll be back up in a moment.  I apologize.

Ms. Hightower has gone back and forth as to the nature
of her claim, your Honor, whether she is conceding that the
Commonwealth can require a license before somebody can carry a

1    firearm or not.

2          In her initial summary judgment memorandum, for

3    example, at page 1, she expressly conceded that states may

4    license the carrying of firearms.  We pointed out in our

5    summary judgment memorandum that that concession is

6    inconsistent with her claim that imposing licensing

7    requirements is unconstitutional.

8          So in her opposition to the Commonwealth's papers at

9    page 8, Ms. Hightower said for the first time, the issue, and

02:43 10   I'm quoting, is whether defendants may bar individuals from

11   exercising the right at all by use of a permitting scheme,

12   close quote.

13         Today Ms. Hightower seemed to go back to her original

14   position in response to a question from the Court, conceding

15   some level of licensing is allowed.  That position is the

16   correct one.  Indeed, the position that having a licensing

17   requirement is an unconstitutional prior restraint cannot be

18   squared with the Supreme Court's decision in Heller.  We can't

19   lose sight of what the Court required at the end of Heller.

02:44 20   What it required is that the District of Columbia permit

21   Mr. Heller, as long as he's not disqualified under other

22   provisions of the licensing scheme from doing so, had to permit

23   him to register his handgun and issue him a license to carry in

24   the home.  Neither Heller nor McDonald called into question the

25   ability of the Commonwealth and other states to require a

1    license in order to make sure somebody is a law-abiding,

2    responsible citizen.  Remember, the Supreme Court in Heller

3    made clear that the Second Amendment only protects the rights

4    of, quote, law abiding, responsible citizens, close quote.

5         THE COURT:  And, counsel, do you agree with your

6    brother's point that applying prior restraint to the Second

7    Amendment context would be a matter of first impression?  Are

8    there any other courts that have applied prior restraint in the

9    Second Amendment context?

02:45 10        MR. SALINGER:  I don't have the cite.  I'm told by

11   counsel for the City that apparently there's a recent decision

12   rejecting the notion.  But our position, as I was just

13   suggesting, your Honor, is that although the Supreme Court in

14   Heller did not speak in these terms, in the terms of prior

15   restraint, by enumerating presumptively constitutional

16   restrictions on eligibility to carry firearms, including

17   restrictions on felons and violent -- and the mentally ill, the

18   Court was necessarily rejecting the notion of a licensing

19   scheme constituting an unlawful prior restraint.  There would

02:45 20   be no practical way to implement the kinds of categorical

21   restrictions that the Supreme Court has said are presumptively

22   constitutional without a licensing scheme.  So the whole prior

23   restraint notion just does not fit this case, your Honor.

24        Similarly, as we've shown in our papers, the arguments

25   that Ms. Hightower has repeated about the various First

1    Amendment cases that say one can't have a good character test

2    or some other sort of more discretionary test as a condition

3    for exercising rights of speech in public forum don't apply

4    here, that's not just us saying that, your Honor, we point to

5    the 1st Circuit's decision from 2004 in Ridley v. MBTA.  This

6    is one of the many cases where somebody is challenging the

7    MBTA's refusal to carry certain kinds of advertising on their

8    property.  And that case, 390 F.3d at pages 94 to 95, the 1st

9    Circuit expressly held that the case law about discretion

02:47 10   doesn't apply throughout all of the First Amendment law.  They

11   only apply at the very core in the exercise of speech in public

12   forum, but in other contexts there can indeed be the equivalent

13   of licensing requirements.

14         We've noted, your Honor, as the Supreme Court has made

15   clear, the core of the Second Amendment is keeping a handgun

16   inside your home to protect hearth and home.  But, in any case,

17   the position taken by Ms. Hightower, what she calls prior

18   restraint, is basically asking this Court to do, aside from

19   Heller, something that would be certainly first impression,

02:47 20   completely novel.  There is no court that has struck down

21   licensing and permitting requirements on the grounds suggested

22   here, that the mere existence of any such requirements violates

23   the Second Amendment.  And so Ms. Hightower has her fallback

24   argument, which is, well, even if prior restraint doesn't work,

25   this standard, the suitable person standard, we don't like it,

1    Judge, so you should strike it down.  That's how I understand

2    the fallback position.

3         Your Honor, there's been some back and forth in the

4    papers about if you were to skip over ripeness and reach the

5    merits, should you apply strict scrutiny versus intermediary

6    scrutiny.  Just quickly, the same kind of -- the same part of

7    Heller I was just discussing, the presumption that various

8    restrictions on the ability of certain folks to carry weapons

9    is inconsistent with any notion of strict scrutiny.  So at most

02:48 10   there would be intermediate scrutiny here.

11         The suitable person standard is not devoid of content.

12   It's entirely consistent with that critical language from

13   Heller I quoted a moment ago, saying that the Second Amendment

14   protects, quote, law abiding, responsible citizens, close

15   quote.  The suitable person standard under Massachusetts law,

16   as developed by the courts, means someone sufficiently

17   responsible to be entrusted with a license to carry firearms.

18   The Massachusetts Appeals Court stressed in the MacNutt case

19   that the point of the licensing scheme under Massachusetts law

02:49 20   is, quote, to limit access to deadly weapons by irresponsible

21   persons, close quote.  And we noted as an aside that the

22   Supreme Judicial Court in the DeLuca case acknowledged that of

23   course character is a necessary qualification.  If somebody

24   can't tell the truth on their licensing application, that

25   certainly calls into question at the very least their ability

1 still to be trusted with a deadly weapon.

2      So, your Honor, really what Ms. Hightower's arguments

3 seem to boil down to is an argument, well, categorical rules,

4 like the kind discussed at the end of the Heller decision, may

5 be okay under the Second Amendment, but an individualized

6 determination of whether someone is a responsible person or not

7 is somehow by the very broad language of the Second Amendment

8 rendered unconstitutional.

9      Now, here, your Honor, Ms. Hightower's argument is

02:50 10 entirely inconsistent with First Amendment doctrine.  We

11 pointed out at page 15 of our memorandum there are at least two

12 U.S. Supreme Court cases that in the First Amendment context

13 reject categorical restrictions on speech but acknowledge that

14 an individualized determination could lawfully produce the same

15 result in the same case.  Florida Star had to do with the

16 newspaper publishing victims' names.  It's unconstitutional to

17 bar that categorically, but in particular cases that might pass

18 constitutional muster.  And the Globe Newspaper case, there the

19 question was media access to trials involving victims of sex

02:50 20 crimes who are younger than age 18.  The court said, well, a

21 categorical rule barring that is not permissible, it violates

22 the First Amendment, but acknowledged that based on an

23 individualized determination of potential harm to such a

24 victim, in an appropriate case the judge could exclude the

25 media.

1          Well, Ms. Hightower's only response -- and this is at

2   page 11 of her memorandum responding to the Commonwealth --

3   Ms. Hightower says that she, quote, respectfully disagrees with

4   the claim that statutory categories are not always better than

5   individualized decisions, close quote.  Your Honor,

6   respectfully, that does not rise to the level of constitutional

7   argument.  Ms. Hightower cites no case law to support the

8   notion that in all instances if one is going to restrict either

9   a First Amendment right or a Second Amendment claimed right

02:51  10  that it has to be done through categorical rules.  That's

11  simply inconsistent with precedent in other areas, and there is

12  nothing in _Heller_ or _McDonald_ that suggest that that is the

13  rule under the Second Amendment.

14          Your Honor, unless you have questions on the Second

15  Amendment, I'll move to other claims.

16          THE COURT:  Yes, and are you going to address the

17  question of pretermination hearing versus post --

18          MR. SALINGER:  Why don't I do that next, your Honor.

19          So the procedural due process claim.  It's undisputed

02:52  20  that Ms. Hightower had a post-deprivation right of judicial

21  review.  She got notice of revocation, so there's no question

22  about notice.  The question is review.  She had the right of

23  review, she chose not to exercise it.  Her claim, therefore, is

24  that as a matter of constitutional law she was required to be

25  given that right of review before having to turn in her license

and gun rather than afterward.  Your Honor, that's wrong as a

matter of constitutional law.  First of all, the one court that

we could find that that addressed this issue in a firearms

licensing context is the 2nd Circuit in the Kuck case, 600 F.3d

at 165, where the 2nd Circuit said that due process requires

only, quote, opportunity to be heard after a denial or

revocation, close quote.  And perhaps more importantly, that is

consistent with Supreme Court precedent, for example, the

Mackey case coming out of Massachusetts.

02:53          THE COURT:  And was the 2nd Circuit case before or

after McDonald?

          MR. SALINGER:  After -- let's see, it was 2010 -- I'm

not positive whether it was before or after McDonald, your

Honor.  I want to say after, but I'm just not positive.  I

apologize.

          THE COURT:  Okay.

          MR. SALINGER:  Your Honor, Mackey, that's the case

having to do with revocation of driver's licenses for somebody

who refuses a Breathalyzer test, Massachusetts case where very

02:53 similar claim went up, the claim was it's not enough that I can

get judicial review afterwards, you should let me keep my

license until I've had that review.  The Supreme Court rejected

the claim, holding that the public safety interests at stake

justify some administrative action with no predeprivation

hearing and post-deprivation review was sufficient to satisfy

1    due process.

2         Hodel is another example that we cite.  That's a case

3    having to do with surface mining cessation orders, the Interior

4    Department having the power for safety or biohazard concerns to

5    tell the surface mining operations to stop, it must stop, and

6    only seek judicial review afterward.  The U.S. Supreme Court

7    upheld that.

8         The theme here, and we explore it at greater length in

9    our memorandum at pages 17 to 19, is when public safety

02:54 10   interests are at stake, the flexibility of procedural due

11   process allows for the review to happen post deprivation rather

12   than predeprivation.

13        THE COURT:  What about your brother's argument that

14   given that Ms. Hightower has a liberty or property interest in

15   her firearm post Heller, post McDonald that if there were --

16   that that compels a pretermination hearing, and that in terms

17   of public safety there could be exceptions for taking away

18   someone's firearm before those pretermination hearings are

19   completed.

02:55 20        MR. SALINGER:  So if I may give a two-part answer.

21   First of all, this is an example -- there were quite a few in

22   his case, unfortunately, where Ms. Hightower is failing to

23   distinguish whether she's addressing arguments by the

24   Commonwealth or by the City.

25        The City has raised some serious questions about

1   whether Ms. Hightower has the requisite property or liberty

2   interests.  The Commonwealth did not.  We have assumed for

3   present purposes that the license that she had was a sufficient

4   property interest.  Certainly she has no liberty interest here

5   but a sufficient property interest.  But Mackey and other cases

6   that we've discussed say -- Mackey as an example -- you don't

7   have a property interest in getting a driver's license.  The

8   1st Circuit has held -- I don't have the cite handy but can

9   send it if it matters -- has held once Massachusetts gives

02:56 10   someone a driver's license, then a person has a property

11   interest and is entitled to due process protection; and yet,

12   the 1st Circuit has held notwithstanding that existing property

13   interest, a post-deprivation hearing is sufficient.  Hodel is

14   the same.  The order was not upheld for a lack of property

15   interest; the order was upheld under the assumption or holding,

16   I forget which, that there was a property interest in the prior

17   operation to conduct surface mining, but given the public

18   interest at stake, it satisfies due process to tell someone to

19   stop and then have review afterward.

02:57 20         Here we're talking about deadly weapons, your Honor,

21   and the notion that in any and all circumstances where a local

22   police chief learns of new information that calls into question

23   whether somebody is still a suitable person, they have to

24   provide for judicial review before they can order somebody to

25   turn in their firearm -- presumably this rule would apply in

domestic abuse cases, spouse has become violent and he's
attacking his wife and he's physically beating her and he has a
firearms license and a weapon.  It would be an odd and
disturbing rule of constitutional law that said it's okay to
revoke that gentleman's license but you have to let him keep it
and keep the gun for the weeks or the months it would take to
have the court review it beforehand.  That is not what the
Constitution requires in that case, and it's not what the
Constitution requires in this case.

02:57   Your Honor, turning to substantive due process, this
is a different kind of claim, even though it shares two words
in common.  It's foreclosed by the 1st Circuit's decision in
Rosenfeld.  Rosenfeld v. Egy was a case arising under the
Massachusetts -- or concerning the Massachusetts firearm
licensing laws.  Interestingly, it also involved revocation of
a firearms license that had been held by a police officer.  And
there were allegations that the revocation was unlawful and
improper.

The 1st Circuit held -- and it spent all of a sentence
02:58   or two on it because it thought it was such an easy question --
that the revocation of a firearms license does not shock the
conscience, and therefore, as a matter of law cannot constitute
a substantive due process violation.

Here's another example of where Hightower was
responding to the defendants, but she actually didn't engage

the Commonwealth.  She was talking about a case cited in the

City's brief, not cited in our brief, which is fine.  She

ignored the many cases we cite in our brief at pages 15 to 17.

For example, the 1st Circuit's decision from last year,

Gonzalez-Fuentes, a 2010 decision, where the 1st Circuit

reiterated that not only is shocking of the conscience a

necessary element of any substantive due process claim, but

that to shock the conscience the challenged action must be,

quote, so inspired by malice or sadism that it amounted to a

brutal and inhumane abuse of official power, close quote.

        The one other case I'll just call out to you, your

Honor, is the Collins case from 2001, again, a 1st Circuit case

holding that a license revocation is not conscience-shocking,

even if it's arbitrary or based on animus.

        But Rosenfeld is the clearest.  Same circumstances,

revocation of firearms license, doesn't shock the conscience.

Ms. Hightower could have gotten judicial review if she wanted

it, that's beside the point now, but she has no substantive due

process claim.

        Your Honor, I see there was one small point I intended

to make on procedural due process, for completeness why don't I

make it, because today in court Ms. Hightower argues, again,

that the judicial review available in District Court does not

satisfy due process because hearsay evidence would be allowed.

Again, the 1st Circuit has rejected that claim in the context

1    of the revocation of a license to practice medicine in the

2    Beauchamp case, 779 F.2d at 775 to 776.  The 1st Circuit held,

3    and it's reiterated since then, we cite the case, that it does

4    not violate due process for a reliable hearsay to be admitted

5    either during the administrative agency's action, or what

6    concerns Ms. Hightower here as well in judicial review of that.

7    Because, again, the District Court review that Ms. Hightower

8    had available but didn't pursue is not the typical

9    administrative review that's on the record.  It's an

03:01 10    evidentiary review.  It's a de novo hearing.  Ms. Hightower had

11    the opportunity to go in and present new affirmative evidence

12    that she was suitable, still suitable, and she opted not to do

13    that.

14            THE COURT:  I'm sorry, are you saying the District

15    Court review is de novo?

16            MR. SALINGER:  Yes, your Honor.

17            THE COURT:  And is that set by case law?

18            MR. SALINGER:  Yes, your Honor, and we've cited the

19    case law in our papers.

03:01 20            So that, your Honor, leaves us with the equal

21    protection claim, and I think this is another area where

22    Ms. Hightower in her responses, today and in her papers, has

23    not grappled with the gist of the Commonwealth's argument.

24            This is a case we all know where under McDonald the

25    plurality, a four-member plurality said the Second Amendment

1   right to keep and bear arms to protect hearth and home, to have

2   a firearm in the home is sufficiently fundamental that it is

3   incorporated into the Fourteenth Amendment.  The 1st Circuit

4   has held repeatedly -- and we discuss this as pages 19 to 20 of

5   our memorandum, your Honor -- repeatedly that in these

6   circumstances, where a right established by one of the first

7   eight amendments is incorporated into the Fourteenth Amendment,

8   the equal protection clause does not erect a separate and

9   distinct framework for analyzing the claims.  Instead, the

03:02 10   Court is first to review under a substantive amendment.  So

11   here if the claim were ripe, which here it's not, would review

12   under the Second Amendment, but any additional equal protection

13   claim only implicates rational basis review and nothing more.

14   We discuss a long line of 1st Circuit cases that go back to

15   that much earlier U.S. Supreme Court case.  Ms. Hightower in

16   her opposition tries to distinguish that 1974 case, but doesn't

17   deal properly here.

18         But, your Honor, we point out in our reply brief at

19   pages 4 to 5 that this very principle that's clear in 1st

03:03 20   Circuit case law was just a few weeks ago applied in a Second

21   Amendment context by the 9th Circuit, this is the Nordyke v.

22   King case that counsel referred to, and it adopts the same

23   principle, that if there's a claim that an action violates the

24   Second Amendment and also a claim that the same action violates

25   the equal protection clause, the only thing that the equal

1  protection clause adds is rational basis review.

2       So if the Court were to reach the merits of the Second

3  Amendment claim and rule in the Commonwealth's favor, then

4  clearly we prevail under the equal protection clause.  But if

5  the Court were to agree that the Second Amendment claim is not

6  ripe, then it should rule in favor of the defendants on the

7  equal protection claim on the grounds that there is a rational

8  basis, as the Massachusetts Appeals Court said in MacNutt, for

9  example.  The goal of these statutes -- I've quoted this

03:04 10  language before -- is to limit access to deadly weapons by

11  irresponsible persons.  That's entirely rational, and entirely

12  consistent with the Heller standard.

13       THE COURT:  And, counsel, I follow that in terms of

14  the facial challenge, but is the analysis the same as applied

15  to Ms. Hightower's situation here?

16       MR. SALINGER:  It's different, and she alludes this

17  much for fundamental reasons in terms of the as applied claim.

18  The 1st Circuit held in many cases, but again, for example, in

19  Rosenfeld, a claim that a person has been treated differently

03:04 20  in terms of having a license revoked compared to other persons

21  just -- it's not a constitutional equal protection claim as a

22  matter of law.  The mere claim that she was treated differently

23  does not give rise to an equal protection claim.  And there are

24  many 1st Circuit cases saying that to come up with a different

25  result would be -- you know, any time any kind of local permit

1   or license is denied, somebody would all of a sudden have an as

2   applied equal protection claim allowing them to come into

3   federal court.  1st Circuit has very strongly rejected that

4   notion.  So it's a different analysis but it gets to the same

5   place.  The equal protection claims, whether the facial claim

6   or the as applied claim, fail as a matter of law.

7           Thank you, your Honor.

8           THE COURT:  Counsel.

9           MS. SKEHILL MAKI:  Good afternoon again, your Honor.

03:05 10  Lisa Skehill Maki on behalf of the City of Boston and the

11  Boston Police Commissioner.

12          I don't want to repeat many of my brother counsel's

13  arguments, but I do want to address an argument on the ripeness

14  issue.

15          Plaintiff has suggested it would be futile for her to

16  go and apply for a different type of license here.  Exhibit C

17  of the City of Boston's summary judgment motion, paragraph 19,

18  Lieutenant Detective Harrington states, assuming Stacey

19  Hightower does not have a statutory disqualification under

03:06 20  General Laws Chapter 140 section 131 if she applied for a class

21  A license to carry a large capacity firearm, she would receive,

22  she would receive a class A restricted license to carry for

23  sport and target and for her protection.

24          So any argument that if the plaintiff were to reapply

25  for a class A restricted license would be based on the

1  interests.  That's not what the declaration says, it says she

2  would receive it.

3       Certainly receiving a firearm for sport and target and

4  for transportation qualifies as carrying a handgun.  You can't

5  do it concealed under the restricted license, but you can

6  certainly openly carry it in a locked box unloaded.  So because

7  she has not applied for the restricted class A license, because

8  she has not applied for the class B license, her claim is not

9  ripe here, it has not been definitively denied by the City of

03:06 10  Boston.

11       Assuming that we do get to the merits of the case,

12  there is no constitutionally burden conduct here.  The

13  revocation was a temporary revocation of a concealed carry

14  license of the plaintiff because she submitted an application

15  form untruthfully.  Plaintiff -- the revocation itself did not

16  bar her from applying for a different type of license so that

17  she could carry it openly in a locked box, that she could carry

18  it for purposes of sport and target, and under the

19  Commonwealth -- common law she's also able to carry a loaded --

03:07 20  carry a loaded firearm when she's in imminent danger.  There's

21  an exception for that.  So any suggestion she would be arrested

22  if she were faced with imminent harm were she to arm herself

23  with a loaded weapon is false.

24       We cited two cases in our brief --

25       THE COURT:  Can I just ask you a question in terms of

1    timing?  So at the time that her license was revoked,

2    Ms. Hightower is no longer on the police department?

3              MS. SKEHILL MAKI:  That's correct, your Honor.

4              THE COURT:  Okay.  At that time there's nothing

5    barring her from applying as a civilian for a class B

6    license -- class A license or a class B license.

7              MS. SKEHILL MAKI:  That's correct.  And she could have

8    applied again for an unrestricted class A license.  She would

9    not have to fill out the Boston Police Department internal

03:08 10   form.  The requirement here is that the paperwork is correct,

11   that the City of Boston knows who's armed, all the pertinent

12   information about them, because it's important to know who has

13   guns in the City of Boston, where they live, and all the

14   information that's required.

15              The only thing that was required here was that she

16   submit another form.  And, yes, we do not guarantee that she

17   would be given an unrestricted class A license to carry

18   concealed again.  You know, it's not something that we

19   guarantee, it is within the discretion of the licensing

03:08 20   official, but there's nothing at all to suggest she wouldn't be

21   given one.  In fact, she was licensed for ten years to carry

22   concealed.  It's not unfathomable that she would be given an

23   unconcealed license again, given that she submits accurate

24   paperwork.  Whether intentionally or unintentionally she didn't

25   submit it before, we need the accurate paperwork.

 1          THE COURT:  And I don't know if there's anything in

 2    the record, but what is the rationale for requiring a member of

 3    the police department -- requiring them to submit this

 4    additional form when they apply for a class A concealed or

 5    large-capacity weapon?  Is there anything in the record that

 6    talks about the rationale?

 7          MS. SKEHILL MAKI:  I don't believe so, your Honor.  I

 8    believe the rationale is just, you know, these are police

 9    officers, they're -- the licensing Commissioner is a Boston

03:09 10    Police Department official, and when it's internal employees

 11    that are -- you know, do have more rights than the average

 12    citizen in taking away someone's constitutional rights, that

 13    they want to know more information.  Certainly if there's an

 14    internal affairs issue pending against them, which they may

 15    abuse their power, it's certainly within the licensing

 16    official's right to know what's going on.

 17          So the only real difference between the civilian

 18    application and the application for a Boston police officer in

 19    applying or renewing for firearm license is the question of

03:10 20    whether there are internal affairs charges pending.

 21          So I think it's just another check on the suitability

 22    of the individual looking for the gun.  Certainly if an officer

 23    is abusing their power and being under investigation for

 24    whatever reason by the Internal Affairs Department, the

 25    licensing official should know that information.

1          Back to the issue of whether there was constitutional

2     protected conduct that was infringed upon here by the

3     revocation.  Again, there was nothing preventing the plaintiff

4     from going out and getting a different type of license.  She

5     could still, even though it's the defendants' position that

6     Heller and McDonald do not go as far as to say the Second

7     Amendment guaranties this right to carry a loaded weapon,

8     either concealed -- has specifically not said not concealed, so

9     the other alternative is unconcealed.  Even if it were to

03:10 10    extend that far, she's certainly not prohibited under a class A

11    restricted license and a class B to carry the gun openly, as

12    long as it's in a locked box to transport it, and use it for

13    sport and target purposes.  It's also another paragraph in

14    Exhibit C where it states class A restricted licenses are

15    allowed for people traveling to employment as security officers

16    for their protection, or further, to get to their job so that

17    they don't have to put it in a locked box and they don't have

18    to fear losing their license over that.  So there are ways the

19    plaintiff could have exercised her Second Amendment right but

03:11 20    simply chose not to do so here.

21          This is not like the case cited by the plaintiff, Bach

22    v. Pataki, where an out-of-state resident was challenging the

23    New York firearm licensing scheme because it did not allow for

24    out-of-state residents to obtain a firearm license there.

25    Plaintiff was an out-of-state resident, there was no question

1   he was going to be denied.  This is completely different.

2   She's been told in paragraph 19 she could get a class A

3   restricted license and she would certainly be reviewed again

4   for a class A unrestricted license.

5        Even if this -- if there were some sort of

6   infringement upon her right to carry -- although the defendant

7   still maintains that Heller and McDonald do not go so far --

8   the constitutional scrutiny that should be applied here is at

9   the very most intermediate scrutiny.  In the case cited by my

03:12 10   brother counsel, Nordyke v. King, the 9th Circuit has now

11   utilized a new test, it's the substantial burden test, and it

12   determines whether the conduct being infringed upon or the

13   government actions substantially burdens the Second Amendment

14   right.

15        As discussed, there's no substantial burden here.  The

16   plaintiff had various alternative measures to exercise her

17   Second Amendment right, has chosen not to do so.  So there's no

18   substantial burden here.  There's nothing stopping her today

19   from going to get a license to carry.

03:12 20        If there's no substantial burden under the 9th

21   Circuit's analysis, it's a rationale basis review.  Certainly

22   this is the revocation of a firearm for someone who has

23   submitted false information is rationally related to the

24   government's interest in making sure that they have the correct

25   information of all people who are licensed to carry firearms

1    within the City of Boston.

2         Since our brief does the analysis under the

3    intermediate scrutiny, I will again repeat it.  Obviously the

4    City has an important government interest in ensuring everybody

5    fills out their application form accurately and provides the

6    correct information so that they have accurate records as to

7    who's licensed.  Heller specifically said that people can --

8    that the states can and the cities can regulate firearm

9    licensing.  The only way to regulate firearm licensing is to

03:13 10   know who has firearms and to know the important information and

11   to make sure that they're not statutorily disqualified or

12   they're not irresponsible persons that should not be having

13   guns.

14        Revocation upon a determination that there's been

15   false information submitted is certainly reasonably related to

16   the important government interests of ensuring that they have

17   all the right information.  You know, asking for accurate

18   information without consequence really doesn't do much to make

19   sure that the City of Boston knows who has guns.

03:14 20        THE COURT:  And is the statutory language that counsel

21   pointed to under Chapter 140 section 131(f), is that the

22   language that the City points to as well in terms of regulating

23   how the Commissioner exercises his discretion in terms of who

24   is a suitable or unsuitable person?

25        MS. SKEHILL MAKI:  Certainly, your Honor.  I mean, the

1   licensing Commissioner is well aware of the fact that -- and it

2   happens all the time -- that denials of revocations are

3   appealed to the District Court.  The discretion that is

4   utilized is to make sure that irresponsible people don't get

5   guns, not to exercise arbitrary exercise of judgment in

6   determining who can have guns or not.  This -- you know, going

7   to my brother counsel's argument that is this is an arbitrary

8   revocation, it certainly is not, it is an objective revocation.

9   Anyone who falsifies information unintentionally or

03:15 10   intentionally on a form will have their license revoked.

11   Exhibit C, again, Lieutenant Detective Harrington states that

12   he's not only revoked people's licenses, civilians' licenses

13   for submitting false information on forms, but he's done it to

14   police officers as well.  It is imperative that we have the

15   correct information.  Revocation is the best way to achieve

16   that.

17        THE COURT:  Just hypothetically speaking, let's say

18   Ms. Hightower had filled out the sworn officer form correctly,

19   accurately, truthfully, but the police Commissioner had

03:15 20   information that bore on her character that didn't bear on the

21   truthfulness of her answers to the sworn form, would the

22   Commissioner still have discretion to deny her class A license?

23        MS. SKEHILL MAKI:  If the information bore on her

24   suitability and he determined she was unsuitable.  And the

25   letter of revoking her license would have told her the reasons

1    that it was being revoked.  The reasons here were simply she

2    provided an untruthful answer on the form.  Holding people

3    accountable to provide the accurate information is not an undue

4    burden.  If Ms. Hightower was confused as to what the question

5    meant, there was certainly ample people to ask what it meant.

6    She could have gone to the Commissioner's office and said, I

7    don't understand what this means, this charge is pending, I've

8    been asked this five times on my other form, why would you ask

9    me again?  There was nothing preventing her from calling

03:16 10    Internal Affairs and making sure all her internal affairs

11    investigations had been closed.  That's something that did not

12    happen here and the City of Boston simply revoked based on her

13    untruthful answer and it was not a bar from preventing her from

14    going again and applying to a different form or, if she was

15    even still a police officer, correcting the form and submitting

16    a new one.

17         THE COURT:  And I don't think there's any information

18    about this in the record, but I think there was a figure about

19    how many licenses had been denied or revoked, but I don't

03:17 20    recall that there was a figure about how many times applicants

21    for licenses which are denied or revoked appeal to the District

22    Court.  Do you have any sense on order of magnitude how often

23    that happens?

24         MS. SKEHILL MAKI:  I do not, your Honor.  I don't

25    believe that's a statistic that the Boston Police Department

1    keeps, but I can certainly ask and submit it to you if there

2    is.

3             THE COURT:  Do you also have any information or a

4    sense of how much time -- is it 90 days in which --

5             MS. SKEHILL MAKI:  You have 90 days to appeal.

6             THE COURT:  Okay.  You have 90 days to appeal.  Is

7    there any information about how long if someone does appeal to

8    District Court, how long typically it takes for that matter to

9    be heard?

03:17 10          MS. SKEHILL MAKI:  Unfortunately, I don't have the

11   answer to that, your Honor.  I do not know.  I guess it all

12   depends on the court's docket.

13            THE COURT:  Okay.

14            MS. SKEHILL MAKI:  So I just wanted to point out two

15   cases out of California also, one was most recently Richard v.

16   County of Yolo in the Eastern District of California, but it's

17   a very similar case as to this one.  There, California allows

18   for concealed carrying upon the discretion of the licensing

19   Commissioner.  The statute gives the licensing Commissioner

03:18 20   discretion to determine who has good cause or proper cause to

21   have a license to carry concealed.  The alternative is that the

22   individual can carry an unconcealed weapon unloaded or can

23   carry a loaded weapon openly when they're in danger.  That is

24   almost exactly what we have here in Massachusetts.  In both of

25   those cases the court found that the statutory scheme, the

          1   discretion, was constitutional.

          2        Just moving on -- I don't want to repeat too much of

          3   my brother's arguments regarding due process -- but the

          4   suggestion that exigent circumstances -- in exigent

          5   circumstances only predeprivation due process should not be

          6   allowed in case -- somebody is seen on TV shooting a gun at

          7   other people, that's, like, the only instance in which somebody

          8   would be denied predeprivation due process.  That requires

          9   subjective discretion.  If somebody has lied on their

03:19    10   revocation form, you have to use your subjective discretion to

         11   determine whether or not that lie equals a public safety

         12   threat.  Plaintiff labors to argue that these charges pending

         13   meant nothing to the City of Boston in the three years prior

         14   once they were brought and all of a sudden meant something

         15   three years later.  That's not the case.  Her license was not

         16   revoked because of the charges.  Her license was revoked

         17   because she submitted inaccurate information.

         18        Using discretion once somebody has submitted

         19   inaccurate information to determine why they submitted, what is

03:20    20   their reason for submitting it, is it intentional, is it

         21   innocent, is it for bad reasons, it's all discretion that the

         22   plaintiff argues that the City shouldn't have.  Here there was

         23   no subjective discretion utilized, it's an objective standard.

         24   You lie on your form, either intentionally or unintentionally,

         25   your license will be revoked or suspended.  You can certainly

1    try to get another one and submit the most accurate information

2    or apply for a different type of license and not a license to

3    carry concealed.

4          I'll rest on our brief so I don't repeat ourself with

5    regard to substantive due process and equal protection claims.

6          If you have any questions, I'm happy to answer,

7    otherwise I'll rest.

8          THE COURT:  Thank you, counsel.

9          Counsel, I appreciate the arguments on both sides, the

03:20 10   advocacy today, as well as the advocacy in your papers.  I will

11   certainly take the matter under advisement.  Thank you,

12   counsel.

13         (Court adjourned at 3:20 p.m.)

14                   - - - - - - - - - - - -

15                        CERTIFICATION

16         I certify that the foregoing is a correct transcript

17   of the record of proceedings in the above-entitled matter to

18   the best of my skill and ability.

19

20

21

22   /s/Debra M. Joyce              September 15, 2011
     Debra M. Joyce, RMR, CRR       Date
23   Official Court Reporter

24

25