# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

_____

| | |
|---|---|
| Stacey Hightower, | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | )   **Civil Action No. 08-11955-DJC** |
| | ) |
| The City of Boston, | ) |
| Boston Police Commissioner Edward Davis, | ) |
| and the Commonwealth of Massachusetts, | ) |
| | ) |
| **Defendants.** | ) |

_____)

## MEMORANDUM AND ORDER

**CASPER, J.**                                                         September 29, 2011

## I.  Introduction

Plaintiff Stacey Hightower ("Hightower") has brought this suit alleging that the Massachusetts statutory scheme for determining whether to issue a license to carry a firearm, Mass. Gen. L. c. 140, § 131, both on its face and as applied by Defendants, the City of Boston and Boston Police Commissioner Edward Davis ("BPD Commissioner") (collectively, "Municipal Defendants"), violates her rights under the Second and Fourteenth Amendments to the United States Constitution. The Commonwealth of Massachusetts intervened to defend the constitutionality of the statute. Hightower, the Municipal Defendants and the Commonwealth have now all moved for summary judgment. For the reasons discussed below, Hightower's motion for summary judgment is DENIED and the Defendants' motions for summary judgment are GRANTED.

1

## II.  Burden of Proof and Standard of Review

A party moving for summary judgment bears the burden of "show[ing] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is "genuine" where the evidence with respect to the material fact in dispute "is such that a reasonable jury could return a verdict for the nonmoving party."  Id.

Once the moving party has satisfied its burden, the burden shifts to the non-moving party to set forth specific evidence showing that there is a genuine, triable issue of fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor.  O'Connor v. Steeves, 994 F.2d 905, 907 (1st Cir. 1993).  The Court shall grant summary judgment if, after viewing the record in this light, it determines that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).

## III.  Background

Because Hightower challenges not only the Municipal Defendants' specific decision regarding her license to carry but also the Commonwealth's statutory scheme regarding such licenses, the Court shall begin with the background facts concerning revocation of  Hightower's firearm license as well as a discussion of the statutory scheme at issue and the constitutional backdrop for Hightower's claims.

### A.     The Statutory Scheme

#### 1.   Classification of Firearms

Under Massachusetts law, the terms "firearm," "shotgun" and "rifle" each have distinct statutory definitions; a firearm is defined as "a pistol, revolver or other weapon of any description, loaded or unloaded, from which a shot or bullet can be discharged and of which the length of the barrel or barrels is less than 16 inches or 18 inches in the case of a shotgun as originally manufactured." Mass. Gen. L. c. 140, § 121.  Additionally, Massachusetts law classifies as a "large capacity weapon" any firearm, rifle or shotgun that either is semiautomatic (i.e., "capable of utilizing a portion of the energy of a firing cartridge to extract the fired cartridge case and chamber the next round, and requiring a separate pull of the trigger to fire each cartridge") and has a fixed large-capacity feeding device or can be readily modified to accept such a device, or "employs a rotating cylinder capable of accepting more than ten rounds of ammunition in a rifle or firearm and more than five shotgun shells in the case of a shotgun or firearm," or is defined under federal law as an assault weapon.  Mass. Gen. L. c. 140, § 121.

#### 2.   Classification of Licenses to Carry:  Class A and Class B

Massachusetts law sets forth two categories of licenses to carry firearms:  Class A and Class B.  See Mass. Gen. L. c. 140, § 131(a)-(b).  Each type of license is issued by a "licensing authority," defined as either the local police chief or the State Police colonel.  Id. at §§ 121, 131(d).

A Class B license to carry authorizes the holder to possess and carry rifles and shotguns of any capacity, provided that the licensing authority "may impose such restrictions relative to the possession, use or carrying of large capacity rifles and shotguns as he deems proper."  Mass. Gen. L. c. 140, § 131(b).  A Class B license also authorizes the holder to possess and carry non-large-

capacity firearms, "subject to such restrictions relative to the possession, use or carrying of such firearm as the licensing authority deems proper," but "a Class B license shall not entitle the holder thereof to carry or possess a loaded firearm in a concealed manner in any public way or place." Id.

A Class A license to carry provides the same authorization as a Class B license, plus authorization to possess and carry large capacity firearms and authorization to carry or possess a loaded firearm in a concealed manner, "subject to such restrictions relative to the possession, use or carrying of firearms as the licensing authority deems proper." Mass. Gen. L. c. 140, § 131(a); Stavis v. Carney, 2000 WL 1170090, at *3 (Mass. Super. Ct. Aug. 1, 2000). "A Class A license with restrictions generally allows individuals to carry a firearm outside the home for sport and target practice or for employment purposes, such as traveling to and from employment as a security officer," and typically "requires the individual to transport their firearm unloaded in a locked box, and when necessary, in the trunk of their vehicle." Decl. of Lieutenant Detective Mark Harrington, D. 40-3 at ¶¶ 7-8. An unrestricted Class A license allows an individual to carry a concealed firearm on their person for any purpose. Id.; Stavis, 2000 WL 1170090, at *3. Just under 60% of the Class A licenses in Boston are unrestricted.[1]

Whether to grant an application for either a Class A or a Class B license to carry is in the bounded discretion of the local licensing authority; here, the BPD Commissioner. A license cannot be issued to an applicant who is statutorily disqualified by virtue of: (i) a conviction for a felony, a misdemeanor punishable by more than two years in prison, a violent crime, a gun crime, or a drug

---

[1]Specifically, as of Febraury 22, 2011, there were 3,798 active Class A licenses in Boston, of which 2,239 (or 59%) were unrestricted, 1,257 (or just over 33%) were restricted to sporting activities, 291 (or just under 8%) were restricted for employment purposes, 10 (or less than 1%) were restricted to home protection, and 1 (much less than 1%) was restricted for film production or theater use. Second Affidavit of Jason Guida, Director of the Commonwealth of Massachusetts Criminal Justice Information Services Firearms Records Bureau, D. 40-15 at ¶ 8.

crime, (ii) a mental illness, (iii) an alcohol or drug addiction, (iv) being less than 21 years of age, (v) being an alien, (vi) being the subject of a restraining order, or (vii) being the subject of an arrest warrant.  Mass. Gen. L. c. 140, § 131(d)(i)-(vii).  If an applicant does not fall into one of the prohibited categories, the licensing authority may still only "issue [a license] if it appears that the applicant is a suitable person to be issued such license."  Mass. Gen. L. c. 140, § 131(d). Massachusetts courts have interpreted this "suitability" standard as a requirement that the applicant be "a sufficiently responsible person to be entrusted with a license to carry firearms."  Wetherbee v. Costerus, 2001 WL 716915, at *7 (Mass. Super. Ct. May 1, 2001).[2]

### 3.  Application, Revocation and Appeals Processes

Massachusetts offers a single form application, Form FA-25/26, to individuals applying for a license to carry (Class A or Class B) or a F.I.D. card.  See, e.g., Hightower's Form FA-25/26, D. 40-12.  The form inquires as to the applicant's citizenship, aliases, age, criminal history, mental health, history of drug or alcohol abuse, history of domestic violence or restraining orders and arrest warrants, and history with regard to previous licenses to carry or F.I.D. cards and requests that the applicant provide two character references.  Id.  The form must be signed under penalty of perjury. Id.

Under Massachusetts law, within forty days of receiving an application for a license to carry, the licensing authority must "either approve the application and issue the license or deny the application and notify the applicant of the reason for such denial in writing."  Mass. Gen. L. c. 140, § 131(e).  In recent years, approximately 98% of applications have been granted statewide, with just

---

[2]Massachusetts law also provides for a Firearm Identification Card ("F.I.D. card").  Mass. Gen. L. c. 140, § 129B.  A F.I.D. card "allows the holder to own or possess a firearm within the holder's residence or place of business, but not to carry it to or in any other place." Commonwealth v. Powell, 459 Mass. 572, 587-88 (2011).

over 1% rejected because the applicant is categorically disqualified from receiving a license and the remaining 1% rejected because the licensing authority deems the applicant unsuitable.[3]

In Boston, sworn officers of the Boston Police Department who seek a license for a personal firearm (separate and apart from any department-issued firearm) are required to go through an additional step in the license to carry application process: completing a License to Carry Firearms Worksheet - BPD Sworn Only, also known as a G 13-S Form. Harrington Decl., D. 40-3 at ¶ 10; see Exh. A to the Hightower Decl., D. 28-2 (Hightower's completed G 13-S Form). The form requires information regarding the applying police officer's rank, assignment, date of appointment, queries whether the officer has any "complaints or charges pending" against her, whether she is currently under suspension, and whether she is currently subject to any abuse or restraining orders and indicates that the applying officer must submit to an interview and a criminal history check. See id.[4] The form is reviewed by the BPD Internal Affairs Division and provides space for the licensing authority - i.e., the BPD Commissioner or his designee, the Commander of the Boston Police Department's Licensing Unit, see Harrington Decl., D. 40-3 at ¶ 3 - to approve the license without restrictions, to list restrictions and approve the license as restricted, or to deny the license.

---

[3]Specifically, from 2008 through 2010, 92,765 applications for licenses to approve were submitted, and 90,865 applications were granted. First Guida Aff., D. 35-6 at ¶ 7. Of the 1,900 applications that were denied, 969 were denied on the ground that the applicant was statutorily disqualified to hold a license, and 931 were denied on the ground that the applicant was deemed unsuitable by the licensing authority. Id.

[4]See also Transcript of Motion Hearing, D. 51 at 48 (counsel for Municipal Defendants, in response to the Court's inquiry as to why sworn BPD officers are required to complete a Form G 13-S in addition to the civilian Form FA-25/26, stated that the focus is on Internal Affairs Division matters: "the only real difference between [a] civilian application and the application for a Boston police officer in applying or renewing [a] firearm license is the question of whether there are internal affairs charges pending. So I think it's just another check on the suitability of the individual looking for the gun").

Hightower Decl., Exh. A, D. 28-2.

Licenses may be suspended or revoked.  A licensing authority must revoke or suspend a license "upon the occurrence of any event that would have disqualified the holder from being issued such license or from having such license renewed," and may revoke or suspend a license "if it appears that the holder is no longer a suitable person to possess such license."  Mass. Gen. L. c. 140, § 131(f).  "Any revocation or suspension of a license shall be in writing and shall state the reasons therefor."  Id.  "[T]he person whose application was so revoked, suspended or denied shall without delay deliver or surrender, to the licensing authority where he resides, all firearms, rifles, shotguns and machine guns and ammunition which he then possesses unless an appeal is pending."  Id. at § 129D.[5]

If a license is denied, revoked or suspended by the licensing authority, the aggrieved party may "file a petition to obtain judicial review" in the appropriate state district court within "90 days after receiving notice of such denial, revocation or suspension."  Id. at § 131(f).  "No appeal or post-judgment motion shall operate to stay such revocation or suspension."  Id.

The "[state district] court, after a hearing, may direct that a license be issued or reinstated to the petitioner if [the court] finds that there was no reasonable ground for denying, suspending or revoking such license and that the petitioner is not prohibited by law from possessing same."  Id. The statute "contemplates an evidentiary hearing" and a decision made "on all the facts."  Godfrey v. Chief of Police of Wellesley, 35 Mass. App. Ct. 42, 44-45 (1993).  The petitioner is entitled to

---

[5]It appears that revocation is uncommon.  For example, in calendar year 2007, the year before Hightower's license was revoked, the Boston Police Department revoked 50 licenses. Second Guida Aff., D. 40-15 at ¶ 6.  Assuming for the moment that the number of licenses in Boston was similar in both 2007 and 2011, and given that in 2011 there were 3,798 active Class A licenses (and that the record does not reflect the number of active Class B licenses), it appears that roughly 1% of the active licenses in Boston are revoked annually.  Id. at ¶¶ 6, 8.

relief if the licensing authority's denial, revocation or suspension "was arbitrary, capricious, or an abuse of discretion."  Id. at 46 (quoting Chief of Police of Shelburne v. Moyer, 16 Mass. App. Ct. 543, 546 (1983)).  Further judicial review is available in Superior Court pursuant to certiorari review per Mass. Gen. L. c. 249, § 4, see Godfrey at *46, and the Superior Court's determination may be appealed as of right.  Mass. R. App. P. 4.

### B. The Constitutional Backdrop

The Second Amendment states:  "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.  In District of Columbia v. Heller, 554 U.S. 570 (2008), the Supreme Court held that the Second Amendment guaranteed an "individual right to possess and carry weapons in case of confrontation."  Id. at 592.  The First Circuit has discussed Heller at length on two occasions:  in United States v. Rene E., 583 F.3d 8 (1st Cir. 2009), a case involving a seventeen-year-old defendant who violated a federal prohibition on the possession of handguns by juveniles, and in United States v. Booker, 644 F.3d 12 (1st Cir. 2011), which involved a challenge to a federal law prohibiting individuals convicted of a "misdemeanor crime of domestic violence" from possessing firearms. Id. at 13.

In Rene E., the First Circuit observed that Heller read the Second Amendment "to 'guarantee the individual right to possess and carry weapons in case of confrontation' [and that] this right included a right to 'self-defense,' which the [Supreme] Court described as 'the central component of the right itself[,]' [and noted further that] 'the inherent right of self-defense has been central to the Second Amendment right.'"  Rene E., 583 F. 3d at 11 (quoting Heller, 554 U.S. at 592, 599, 628).  Accordingly, some of the statutes at issue in Heller, including a local ban on handgun

ownership, "were unconstitutional because they 'prohibit[ ] . . . an entire class of 'arms' that is overwhelmingly chosen by American society for th[e] lawful purpose [of self-defense],' and 'make[] it impossible for citizens to use [firearms] for the core lawful purpose of self-defense.'" Id. (quoting Heller, 554 U.S. at 630).[6] But "[t]he Heller Court did not identify a standard of review for regulations that restrict Second Amendment rights, apart from rejecting rational basis review and 'interest-balancing,'" id. at 11 n.4 (quoting Heller, 554 U.S. at 628 n. 27, 634-35), and "[t]he Heller Court was careful to note that the rights guaranteed by the Second Amendment were 'not unlimited.'" Id. at 12 (quoting Heller, 554 U.S. at 626). Indeed, many gun-control regulations "were left intact by the Second Amendment and by Heller," including "'(1) laws prohibiting the carrying of concealed weapons, (2) laws prohibiting the possession of firearms by felons and the mentally ill, (3) laws prohibiting the carrying of firearms 'in sensitive places such as schools and government buildings,' (4) laws imposing conditions and qualifications on the commercial sale of arms, and (5) laws prohibiting the carrying of 'dangerous and unusual weapons.'" Id. (quoting Heller, 554 U.S. at 626-27 and n. 26).

In Booker, the First Circuit noted that Heller "expressly left for 'future evaluation' the precise level of scrutiny to be applied to laws trenching upon Second Amendment rights." Booker, 644 F.3d at 12 (quoting Heller, 554 U.S. at 626, 634-35). It noted further that Heller "'tell[s] us that statutory prohibitions on the possession of weapons by some persons are proper.' . . . That is, the Second Amendment permits categorical regulation of gun possession by classes of persons . . . rather than requiring that restrictions on the right be imposed only on an individualized, case-by-case

---

[6]Heller also "held that a provision of D.C. law requiring gun-owners to secure their guns with a trigger-lock or keep the guns disassembled unquestionably infringes upon Second Amendment rights." Booker, 644 F.3d at 22 n.12 (citing Heller, 544 U.S. at 630).

basis." Id. at 23 (quoting United States v. Skoien, 614 F.3d 638, 640 (7th Cir. 2010)).  In its efforts to develop a standard of review to be applied to a statute that included such a categorical ban, the First Circuit explained that "[w]hile we do not attempt to discern the 'core' Second Amendment right vindicated in Heller, we note that Heller stated that the Second Amendment 'elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home,'" id. at 25 n. 17 (quoting Heller, 554 U.S. at 635).  Further, "[w]e think it sufficient to conclude, as did the Seventh Circuit, that a categorical ban on gun ownership by a class of individuals must be supported by some form of 'strong showing,' necessitating a substantial relationship between the restriction and an important governmental objective."  Id. at 25 (quoting Skoien, 614 F.3d at 641).

In 2010, the Supreme Court made clear that the Second Amendment's right to bear arms applies to the states as well as to the federal government.  McDonald v. City of Chicago, 130 S.Ct. 3020, 3050 (2010) (Alito, J., plurality opinion) (holding Second Amendment right is incorporated against the states through Fourteenth Amendment).  "In so doing, however, the McDonald Court reiterated the affirmation by the [Supreme] Court in Heller that the right to bear arms is not without restrictions."  Yohe v. Marshall, 2010 WL 4027797, at *3 (D. Mass. Oct. 14, 2010).  Indeed, McDonald explained that "it is important to keep in mind that Heller, while striking down a law that prohibited the possession of handguns in the home, recognized that the right to keep and bear arms is not 'a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.'"  McDonald, 130 S.Ct. at 3047 (quoting Heller, 554 U.S. at 626).  The court explained further that "[w]e made it clear in Heller that our holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill,'

'laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms,'" id. (quoting Heller, 554 U.S. at 626-27), and "[w]e repeat those assurances here." Id. "Thus, incorporating the right to bear arms in the Second Amendment as a fundamental right applicable to the states through the Fourteenth Amendment 'does not imperil every law regulating firearms.'" Yohe, 2010 WL 4027797, at *3 (quoting McDonald, 130 S.Ct. at 3047).

### C.    Factual Background

The following facts are undisputed unless otherwise noted.  Hightower is a resident of Dorchester.  Hightower Decl., D. 28-7 at ¶¶ 1, 11.  She joined the Boston Police Department ("BPD") in June 1998. Id. at ¶ 3.  In 1999, Hightower sought a Class A license "to carry concealed, large capacity firearms," Am. Compl., D. 3 at ¶ 15, and applied for and received an unrestricted Class A license granted "for all lawful purposes."  Hightower Decl., D. 28-7 at ¶ 15.  Pursuant to this license, in addition to her BPD-issued gun, she kept a privately-owned Smith & Wesson ".38 Special" five-round revolver, which is a non-large-capacity firearm.  Hightower Deposition, D. 35-1 at 16; Exh. N to Mun. Def.'s Statement of Material Facts, D. 40-14 (BPD Incident Report).

Hightower sought to renew her unrestricted Class A license in July 2008.  As a sworn BPD officer, she was required to fill out a Form G 13-S.  Hightower Decl., D. 28-7 at ¶ 17; Harrington Decl., D. 40-3 at ¶ 10.  She completed and submitted the form on July 9, 2008.  Hightower Decl., D. 28-7 at ¶ 18.  In response to the form's query "Are There Any Complaints Or Charges Pending Against You?," Hightower answered "No."  Exh. A to the Hightower Decl., D. 28-2 (Hightower's completed Form G 13-S).[7]

---

[7]The parties vigorously dispute whether Hightower's response to this question was accurate, although they do not dispute the facts underlying Hightower's response.  On July 28,

Thereafter, the processing of Hightower's application overlapped with the conclusion of her service with the BPD. On July 30, 2008, Hightower's application was reviewed by BPD's Internal Affairs Division. Id. The next day, July 31, Hightower submitted her resignation to BPD, effective August 15, and responded "no" to that form's query "Is resignation presented while charges are pending?" Exh. B to the Hightower Decl., D. 28-3 at 1 (Hightower's completed Resignation Form). On August 1, the day after Hightower submitted her resignation, the BPD Commissioner approved Hightower's application for an unrestricted Class A license. Exh. A to the Hightower Decl., D. 28-2 (Hightower's completed Form G 13-S). On August 5, Hightower's superior, Acting Commander Luis Cruz, recommended to Commissioner Davis that Hightower's resignation "be accepted as

---

2004, an incident occurred at a BPD booking desk that resulted in an individual claiming that he had been assaulted by a BPD officer. Exh. D to Mun. Def.'s Statement of Material Facts, D. 40-4 at ¶¶ 3-5 (Declaration of BPD Superintendent of Internal Affairs Kenneth Fong). Hightower was involved in the arrest of the complainant and was interviewed during the subsequent BPD Internal Affairs investigation. Id. at ¶ 4-5. BPD Internal Affairs investigators found Hightower to be in violation of various BPD rules. Id. at ¶ 6. Hightower appealed these findings through her union representative. Hightower Deposition, D. 40-7 at 13-15. Hightower also hired an attorney who engaged in settlement negotiations with BPD in connection with the findings. Id. at 16-21. Neither Hightower's appeal of the findings nor her settlement negotiations were resolved at the time Hightower resigned from BPD on July 31, 2008, some twenty-two days after she applied for renewal of her Class A license. Id. at 21-22. Hightower was aware of her dispute with the Internal Affairs findings, id. at 9-10, 15-16, and that the dispute had not been resolved by the time of her resignation, id. at 22, but she asserts that she was "unaware at that time [of her renewal application] of any pending investigations in my Internal Affairs record. . . ." Hightower Decl., D. 28-7 at ¶ 19.

Hightower asserts that she interpreted the question "Are There Any Complaints Or Charges Pending Against You?" on the BPD Form G 13-S to refer only to criminal complaints or charges, Hightower Deposition, D. 40-7 at 25, and thus asserts that the answer was accurate when she submitted her form on July 9, 2008 and continues to be true. Id. The Municipal Defendants argue that because Form FA-25/26, the standard civilian application, specifically asks about criminal history, see Hightower's Form FA-25/26, D. 40-12, it is clear that the phrase "complaints or charges" on the supplemental Form G 13-S for sworn officers refers to internal affairs investigations, Mun. Def.'s Statement of Material Facts, D. 40 at ¶ 20, and thus Hightower's answer was and remains inaccurate.

Both parties assert that this case can be resolved on summary judgment without resolving this dispute. Pl. Memo, D. 29 at 8; Mun. Def. Memo, D. 41 at 14-15.

12

submitted," Exh. B to the Hightower Decl., D. 28-3 at 3 (Cruz letter), and the BPD Commissioner

accepted Hightower's resignation on August 15.  Exh. B to the Hightower Decl., D. 28-3 at 2

(Hightower's completed Resignation Form).

On August 18, 2008, a "Police Commissioner's Personnel Order," signed by the BPD

Commissioner, was placed in Hightower's personnel file.  Exh. D to the Hightower Decl., D. 28-5

(Police Commissioner's Personnel Order).  The order stated that "the resignation of Police Officer

Stacey Hightower, [], assigned to the Bureau of Field Services / District B-2, [] after being presented

with charges pending is hereby effective, Friday, August 15, 2008."  Id.

On August 20, 2008, the BPD Commissioner sent Hightower a letter stating that her license

to carry was revoked pursuant to the provisions of Mass. Gen. L. c. 140, § 131.  Exh. C to the

Hightower Decl., D. 28-4 (revocation letter).  The letter stated that "the reason[] for this revocation

is [that] you completed the application form untruthfully."  Id.[8]  The letter stated further that:

> As a result of this revocation you shall, in accordance with M[ass]. G[en]. L. c. 140,
> § 129D, without delay, deliver or surrender to the licensing authority where you
> reside your licenses to carry, and all firearms, large capacity feeding devices, rifles,
> shotguns and ammunition which you have in your possession, or which are owned
> by you.  Failure to do so is a criminal offense. . . . You have the right to appeal this
> decision within 90 days to the District Court with appropriate jurisdiction.  Please
> contact us at any time if you have any questions concerning this matter.

Id.  Shortly thereafter, Hightower surrendered her handgun and ammunition to the police.

Hightower Decl., D. 28-7 at ¶ 24.  She did not appeal the revocation and did not reapply for a Class

B or restricted Class A license.  Hightower Deposition, D. 35-1 at 20.

In the course of this litigation, BPD has taken the position that since Hightower is no longer

_____

[8]The Commissioner's designee has declared that, as a general matter, he has both denied
and revoked license applications when a sworn BPD officer has answered questions on the Form
G 13-S untruthfully.  See Harrington Decl., D. 40-3 at ¶ 15.

a sworn BPD officer and the G 13-S requirement no longer applies to her, if Hightower "truthfully completes a civilian License to Carry form, and no other disqualification applies, her right to carry a firearm will be restored."  Mun. Def.'s Am. Answer, D. 16 at ¶ 37; see also Harrington Decl., D. 40-3 at ¶ 19.

Nonetheless, Hightower testified at her deposition that she believes that even if she reapplied for a Class A unrestricted license that would allow her to carry a concealed firearm, her application would be denied and, accordingly, she has refrained from reapplying.  See Hightower Deposition, D. 35-1 at 16-18.[9]  Nor has she applied as a civilian for a Class B or restricted Class A license to

---

[9]The parties differ as to the best way to characterize the deposition testimony on this point.  The relevant portion of Hightower's deposition reads as follows:

Q:      . . . Since the revocation of your class A license, have you ever reapplied for a gun license?
A:      No.
Q:      Why is that?
A:      Reapplied where?
Q:      To the City of Boston.
A:      They revoked my license.
Q:      Do you know you have a right to reapply?
A:      Yeah, sure.
Q:      You're aware that you can reapply?
A:      Sure, I can reapply.
Q:      So you know that, why haven't you done that?
A:      Why would I?  They revoked my license.
Q:      But you understand that you can go reapply for another one, right?
A:      Sure.
Q:      Okay.  Why haven't you done that?
A:      Because they revoked my license.
Q:      Okay.
A:      It's a waste of time.  Why would I go apply when they revoked my license?
Q:      So you believe that because they revoked your license you'll be denied if you reapply?
A:      It's not my belief that I would be necessarily denied to car[ry] a firearm.  It's my belief that I would be denied a Class A.
Q:      A Class A, unrestricted license to carry a concealed - -
A:      That's right.

14

carry.  Hightower Deposition, D. 35-1 at 20.

The 90-day window within which Hightower was allowed to seek judicial review of the

revocation of her unrestricted Class A license on August 20, 2008, closed on November 18, 2008.

Mass. Gen. L. c. 140, § 131(f).

**D.      Procedural Background**

---

Q:      You don't want your gun license if you can't carry it concealed?
A:      That's not necessarily true.
Q:      Okay.
A:      I would like to have my gun license and be able to carry it concealed. . . . I've
        lived a very dangerous life and I've arrested some dangerous people, and I would
        feel a lot more comfortable if I could have a Class A unrestricted license. . . .
Q:      So back to my original question, which was why you have not applied for your
        Class A unrestricted license.
A:      Because I don't feel I'm going to get my Class A unrestricted license.
Q:      But you haven't tried?
A:      No, I haven't.
Q:      And what makes you feel that you wouldn't get it?
A:      Because of the simple fact that they revoked it already.  I mean, if they wanted me
        to have the license, they would have let me keep the license.  I mean, what was all
        this craziness of taking my license and take my firearm and leaving me
        unprotected in a house that already had been broken into while I was a police
        officer?  It's scary.
Q:      You didn't file an appeal to get your gun license unrevoked?
A:      No.
Q:      And you haven't reapplied to get your Class A unrestricted license again?
A:      No.
Q:      And you haven't applied to get a Class A restricted license?
A:      No.
Q:      Do you have a gun, at least in your home, to protect yourself?
A:      No.
Q:      And the reason you haven't done that is why again?
A:      Because they already revoked it.  They already revoked it.  I applied, they
        revoked it.
Q:      Okay.  But you're aware of the fact that you can still reapply regardless of the fact
        that it's been revoked, right?
A:      Sure.  If it will make you happy, I will go down there today and reapply.

Hightower Deposition, D. 35-1 at 16-18.  There is no suggestion in the record that Hightower
has actually reapplied.

On November 24, 2008, six days after the closure of Hightower's window for seeking judicial review in state court, Hightower filed the instant lawsuit against the Municipal Defendants. On March 23, 2009, she filed an amended complaint, which remains the operative complaint, that raises four claims, each brought under 42 U.S.C. § 1983 and the Second and Fourteenth Amendments: first, that "[b]y requiring Ms. Hightower to turn over her handgun," the Defendants violated her right to bear arms, Am. Compl., D. 3 at 9; second, that by "forc[ing] Ms. Hightower to turn over her handgun without first conducting a hearing of any sort," the Defendants violated her right to procedural due process, id. at 9-10; third, that "[b]y requiring Ms. Hightower to maintain her Class A License at [the Commissioner's] discretion," the Defendants have subjected her to an "unconstitutional licensing requirement," id. at 10-11; and finally, that by "prevent[ing] Ms. Hightower from exercising her fundamental individual right to keep and bear arms for the purpose of self-defense," the Defendants are "denying law abiding citizens like Ms. Hightower the equal protection of the laws," id. at 11-12 - and seeks declaratory and injunctive relief. Id. at 9-12.

On July 24, 2009, in accordance with Fed. R. Civ. P. 5.1, Hightower filed a notice of claim of unconstitutionality, stating that her complaint calls into question the constitutionality of Mass. Gen. L. c. 140, § 131, and served such notice on the Attorney General of Massachusetts.

On September 30, 2009, the Supreme Court granted certiorari in McDonald v. City of Chicago, see 130 S.Ct. 48 (Mem) (2009), and Hightower and the Municipal Defendants jointly moved to stay this case pending the outcome of McDonald. D. 20-2. The Court granted the motion, stayed the case, and ordered Hightower to move to reopen after the Supreme Court issued its opinion in McDonald.

On June 28, 2010, the Supreme Court issued McDonald. 130 S.Ct. 3020, 3020 (2010). On

Hightower's motion, the Court reopened the case on November 20, 2010.

On January 31, 2011, Hightower moved for summary judgment.  On February 14, 2011, the Court allowed the Commonwealth to intervene in the case for the limited purpose of defending the constitutionality of Mass. Gen. L. c. 140, § 131.  On April 21, 2011, the Commonwealth cross-moved for summary judgment and the Municipal Defendants filed their own cross-motion for summary judgment the next day.  After transfer of the case to this session, the Court held a hearing on the summary judgment motions and took the matter under advisement.

## IV. Discussion

### A. Ripeness of Hightower's Second Amendment Claims

The Commonwealth argues that Hightower's claims are unripe, at least inasmuch as they rely on the Second Amendment or on a Fourteenth Amendment right to substantive due process derivative of her Second Amendment rights.[10]  "Ripeness is an Article III jurisdictional requirement," and turns upon the existence of "an 'actual' controversy," which "is a sine qua non of any assumption of federal jurisdiction."  Verizon New England, Inc., v. Int'l Bhd. of Elec. Workers, Local No. 2322, 2011 WL 2568008, at *9 (1st Cir. June 30, 2011) (quoting 28 U.S.C. § 2201(a) (Declaratory Judgment Act)).  Ripeness doctrine protects against "premature adjudication," keeps courts "from entangling themselves in abstract disagreements," "avoid[s] unnecessary constitutional decisions," and reflects "the recognition that, by waiting until a case is fully developed before deciding it, courts benefit from a focus sharpened by particular facts."  Doe v. Bush, 323 F.3d

---

[10]The Commonwealth does not dispute the ripeness of the Hightower's procedural due process claim (Claim II), her substantive due process claim (Claim III) or her equal protection claim (Claim IV) to the extent they can be based solely on the Fourteenth Amendment.  The Municipal Defendants echo the Commonwealth's ripeness argument.  Mun. Def. Memo, D. 41 at 22-23.

133, 138 (1st Cir. 2003) (citations omitted).

"There is little difficulty in finding an actual controversy if all of the acts that are alleged to create liability have already occurred.  The court is then merely being asked, as in any litigation, to determine the legal consequences of past events." Verizon New England, 2011 WL 2568008, at *10 (quoting 10B Charles Alan Wright et al., Federal Practice and Procedure § 2757, at 475 (1998)). The situation is more complicated when "a declaration is sought on the legal consequences of a hypothetical act that may or may not occur in the future." Id.  "[W]here challenges are asserted to government actions and ripeness questions arise, a court must consider both 'fitness' for review and 'hardship.'" Id. at *9 (quoting Ernst & Young v. Depositors Econ. Prot. Corp., 45 F.3d 530, 535 (1st Cir. 1995)).  "The 'fitness' inquiry concerns questions of finality, definiteness, and the need for further factual development." Id.  The "hardship" inquiry requires courts to "consider whether the challenged action creates a direct and immediate dilemma for the parties." Id. (quotations omitted). The "hardship" inquiry "should focus on the judgment's usefulness . . . . [R]ather than asking, negatively, whether denying relief would impose hardship, courts will do well to ask, in a more positive vein, whether granting relief would serve a useful purpose, or, put another way, whether the sought-after declaration would be of practical assistance in putting the underlying controversy to rest." Id. (quoting State of R.I. v. Narragansett Indian Tribe, 19 F.3d 685 (1st Cir. 1994)).  "Both prongs of the test ordinarily must be satisfied in order to establish ripeness." Ernst & Young v. Depositors Econ. Prot. Corp., 45 F.3d 530, 535 (1st Cir. 1995).[11]

---

[11]The First Circuit has held open "the possibility that there may be some sort of sliding scale under which, say, a very powerful exhibition of immediate hardship might compensate for questionable fitness (such as a degree of imprecision in the factual circumstances surrounding the case), or vice versa," Ernst & Young, 45 F.3d at 535, although it has not explicitly held whether or when district courts should rely on such a sliding scale.  Id. at 535 n.9 ("We need not probe this final point").

The Commonwealth's argument proceeds as follows.  First, the Second Amendment neither creates nor preserves any right to carry a handgun in a concealed manner, nor any right to large-capacity firearms; indeed, it is permissible for a legislature to ban such conduct outright, never mind restrict it, without running afoul of the Second Amendment.  Rene E., 583 F.3d at 12 (citing Heller, 554 U.S. at 626-27).[12]  Second, the deprivation suffered by Hightower at issue in this case is the revocation of her unrestricted Class A license, which allowed her to carry concealed, large-capacity firearms.  Mass. Gen. L. c. 140, § 131(a); Hightower Decl., D. 28-7 ¶ 15.  Third, although Hightower asserts that all she wants to be able to do is carry her .38 caliber revolver, a regular-capacity firearm, either concealed or unconcealed, for self-defense purposes, Pl. Opp. Memo 45 at 7-9 ("Hightower wants a permit that would allow her to carry a handgun - the one she had seized from her - for self defense . . . Hightower might prefer carrying concealed, but her testimony flatly rejects [an] attempt to convert this case into one that turns on concealment.  It does not"),[13] she has never sought and has never been denied a narrower license, such as a restricted Class A license or a Class B license, that would allow her to do so.  Hightower Deposition, D. 35-1 at 16, 20; Harrington Decl., D. 40-3 ¶ 18.  Accordingly, the Commonwealth argues that because the unrestricted Class A license Hightower had revoked is not subject to the protections of the Second Amendment, and because Hightower has not yet sought and has not been denied the type of license which is protected by the Second

---

[12]Hightower concedes the former.  See Pl. Opp. Memo, D. 48 at 7 ("It is also not contested that the concealed carrying of handguns may be banned").  She disputes the latter, but repeatedly asserts that the issue is not before the Court.  See Pl. Opp. Memo, D. 45 at 7-8.

[13]But see Hightower Deposition, D. 35-1 at 17-18 ("Q:  You don't want your gun license if you can't carry it concealed?  A:  That's not necessarily true.  Q:  Okay.  A:  I would like to have my gun license and be able to carry it concealed. . . . I've lived a very dangerous life and I've arrested some dangerous people, and I would feel a lot more comfortable if I could have a Class A unrestricted license").

Amendment, her Second Amendment claims amount to no more than an unripe inquiry into the "legal consequences of a hypothetical act that may or may not occur in the future." Verizon New England, 2011 WL 2568008, at *10.

Hightower responds that "there is no need to engage in futile, ritualistic acts to ripen a claim - and the idea that a license revocation does not present a live, justiciable controversy is untenable." Pl. Opp. Memo, D. 45 at 9. The Court finds neither part of Hightower's reply in this regard persuasive. Taking the second part of that response first, the Court notes that the Commonwealth does not dispute that the revocation of Hightower's unrestricted Class A license presents a justiciable controversy with reference to Hightower's Fourteenth Amendment rights. Commonwealth's Reply Memo, D. 50 at 1-4. Nor does it argue that Hightower's Fourteenth Amendment claims are unripe. Id.

The first part of Hightower's response requires a more thorough discussion. Hightower's reference to "futile, ritualistic acts" presumably alludes to the language the First Circuit has used to describe the "futility exception" to the requirement of ripeness review, see Gilbert v. City of Cambridge, 932 F.2d 51, 60 (1st Cir. 1991) ("the law should not be construed idly to require parties to perform futile acts or to engage in empty rituals") (quoting Northern Heel Corp. v. Compo Indus., Inc., 851 F.2d 456, 461 (1st Cir. 1988)). A fuller reading of Gilbert makes clear that the futility exception is quite narrow:

> [T]here are circumstances in which a party, on grounds of futility, might bypass a permit process and go directly to court seeking judicial review of a law's constitutionality . . . . Futility may be found, for example, where special circumstances exist such that a permit application is not a 'viable option,' or where the granting authority has dug in its heels and made it transparently clear that the permit, application or no, will not be forthcoming. . . .
>
> The futility exception is far easier to conceptualize than to define. Since obtaining

20

a final municipal decision should be the rule, however, the burden of establishing futility must lie with the party seeking to bypass the permit procedure - and any reasonable doubt ought to be resolved against that party.  Thus, although futility can excuse a plaintiff's eschewal of a permit application, the mere possibility, or even the probability, that the responsible agency may deny the permit should not be enough to trigger the excuse.  To come within the exception, a sort of inevitability is required:  the prospect of refusal must be certain (or nearly so).

Gilbert, 932 F.2d at 60-61 (quotations and citations omitted).  Nothing in the record supports Hightower's assertion that it would be so futile for her to apply for the type of permit that is protected by the Second Amendment as to justify the application of this narrow exception.  As Hightower herself notes, "Defendants admit . . . that if Hightower completes a civilian License to Carry form, they will approve it provided that 'no other disqualification applies,'" and "Defendants admit that Hightower has no criminal or drug history that would disqualify her from carrying a gun." Pl. Statement of Material Facts, D. 30 ¶¶ 36-37.[14]  This is confirmed by the Harrington Declaration. See Harrington Decl., D. 40-3 at ¶ 19.

Hightower asserts that the Commonwealth's position "unravels," Pl. Opp. Memo, D. 43 at 14, because Lieutenant Detective Harrington states that if Hightower "desired a Class A unrestricted license to carry, I would review her stated need to have an unrestricted license and make a determination based on her needs and the interests of the [BPD] in regulating Class A unrestricted licenses."  Harrington Decl., D. 40-3 at ¶ 19.  Hightower's assertion fails for three reasons.  First, as a matter of law, Rene E. makes clear that post-Heller the Second Amendment cannot be interpreted to confer a right to an unrestricted Class A license, which permits both concealed carrying and the possession of high-capacity firearms; accordingly, even if it were futile for

_____

[14]The Municipal Defendants confirm that, at least as of July 2008, Hightower had no disqualifying criminal history; the City asserts that "the facts essential to [determine whether or not Hightower has disqualifying drug history] are unavailable at this time."  Mun. Def.'s Statement of Material Facts, D. 40 ¶ 37.

Hightower to reapply for an unrestricted Class A license, such futility would not ripen her Second Amendment claims.  Second, as a matter of fact, the Harrington Declaration does not establish that Hightower would not receive an unrestricted Class A permit if she reapplied, and it certainly does not show that this is a case "where the granting authority has dug in its heels and made it transparently clear that the permit, application or no, will not be forthcoming."  Gilbert, 932 F.2d at 61.  Finally, and most importantly, the statement in the Harrington Declaration upon which Hightower focuses in no way suggests that it would be futile for her to apply for any type of restricted permit that would clearly fall within the protections of the Second Amendment, which the question upon which the futility analysis turns.  Again, record evidence suggests, and Hightower herself concedes, that such an application is likely to be granted.  Pl. Statement of Material Facts, D. 30 ¶¶ 36-37.

Having rejected the application of the futility exception here, the Court turns to the two prongs of the ripeness analysis:  fitness for review and hardship.

When determining fitness, "the critical question . . . is whether the claim involves uncertain and contingent events that may not occur as anticipated or may not occur at all."  Ernst & Young, 45 F.3d at 536 (quoting Mass. Ass'n of Afro-Am. Police, Inc v. Boston Police Dep't, 973 F.2d 18, 20 (1st Cir. 1992) (per curiam)).  Here, the Second Amendment issues Hightower raises are not yet fit for review.  First, as discussed at length above, it is not clear that the Massachusetts statutory scheme, either on its face or as applied by the Municipal Defendants, would prevent or infringe on Hightower's ability to acquire a license to carry so limited or restricted as to come within the ambit of the Second Amendment.  Second, in order to deny such a license - indeed, to deny any type of license to carry - the licensing authority must "notify the applicant of the reason for such denial in

writing."  Mass. Gen. L. c. 140, § 131(e).  The Second Amendment questions raised by Hightower would be more fit for review once the Municipal Defendants have not only trenched upon Hightower's Second Amendment rights (and they have not yet done so by revoking her <u>unrestricted</u> Class A license) but also once they have provided its reasons for doing so, subjecting those reasons for judicial review.  At this point, the Court need not and will not surmise if, let alone why, the Municipal Defendants would pursue such a course of conduct in the future.  The Court does note, however, that the reason that the BPD Commissioner <u>has</u> provided for his decision to revoke Hightower's unrestricted Class A license - that she "completed the application form [G 13-S] untruthfully," Exh. C to the Hightower Decl., D. 28-4 (revocation letter) - would <u>not</u> apply to any such future course of conduct, because Hightower has retired from her position as a sworn BPD officer and thus any future application she files will not include a Form G 13-S.

As to hardship, the issue of "whether the sought-after declaration would be of practical assistance in putting the underlying controversy to rest," <u>Verizon New England</u>, 2011 WL 2568008, at *9 (quoting <u>State of R.I. v. Narragansett Indian Tribe</u>, 19 F.3d 685 (1st Cir. 1994)), tips somewhat in Hightower's favor.  The Defendants do not dispute that the order Hightower seeks, which would not only enjoin the Defendants from continuing their current method of enforcing Mass. Gen. L. c. 140, § 131 but also compel them to restore Hightower's unrestricted Class A license and return her handgun, Am. Compl., D. 3 at 12, would resolve the dispute between Hightower and the Commonwealth.  The Court notes, however, that the gravamen of the hardship here does not turn solely on Hightower's Second Amendment claims, since the relief she seeks includes the return of her unrestricted license, <u>id.</u>, and not the issuance of a new license tailored to the limits of the Second Amendment.

Because Hightower's Second Amendment claims are not fit for review at this time, and because the hardship inquiry here is not so unequivocal as to compel the Court to reach those claims, the Court agrees with the Commonwealth's argument that Hightower's Second Amendment claims are unripe.[15]

### B.  Evaluation of Hightower's Ripe Claims

#### 1.  Claim I:  Violation of the Individual Right to Keep and Bear Arms

Hightower bases her first claim on both the Second and Fourteenth Amendments, but it is the Second Amendment that provides the sole source of the right to keep and bear arms; the Fourteenth Amendment merely incorporates that right against the states.  McDonald, 130 S.Ct. at 3050.  Accordingly, in the absence of a ripe Second Amendment basis, there is no independent legal

---

[15]The Municipal Defendants argue not only that Hightower's Second Amendment claims are unripe (as the Commonwealth does), but also that Hightower lacks standing entirely.  Mun. Def. Memo, D. 41 at 15-23.  Their argument rests primarily on their position that McDonald's holding that the Second Amendment is incorporated against the states cannot be applied retroactively and thus the Defendants cannot be held liable for their revocation of Hightower's unrestricted Class A license, which took place roughly a year before the Supreme Court decided McDonald.  Id.

The Court rejects this argument since it is well settled that "[i]f a new rule is applied to the parties in the rule-creating case, then it must be applied retroactively to similarly situated parties in all pending cases."  Crowe v. Bolduc, 365 F.3d 86, 93 (1st Cir. 2004) (citing Harper v. Dep't of Taxation, 509 U.S. 86, 97 (1993)).  Chicago, the defendant in the original action underlying McDonald, repealed the city code at issue in McDonald, mooting the Supreme Court's remand, see Pl. Opp. Memo, D. 43 at 18, but there was no reason to question that any subsequent proceedings would apply the holding in McDonald to the parties in that case.  See, e.g., Exh. H to Pl. Opp. Memo., D. 43-3 at 2 (Testimony of Chicago Corporation Counsel Mara Georges to the City of Chicago Comm. on Police and Fire on June 18, 2010); Exh. I to Pl. Opp. Memo, D. 43-4 at 3 (Georges Testimony to the City of Chicago Comm. on Police and Fire on June 29, 2010).  Because the McDonald court intended the rule in McDonald to be applied to the parties in McDonald, McDonald must be applied retroactively.  Crowe, 365 F.3d at 93.

basis for Hightower's first claim.

### 2.  Claim II:  Violation of Procedural Due Process

"The basic guarantee of procedural due process is that, 'before a significant deprivation of liberty or property takes place at the state's hands, the affected individual must be forewarned and afforded an opportunity to be heard at a meaningful time and in a meaningful manner.'" González-Droz v. González-Colón, 2011 WL 4346673, at *8 (1st Cir. Sept. 16, 2011) (quoting Amsden v. Moran, 904 F.2d 748, 753 (1st Cir. 1990) (quotations and citations in Amsden omitted)). Accordingly, to establish a procedural due process violation, a plaintiff "must identify a protected liberty or property interest and allege that the defendants, acting under color of state law, deprived [her] of that interest without constitutionally adequate process." Id. (quoting Aponte-Torres v. Univ. of P.R., 445 F.3d 50, 56 (1st Cir. 2006)).  "No rigid taxonomy exists for evaluating the adequacy of state procedures in a given case; rather, 'due process is flexible and calls for such procedural protections as the particular situation demands.'" Id. (quoting Morrissey v. Brewer, 408 U.S. 471, 481 (1972)).

Hightower asserts that she has a property interest in her revoked unrestricted Class A license. To establish a property interest in a government-conferred benefit such as a license, a plaintiff must demonstrate "a legitimate claim of entitlement" under state law to the benefit.  Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 577 (1972).  The Commonwealth does not dispute that Hightower has a property interest in her license.  Def. Commonwealth's Memo, D. 36 at 19-21.  Interestingly, the Municipal Defendants argue that given the scope of the BPD Commissioner's discretion to issue and revoke firearms licenses, Hightower cannot reasonably consider herself entitled to her license.  Mun. Def. Memo, D. 41 at 36-39.  But the statutory scheme does not invest local licensing

authorities with "unbridled discretion"; it instead requires the authority to disqualify any applicant who falls within certain categories, Mass. Gen. L. c. 140, § 131(d)(i)-(vii), permits the authority to issue a license to anyone outside those categories only if the applicant is "suitable," Id. at § 131(d), and requires the authority to submit a written statement of reasons, subject to judicial review, to any applicant who is denied a license. Id. at § 131(e)-(f). In any event, the Court sees no reason to depart from the holding in Medina v. Rudman, 545 F.2d 244 (1st Cir. 1976) - the case the Municipal Defendants cite as the primary support for their argument with regard to the import of the BPD Commissioner's discretion, see Mun. Def. Memo, D. 41 at 36-37 - that "[d]oubtless once a license, or the equivalent, is granted, a right or status recognized under state law would come into being, and the revocation of the notice would require notice and hearing as" required by due process. Medina, 545 F.2d at 250.[16]

Having established Hightower's interest in her unrestricted Class A license, the next question is whether the Defendants provided Hightower with constitutionally adequate process when revoking her unrestricted Class A license. The constitutional adequacy of any process offered by the government is evaluated under the three-factor test set out in Mathews v. Eldridge, 424 U.S. 319 (1976), which requires courts to consider: "[f]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." Mathews, 424 U.S. at 335.

---

[16]Hightower also asserts that she has a Fourteenth Amendment liberty interest in her unrestricted Class A license through the Fourteenth Amendment's incorporation of the Second Amendment against the states. Pl. Memo, D. 29 at 21. This position fails in the absence of a ripe Second Amendment basis.

Because "due process is flexible and calls for such procedural protections as the particular situation demands," González-Droz, 2011 WL 4346673, at *8 (quoting Morrissey, 408 U.S. at 481), it is worth reiterating the particulars of Hightower's challenge.  Hightower had her unrestricted Class A license revoked when the BPD Commissioner concluded that she completed her Form G 13-S untruthfully.  The only license applicants who complete a Form G 13-S are sworn BPD officers. The revocation letter the BPD Commissioner sent Hightower instructed her to surrender her license and her firearm without delay "in accordance with M[ass]. G[en]. L. c. 140, § 129D," and apprised her of her right to appeal.  Exh. C to the Hightower Decl., D. 28-4 (revocation letter).  Hightower, however, chose not to appeal.  Against this backdrop, Hightower alleges that the process she was accorded was inadequate because (i) "[t]he Defendants forced Ms. Hightower to turn[] over her handgun without first conducting a hearing of any sort, (ii) the statutory scheme "used by the Defendants to confiscate Ms. Hightower's handgun are inadequate and pose an unacceptable risk of erroneous deprivation," and (iii) "the Defendants lack substantial interest for preventing Ms. Hightower . . . [from] keeping and bearing handguns for the purpose of self-defense."  Am. Compl., D. 3 at ¶¶ 58-60.[17]

Turning to the first of the three Mathews factors - Hightower's interest in her unrestricted Class A license - Hightower asserts that her interest in self-defense gives her a "strong" interest that is "particularly elevated" given that she is a "former police officer who has testified against numerous violent felons."  Pl. Memo, D. 29 at 23.  Even separated from any general right to self-defense inherent in the Second Amendment, which for reasons already discussed are unripe at this

---

[17]Hightower also alleges that the scheme inadequately respects her Second Amendment rights.  Am. Compl., D. 3 at ¶¶ 59, 61.  For the reasons discussed above, these specific allegations are unripe.

point, Hightower's specific general interest in self-defense is not insignificant.  Of course, revoking

Hightower's unrestricted Class A license does not completely erode her interest in self-defense, or

even her more specific interest in using a gun to augment her self-defense; even with her unrestricted

Class A license revoked, Hightower was and is still free to apply for a restricted Class A license, a

Class B license, or a F.I.D. card.  Mass. Gen. L. c. 140, § 131.  Hightower's interest is thus best

described as the added margin of self-defense she would receive from an unrestricted Class A

license over and above the what she would receive from a restricted Class A license.

The risk of erroneous deprivation under the processes challenged by Hightower is low.

Under the statutory scheme, a license to carry applicant should not receive a license if she is either

categorically disqualified or is deemed unsuitable by the licensing authority.  Mass. Gen. L. c. 140,

§ 131(d).  Hightower does not identify a structural problem in the statutory scheme or administrative

process at issue that would lead to systematic error; her only argument is that she herself suffered

an erroneous deprivation because, as she alleges, she completed her Form G 13-S form accurately,

the BPD Commissioner mistakenly concluded otherwise and this mistake could have been avoided

had Hightower received a pre-deprivation hearing.  Pl. Memo, D. 29 at 23-24.  But whether

Hightower's own completed Form G 13-S was in fact accurate is both (i) hotly disputed by the

parties and thus a fact unfit for use in summary judgment and (ii) beside the point.  Amsden v.

Moran, 904 F.2d 748, 753 (1st Cir. 1990) (noting that "[w]hen a procedural due process claim is

advanced, the proper focus must be on the manner in which the state has acted: 'how and when' the

alleged deprivation was effected. . . . Whether the deprivation (e.g., license revocation) was itself

erroneous is beside the procedural due process point") (citations omitted).  Given the record

presently before the Court - including the fact that under the current statutory scheme, roughly 98%

28

of license to carry applications are granted and only 1% are denied on the basis of unsuitability, First Guida Aff., D. 35-6 at ¶ 7 - the risk of erroneously classifying a suitable applicant as unsuitable appears quite low, and it is difficult to fathom what errors of this kind a pre-revocation hearing would prevent that the written application process and course of judicial review under Mass. Gen. L. c. 140, § 131(f) would not.[18]

The government interest here, on the other hand, is high.  The government interest here is preserving public safety by keeping firearms out of the hands of individuals who are not "sufficiently responsible . . . to be entrusted with a license to carry firearms," Wetherbee, 2001 WL 716915, at *7.  The Supreme Court "ha[s] traditionally accorded the states great leeway in adopting summary procedures to protect public health and safety."  Mackey v. Montrym, 443 U.S. 1, 17 (1979) (affirming against a due process challenge a Massachusetts law mandating summary revocation of driver's licenses for refusing breathalyzer test, with opportunity for post-revocation hearing).  The "paramount interest" of a city or state is "protecting the safety of its people," id., and it is beyond dispute that gun violence is a threat to the people of Massachusetts, particularly in Boston.  From January 1, 2005 until March 1, 2011 there were 1,876 shootings in Boston alone, 301 of which were fatal homicides.  Declaration of Boston Regional Intelligence Center Deputy Director / Street Violence Supervisor Clifford Goodband, D. 40-20 at 4.[19]  In the first nine months of 2011, over 80% of Boston's homicides were the result of gun violence.  Map of 2011 Murders in Boston,

---

[18]Hightower objects to the fact that hearsay is admissible in judicial proceedings pursuant to Mass. Gen. L. c. 140, § 131(f).  But "nothing in the due process clause precludes the use of hearsay evidence in administrative proceedings."  Toribio-Chavez v. Holder, 611 F.3d 57, 66 (1st Cir. 2010).

[19]These numbers appear to exclude suicides committed by shooting.  See generally Goodband Decl., D. 40-20.

http://www. boston.com/news/local/massachusetts/2011_murders_in_boston/ (last visited September

29, 2011) (based on information from the BPD, the Suffolk County District Attorney's Office, and

the Boston Globe).  The current statutory scheme as applied by Boston, which allows the BPD

Commissioner to revoke pending appeal the gun and gun license of an individual who appears to

be unsuitable to handle guns - as opposed to a scheme where an individual deemed to be unsuitable

would be allowed to keep their gun pending appeal - is wholly consonant with the state's paramount

interest in public safety and combating gun violence.[20]

In sum, given the scope of Hightower's interest, the limited risk of erroneous deprivation

under the current scheme and the strength of the relevant governmental interest, the statutory scheme

allowing for the revocation of an unrestricted Class A license followed by statutorily-guaranteed

judicial review of that revocation satisfies the constitutional requirement of procedural due process

both on its face and as applied by the Defendants.

### 3.  Claim III:  Violation of Substantive Due Process

The third claim in Hightower's complaint is titled "Unconstitutional Licensing

Requirement," and asserts that "the Defendants have prevented [Hightower] from keeping and

---

[20]The parties in this case appear to be proceeding under the understanding that the
Massachusetts statutory scheme requires that an individual whose license to carry is revoked or
denied must surrender her license and firearm to the local licensing authority in all circumstances
of revocation.  The Court, accordingly, is resolving this case based on that understanding and
that was certainly the case for Hightower, who did not appeal the revocation of her license.  But
see Mass. Gen. L. c. 140, § 129D ("Upon revocation, suspension or denial of an application for a
firearm identification card . . . the person whose application was so revoked, suspended or
denied shall without delay deliver or surrender, to the licensing authority where he resides, all
firearms, rifles, shotguns and machine guns and ammunition which he then possesses unless an
appeal is pending.") (emphasis added); Exh. C to the Hightower Decl., D. 28-4 (revocation
letter) (instructing Hightower to surrender her license and firearm "in accordance with M[ass].
G[en]. L. c. 140, § 129D").  Since Hightower chose not to appeal the revocation of her
unrestricted Class A license, whether immediate surrender of her firearm would have been
required if she had an appeal pending pursuant to § 129D is not before the Court.

bearing handguns for the lawful purpose of self-defense" by requiring her to "maintain her Class A license at their discretion," that "[t]he statutes enforced by the Defendants are unconstitutional as written or as applied," and that "[t]he Defendants currently maintain and actively enforce a set of laws, customs, practices, and policies under the color of state law that deprive individuals, including Ms. Hightower, of their right to keep and bear arms."  Am. Compl., D. 3 at ¶¶ 63-67.  This claim, which initially appeared to be a general as-applied constitutional challenge to the statutory scheme that is somewhat undifferentiated from Hightower's other claims, has been treated in the various briefs filed by both Hightower and the Defendants as a substantive due process challenge to the statutory scheme as applied to Hightower, see Pl. Memo, D. 29 at 25; Def. Commonwealth's Memo, D. 36 at 17-19; Mun. Def. Memo, D. 41 at 39-40; Pl. Opp. Memo, D. 45 at 23-24, and the Court now construes it as such.

"[T]he threshold question" in analyzing a substantive due process claim "is 'whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience."  González-Fuentes v. Molina, 607 F.3d 864, 880 (1st Cir. 2010), cert. denied, 131 S.Ct. 1568 (2011) (quoting Cnty. of Sacramento v. Lewis, 523 U.S. 833, 847 n.8 (1998)).  This "test is primarily concerned with 'violations of personal rights . . . so severe . . . so disproportionate to the need presented, and . . . so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience.'"  Id. at 881 (quoting Moran v. Clarke, 296 F.3d 638, 647 (8th Cir. 2002) (en banc) (ellipses in Moran).  There are no allegations in Hightower's complaint, let alone any evidence in the record, that shocks the contemporary conscience; instead, the main thrust of Hightower's complaint and subsequent briefing is that the Defendants' revocation

of her unrestricted Class A license was arbitrary.  Even if Hightower is correct, though, the "denial of [a] permit, even if arbitrary, d[oes] not constitute a substantive due process violation unless it [i]s a 'truly horrendous situation.'"  Collins v. Nuzzo, 244 F.3d 246, 250 (1st Cir. 2001) (quoting Néstor Colón Medina & Sucesores, Inc. v. Custodio, 964 F.2d 32, 45 (1st Cir. 1992)).  The Court concludes that this is not the case here.

### 4.  Claim IV:  Violation of Equal Protection

Hightower's final claim is that the Defendants have violated her right to equal protection of the laws by classifying her as "unsuitable" to possess an unrestricted Class A license, because "the classification of some individuals as 'suitable' and others as 'unsuitable' is completely arbitrary and irrational."  Pl. Memo, D. 29 at 27.

Although Hightower acknowledges that "[t]he Equal Protection Clause 'is essentially a direction that all person[s] similarly situated should be treated alike,'" id. at 25 (quoting City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985) (citation omitted)), she has neither alleged nor shown that there is a similarly situated person or type of person who has received treatment differently than Hightower has, nor that there is a differently situated person or type of person who has been treated similarly to Hightower.  Instead, her only argument is that she and (presumably) others like her have all been subjected equally to a process Hightower finds arbitrary and unfair.  Pl. Opp. Memo, D. 45 at 18 ("[t]he correct category for Hightower is simply, 'law-abiding Bostonian fully qualified to possess firearms.'  All people in this category should expect to have their applications treated equally.  Yet instead, all are subjected to a classification that is inherently arbitrary, depending upon the unbridled discretion of the licensing official"); Pl. Memo, D. 29 at 27 ("the classification of some individuals as 'suitable' and others as 'unsuitable' is

completely arbitrary and irrational").  However, the equal protection clause protects against unequal treatment, not against the equal application of a statute that a plaintiff finds uncongenial or arbitrary, and, therefore, Hightower's claim fails.

Even if Hightower's fourth claim could be construed as an allegation that the "suitability" standard enshrined in Mass. Gen. L. c. 140, § 131(d) is so empty of meaning that there is no meaningful difference between "suitable" and "unsuitable" applicants for unrestricted Class A licenses, and thus applicants deemed unsuitable, like Hightower, are denied equal application of the laws when they have their licenses denied or revoked while their similarly situated "suitable" peers have their licenses granted, the claim would fail.  Were Hightower to raise a challenge of this sort,[21] the statutory scheme's "suitability" standard would be subjected to rational basis review, since Hightower alleges neither that she is the member of a suspect class nor that the statutory scheme burdens any fundamental right other than her Second Amendment rights (which the Court has found unripe for review at this point).  González-Droz, 2011 WL 4346673, at *4 ("the plaintiff does not allege either that he is a member of a suspect class or that the Regulation infringes a fundamental right.  Consequently, we take the measure of the Regulation under rational basis review").  Under rational basis review, "[t]he general rule is that legislation is presumed to be valid and will be sustained if the classification drawn . . . is rationally related to a legitimate state interest."  Id. (quoting Cleburne Living Ctr., 473 U.S. at 440).  "The challenger has the devoir of persuasion and must negate any and all conceivable bases upon which the challenged regulation might appropriately rest.  If any such ground exists to support the classification employed, the regulation must be upheld

---

[21]For this sort of claim to prevail at the summary judgment stage, Hightower would need to show (rather than merely allege) that there are in fact individuals situated similarly to Hightower who were found "suitable."

even if it is drawn from 'rational speculation unsupported by evidence or empirical data.'" <u>Id.</u> (quoting <u>FCC v. Beach Commc'ns, Inc.</u>, 508 U.S. 307, 315 (1993)) (internal citations removed).

The statutory scheme's "suitability" standard as applied to applicants for unrestricted Class A licenses certainly survives rational basis review.  The paramount general state interest in promoting public safety extends to the state's specific interest preventing guns from falling into the hands of individuals who are deemed to be unsuitable to be entrusted with a license to carry firearms.  It is rational to commit the initial suitability determination to the expertise of each locality's lead public safety officer, subject to judicial review.  The Court understands Hightower's concern that the statutory guidance available to local licensing authorities as to how to apply the suitability standard is imprecise, but the statutory scheme's differentiation between license-to-carry applicants who appear suitable and those who do not is more than merely rational - it is prudent, even if the distinction itself is only raggedly drawn.  Accordingly, the statutory scheme "must be upheld."  <u>González-Droz</u>, 2011 WL 4346673, at *4.

For the aforementioned reasons, the claims in Hightower's complaint cannot be sustained and the Defendants are entitled to summary judgment.

### C.  The Court Would Reach the Same Conclusion Even If Hightower's Second Amendment Claims Were Treated As Ripe

The parties have thoroughly briefed and argued the question of how, assuming Hightower's complaint included ripe Second Amendment concerns, her individual claims should be resolved. <u>See</u> Pl. Memo, D. 29 at 1-28;  Def. Commonwealth's Memo, D. 36 at 9-20; Mun. Def.'s Memo, D. 41 at 16-35; Pl. Opp. Memo, D. 43 at 11-24; Pl. Opp. Memo, D. 45 at 1-20.  Although the Court's holding on ripeness is contrary to such an assumption, "in the interest of completeness," <u>Rosado v. Allen</u>, 482 F.Supp.2d 94, 101 (D. Mass. 2007); <u>Raso v. Lago</u>, 958 F.Supp. 686, 696 (D. Mass.

1997), and assuming no further guidance from the First Circuit or the Supreme Court, the Court notes that the analysis of the individual claims in Hightower's complaint would change in some respects if the Second Amendment questions raised by Hightower's complaint were treated as ripe, but, for the reasons discussed briefly below, the Court would nonetheless still hold that the Defendants are entitled to summary judgment.

### 1.  Claim I:  Violation of the Individual Right to Keep and Bear Arms

First, if the Second Amendment basis underlying Hightower's claims was treated as ripe, the Court's analysis of Hightower's first claim, as set forth as Section IV(B)(i) above, would change. Resolving Hightower's first claim, which is at heart a pure Second Amendment claim, would require subjecting the statutory scheme in question to some sort of "Second Amendment review" - and as the First Circuit has noted, the Supreme Court has not yet provided clear guidance to the lower courts about how to perform such review.  Booker, 644 F.3d at 23 ("[t]he full significance of [the Supreme Court's Second Amendment] pronouncements is far from self-evident.  Indeed, the Court itself acknowledged that it had not left the law 'in a state of utter certainty'") (quoting Heller, 554 U.S. at 635).

The Court gleans the following guidance from Heller, McDonald, and the First Circuit's rulings in Rene E. and Booker applying same:

First, the central component of the Second Amendment is the right to self-defense, especially the defense of hearth and home.  Rene E., 583 F.3d at 11 (citing to Heller, 554 U.S. at 599, 628); Booker, 644 F.3d at 25 n.17 (citing to Heller, 554 U.S. at 635).[22]

---

[22]See United States v. Masciandaro, 638 F.3d 458, 470 (4th Cir. 2011) (describing "self-defense in the home by a law-abiding citizen" as the Second Amendment's "fundamental, core right," and noting that "as we move outside the home, firearm rights have always been more limited, because public safety interests often outweigh individual interests in self-defense").

Second, the Second Amendment permits categorical prohibitions on the possession of certain types of weapons or on the possession of weapons by certain categories of people and does not necessarily require that governments limit themselves to narrower restrictions on Second Amendment rights applied on a case-by-case basis.  Rene E., 583 F.3d at 12 (citing to Heller, 554 U.S. at 626-27 and n.26); Booker, 644 F.3d at 23 (citing to Heller, 554 U.S. at 626).

Third, there are some boundaries as to both what "Second Amendment review" is (and what it is not), and what it will permit (and what it will not permit).  Second Amendment review is not "rational basis review" nor is it "interest balancing."  Rene E., 583 F.3d at 11 n.4 (citing Heller, 554 U.S. at 628 n.27, 634-35).  Whatever Second Amendment review is, it must permit both laws that flatly prohibit the carrying of concealed weapons and laws that flatly prohibit the carrying of dangerous and unusual weapons; these types of laws are "left intact" by both the Second Amendment and Heller.  Rene E., 583 F.3d at 12.  On the other hand, it must not permit a statute that prohibits an entire class of arms that has been overwhelmingly chosen by American society for self-defense.  Id. at 11 (citing Heller, 554 U.S. at 630).  It must not permit a requirement that firearms in the home be kept inoperable - for example, by requiring that guns kept in the home be stored in a disassembled state or fitted with trigger-locks - because such a requirement makes it impossible to use such guns for self-defense in the home.  Booker, 644 F.3d at 22 and 22 n.12 (citing Heller, 554 U.S. at 630).  The development of the content of Second Amendment review beyond these parameters is left for "future evaluation," presumably by district and circuit courts and, ultimately by the Supreme Court.  Id. (citing Heller, 554 U.S. at 626, 634-35).

Fourth, the Second Amendment allows legislatures to adopt new categorical limits on Second Amendment rights, such as prohibiting misdemeanor offenders convicted of domestic violence (as

opposed to felons) from possessing guns.  Booker, 644 F.3d at 25 (citing United States v. Skoien, 614 F.3d 638, 641 (7th Cir. 2010)).  A categorical ban of this sort "must be supported by some form of 'strong showing,' necessitating a substantial relationship between the restriction and an important governmental objective."  Id. (quoting Skoien, 614 F.3d at 641).[23]

Taken together, this guidance provides a rough but incomplete roadmap for the type of review the statutory scheme at issue in this case should be subjected to when analyzing Hightower's Second Amendment claim.

Following the guidance that this Court has been able to discern from Heller and its progeny, and in the absence of any further guidance from the Supreme Court or the First Circuit, this Court's analysis would proceed as follows.  First, the Massachusetts licensing statutory scheme does not strike at the heart of the Second Amendment:  while the difference between a restricted Class A license (which Hightower has not applied for) and an unrestricted Class A license (which Hightower has had revoked) may have some marginal impact on Hightower's ability to use a gun to defend herself outside her home, it has no impact on her ability to defend hearth and home or to defend herself at home, which she can do adequately with a restricted Class A license or Class B license. Further, because the statutory scheme at issue here imposes only case-by-case restrictions, it creates a narrower restraint than the categorical prohibitions that, under certain circumstances, survive Second Amendment review.  Mass. Gen. L. c. 140, § 131(d).

---

[23]See Kachalsky v. Cacace, 2011 WL 3962550, at *25 (S.D.N.Y. Sept. 2, 2011) (citing Booker and the standard applied therein in support of the proposition that "[m]ost circuit courts" to have considered the question "reject a one-size-fits-all framework in favor of a variable approach whereby the level of scrutiny to be applied is determined on a case-by-case basis depending on the proximity of the right burdened by the statute at issue to the core Second Amendment right recognized in Heller") (citing also to Masciandaro, 638 F.3d at 469-71; Ezell v. City of Chicago, 2011 WL 2623511, at *13-17 (7th Cir. July 6, 2011); United States v. Reese, 627 F.3d 792, 801-02 (10th Cir. 2010)).

Because the statutory scheme at issue here is less categorical and imposes less of a burden on the right to protect oneself in one's home than, for example, the prohibition on gun ownership by domestic violence misdemeanor offenders at issue in <u>Booker</u>, it stands to reason that the scheme at issue here might be subject to a slightly less exacting standard than <u>Booker</u>'s 'strong showing' and its requirement of a "substantial relationship between the restriction and an important governmental objective." <u>Booker</u>, 644 F.3d at 25.[24]  What would be a sufficient standard below <u>Booker</u>'s "strong showing" is unclear, but at a minimum, would likely require a meaningful relationship between the restriction and a legitimate governmental objective.  This type of standard is neither rational basis review nor interest balancing, and at first blush it does not seem to compel any of the results forbidden by the Second Amendment as interpreted by <u>Heller</u>, <u>Rene E.</u> or <u>Booker</u>.

It appears that both the statutory scheme at issue and its application to Hightower would survive such review.  Assuming <u>arguendo</u> that Hightower's complaint raised a ripe Second Amendment (as the Court has concluded it has not) and that the appropriate level of analysis would resemble something like the review discussed above, the Court would acknowledge that although Hightower's Second Amendment rights are burdened by the requirement that as part of the process of applying for a unrestricted Class A license she submit herself to a "suitability" determination by the BPD Commissioner, the fact that such a determination could lead to a pre-hearing revocation of her license, and a possible further requirement that she surrender her license and firearm at least until she proceeds with the statutorily-guaranteed appeals process.  But the Court would find that the government has a legitimate interest in protecting public safety, especially in light of the

---

[24]Of course, there may be a much stronger interest in preventing gun possession by domestic violence misdemeanor offenders than in restricting the types of gun possession available to "unsuitable" individuals - but while such interest balancing carries intuitive appeal, it appears to be foreclosed as a mode of analysis by <u>Heller</u>.  <u>Heller</u>, 554 U.S. at 628 n.27.

prevalence of gun violence in Massachusetts and especially in Boston, would find further that this interest extends to an interest in removing, at least temporarily, guns from the hands of individuals initially deemed unsuitable for gun possession, and would find further still that these interests bear a meaningful relationship to the enforcement mechanism requiring local licensing authorities like the BPD Commissioner to determine whether an individual applicant appears unsuitable based on the content of her application materials, subject to judicial review.[25]

Before concluding its analysis of Hightower's first claim, the Court makes one final observation regarding the unusual context of this case, which is essentially a request by Hightower that the federal courts constrict the scope of discretion that the BPD Commissioner exercised in determining in the first instance whether a sworn BPD officer in his employ is suitable to carry a weapon to the extent permitted by an unrestricted Class A license.  Harrington Decl., D. 40-3 at ¶ 10; see also Exh. A to the Hightower Decl., D. 28-2 (Hightower's completed G 13-S Form).  To be sure, sworn police officers have the same Second Amendment rights in the same measure as any civilian, and it is not clear to the Court how the relationship between a sworn officer and her Commissioner should affect Second Amendment analysis.[26]  But given the amount of and sensitivity of information police forces have (and must have) about the sworn officers in their employ, and

---

[25]Because the Court is hesitant to place too much reliance on anything like the less exacting standard than Booker's "strong showing," the Court notes that it would hold that the instant scheme, both on its face and as applied, would also survive the "strong showing" analysis discussed in Booker.  Booker, 644 F.3d at 25.

[26]The Court recognizes that the plaintiff in Heller was a District of Columbia Special Police Officer, Heller, 554 U.S. at 575, but the relationship between Officer Heller and the D.C. Police Department was not an issue in Heller, which addressed only the District's blanket ban on the possession of handguns and its requirement that firearms kept in the home be kept unloaded and disassembled or bound by a trigger lock when not in use, not the individual application of the District's licensing law or the D.C. Police Department's administration thereof, either on its face or as applied to Heller.  Id. at 575, 631.

given the importance of well-run, efficient police forces to the paramount state interest of public safety, Mackey, 443 U.S. at 17, perhaps the federal courts ought to proceed even more deliberately when scrutinizing the discretionary determinations made by local police chiefs as to whether and under what restrictions individual police officers in their employ are suitable to carry firearms. See Plummer v. Town of Somerset, 601 F.Supp.2d 358, 366-67 (D. Mass. 2009) (stating, with regard to a police officer's conduct outside the workplace, that "[a] police department is a highly regimented organization that must, in the interests of morale, efficiency, and public safety, place restrictions on the constitutional rights of its rank-and-file that exceed those permitted with regard to civilian employees"); see also note 4 above (counsel for Municipal Defendants stating that Form G 13-S inquires about matters that are unique to police officers and bear upon the BPD Commissioner's determination of suitability).

### 2. Claims II, II and IV:  Due Process and Equal Protection

Finally, even if the Second Amendment basis underlying Hightower's claims was treated as ripe, the Court would not significantly alter its conclusions with regard to Hightower's procedural due process, substantive due process and equal protection claims.  As to procedural due process, Hightower's interest under the first prong of the Mathews test, 424 U.S. at 335, would carry slightly more gravity assuming her Second Amendment rights were implicated than they would otherwise, but the difference would be marginal - the Court takes Hightower's interest in self-defense seriously regardless of whether it is seen as "constitutionalized" or "extra-constitutional," see Section IV.B.ii above - and the final two prongs of the Court's Mathews analysis, as well as the ultimate outcome of that analysis, would remain the same.  As to the substantive due process claim, the presence of a valid Second Amendment claim would preclude the Court from engaging in a substantive due

process analysis.  Albright v. Oliver, 510 U.S. 266, 273 (1994) (holding that "[w]here a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims'") (quoting Graham v. Connor, 490 U.S. 386, 395 (1989)).  Likewise, the Court would compress Hightower's equal protection claim into her Second Amendment claim.  See Rosenfeld v. Egy, 346 F.3d 11, 15 (1st Cir. 2003) (stating that "we see little basis or justification for applying equal protection analysis" in a situation where an equal protection claims substantially overlaps with a stronger Bill of Rights claim); see also Néstor Colón Medina & Sucesores,, 964 F.2d at 44-45 (same); Nordyke v. King, 644 F.3d 776, 794 (9th Cir. 2011) (rejecting an equal protection claim brought in conjunction with Second Amendment concerns by noting that "although the right to keep and bear arms is a fundamental right, that right is more appropriately analyzed under the Second Amendment") (citation omitted).

Accordingly, for the reasons discussed above, the Court would grant Defendants' motions for summary judgment even if the Second Amendment claim raised by Hightower's complaint was treated as ripe.

## V.  Conclusion

For the reasons discussed above, Hightower's motion for summary judgment is DENIED, and the Defendants' motions for summary judgment are GRANTED.

**So ordered.**

/s/ Denise J. Casper
United States District Judge

41